**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Dana Corporation, et al. | : | Case No. 06-10354 (BRL) |
| | : | (Jointly Administered) |
| Debtors, | : | |

------------------------------------------------------x

JONES DAY
Attorneys for the Debtors and Debtors in Possession
222 East 41st Street
New York, New York 10017
(212) 326-3939
By:     Corinne Ball, Esq.
        Heather Lennox, Esq.
        George T. Manning, Esq.


KRAMER LEVIN NAFTALIS & FRANKEL LLP
Attorneys for the Official Committee of Unsecured Creditors of Dana Corp., *et al.*
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
By:     Thomas Moers Mayer, Esq.
        Matthew J. Williams, Esq.


FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
Attorneys for the Official Equity Committee of Dana Corp., *et al*.
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
By:     Gary Kaplan, Esq.
        Brian Pfeiffer, Esq.


STROOCK & STROOCK & LAVAN LLP
Attorneys for the Ad Hoc Committee of Dana Noteholders
180 Maiden Lane
New York, NY 10038
(212) 806-5400
By:     Kristopher M. Hansen, Esq.
        Shannon Lowry Nagel, Esq.

COHEN, WEISS AND SIMON LLP
Attorneys for UAW and USW
330 West 42nd Street, 25th Floor
New York, New York 10036-6976
(212) 563-4100
By:     Babette A. Ceccotti, Esq.

International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214
(313) 926-5216
By:     Niraj R. Ganatra, Esq.

United Steelworkers
Five Gateway Center
Pittsburgh, Pennsylvania 15222
(412) 562-2546
Attorney for USW
By:     David R. Jury, Esq.


STAHL COWEN CROWLEY LLC
Attorneys for the Official Committee of Non-Union Retirees of Dana Corp. *et al.*
55 West Monroe Street, Suite 1200
Chicago, Illinois 60603
(312) 641-0060
By:     Trent Cornell, Esq.
        Jon D. Cohen, Esq.


OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, NY 10004
(212) 510-0500
By:     Diana Adams, Esq.
        Greg M. Zipes, Esq.
        Andrew Velez-Rivera, Esq.


Before:         Hon. Burton R. Lifland,
                United States Bankruptcy Judge

<u>MEMORANDUM OPINION APPROVING, IN PART, DEBTORS' MOTION FOR
AUTHORIZATION TO ASSUME EMPLOYMENT AGREEMENTS,
FOR APPROVAL OF A LONG TERM INCENTIVE PLAN AND RELATED RELIEF</u>

Before the Court is the motion (the "Executive Compensation Motion") of Dana

Corporation ("Dana" or collectively with its affiliated debtors, the "Debtors"), pursuant

to sections 105(a), 363(b), 365, 502 and 503(c) of title 11 of the United States Code (the

"Bankruptcy Code"), for an order authorizing Debtors' assumption of the prepetition

employment agreements (the "Employment Agreements") of Michael J. Burns, its

President and Chief Executive Officer (the "CEO"), and senior executives of the core

management team (the "Senior Executives"), as modified; allowing certain general

unsecured claims against Debtors' estate under certain circumstances; approving a long-

term performance based incentive plan (the "LTIP") for the CEO and Senior Executives;

and Debtor's Motion for Clarification and Reconsideration, Pursuant to Rules 9023 and

9024 of the Federal Rules of Bankruptcy Procedure, of Order Denying Executive

Compensation Motion (the "Motion to Reconsider").  The Hearing on the Executive

Compensation Motion and the Motion to Reconsider was held on November 21, 2006

(the "Hearing").


This is the Debtors' second effort to obtain approval of an executive compensation

package for the CEO and Senior Executives.  At the first hearing for such approval this

Court found that the executive compensation plan proposed (the "Initial Compensation

Motion") was wanting as an acceptable "incentive" plan.  *See In re Dana Corp.*, 2006

WL 2563458 (Bankr. S.D.N.Y. September 5, 2006) (the "September 5 Order").

Following the September 5 Order denying the Debtors' motion to approve the Initial

Compensation Motion, the Debtors negotiated with the official committee of unsecured

creditors (the "Creditors' Committee") and official committee of equity security holders

(the "Equity Committee") in an effort to reach a consensus on an acceptable

compensation package.  The Debtors assert, and the Committees agree, that the Executive

Compensation Motion currently before this Court is a true incentivizing package for

senior management and is wholly different than the initial proposal.

The Creditors' Committee and the Equity Committee filed statements in support of the

Executive Compensation Motion, but maintained that the Court need not determine the

Motion to Reconsider.  The United States Trustee (the "U.S. Trustee"), the International

Union, United Automobile, Aerospace and Agricultural Implement Workers of America

(the "USW")[1] and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,

Allied Industrial and Service Workers International Union (the "UAW")[2] (collectively

the "Unions"), and the committee of non-union retirees (the "Non-Union Retiree

Committee") oppose both the Executive Compensation Motion and the Motion to

Reconsider.

---

[1] The USW is the exclusive collective bargaining representative of approximately 2,800 active Dana employees who are employed under the terms of collective bargaining agreements (the "CBAs") in effect between Dana and the USW.  In addition, the USW serves as the "authorized representative" under 11 U.S.C. §1114(c) for certain retirees currently receiving retiree health benefits pursuant to the USW CBAs. The USW is the "authorized representative" of the retirees under 11 U.S.C. §1114(c).

[2] The UAW is the exclusive collective bargaining representative of approximately 5,300 active employees of Dana Corporation ("Dana" or "Debtors") who are employed under the terms of CBAs in effect between Dana and the UAW.  In addition, the UAW represents approximately 9,000 retirees currently receiving retiree health benefits pursuant to the UAW CBAs.  The UAW is the "authorized representative" of the retirees under 11 U.S.C. §1114(c).

Generally, courts take a holistic view of and measure acceptability of compensation packages through the prism of several factors including:

- whether the amount of cost or expense is reasonable and in the best interest of the estate;

- whether the services to be provided are likely to enhance a successful reorganization or liquidation of the debtor;

- whether the debtor exercised appropriate business judgment in implementing any application for continuing, resuming, or retaining the executive.

Recognizing the potential limitations of section 503(c) of the Bankruptcy Code as it applies to those employee retention provisions that are essentially "pay to stay" key employee retention programs ("KERPs"), yet viewing compensation packages holistically,[3] a *true* incentive plan may not be constrained by 503(c) limitations. I noted in the September 5 Order that merely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature.

As set forth below, the plan before this Court is substantially watered down and modified from the original employment agreements and from the Initial Compensation Motion. Accordingly, subject to the limitations or conditions set forth herein, the plan before this Court is consistent with section 503(c), is within the fair and reasonable business judgment of the Debtors and thus within the zone of acceptability.

---

[3] Holistic is defined as, "relating to or concerned with wholes or with complete systems rather than with the analysis of, treatment of, or dissection into parts," i.e. the components have an existence other than as the mere sum of their parts. *See* MERRIAM-WEBSTER COLLEGIATE DICTIONARY 553 (Eleventh Ed. July 2003).

**BACKGROUND**

On March 3, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code.  The Debtors are leading suppliers of modules,

systems and components for original equipment manufacturers and service customers in

the light, commercial and off-highway vehicle markets.  The products manufactured and

supplied are used in cars, vans, sport-utility vehicles, light, medium and heavy trucks, and

a wide range of off-highway vehicles.  As disclosed in Dana's Form 10-K filed on April

27, 2006, for the year ended December 31, 2005, the Dana Companies recorded revenue

of more than $8.6 billion and had assets of approximately $7.4 billion and liabilities

totaling $6.8 billion.  As of the Petition Date, the Dana Companies had approximately

44,000 employees.  After the cases were commenced, the U.S. Trustee appointed the

Creditors' Committee, the Equity Committee, and the Non-Union Retiree Committee.


On June 29, 2006, the Debtors filed the Initial Compensation Motion seeking authority to

assume the employment agreements of the CEO and Senior Executives.  Objections to

the Initial Compensation Motion were filed by the U.S. Trustee, the Creditors'

Committee, the Equity Committee, the *Ad Hoc* Noteholders' Committee and the Unions

on the basis that the relief being sought violated section 503(c) of the Bankruptcy Code.

The opposition, while general in form, focused primarily on the benefits proposed for the

CEO.  At the September 5, 2006 hearing, this Court denied the Initial Compensation

Motion, finding that the plan presented to the Court was not an incentive plan, and that it

violated section 503(c).  However, as noted, this Court also opined that incentivizing

plans with *some* components that arguably have a retentive effect do not necessarily

violate section 503(c).  *See* September 5 Order.


## THE MOTION TO RECONSIDER

The Debtors' stated purpose in filing the Motion to Reconsider was to maintain flexibility

while they negotiated with their stakeholders over the terms of a new plan.  The Debtors

have revamped their proposals and a new package is now before the Court.  As such, the

Executive Compensation Motion will be considered - standing alone- on its own merits.

Moreover, as the Initial Compensation Motion was holistically denied by this Court, it

serves no purpose to revisit portions of that plan when the new proposal will be

considered *de novo*.  Accordingly, the Motion to Reconsider is moot.[4]


## EXECUTIVE COMPENSATION MOTION

In addition to base salary and an annual incentive plan (the "AIP"), the Employment

Agreements of the CEO and Senior Executives, as modified, include the following

terms:[5]

---

[4] In their Consolidated Reply to Objections to the Debtors' Motion for Clarification and Reconsideration, the Debtors ask this Court to determine whether the payment of the annual incentive plan to the CEO is ordinary course, which will be addressed *supra*.

[5] The Debtors' Executive Compensation Motion was submitted with a Term Sheet exhibit, containing metrics and interpretive data.   The Term Sheet was submitted at the Hearing as Debtors' Exhibit 38.

PENSION BENEFITS

Dana proposes to assume one hundred percent of the Senior Executives' pension plans
(ranging between $999,000 and $2.7 million) and sixty percent of the CEO's pension
plan (60% of $5.9 million), with the remaining forty percent being allowed as a general
unsecured claim.  Assumption would take place upon emergence from bankruptcy or the
Senior Executives' involuntary termination without cause, and with respect to the CEO,
voluntary termination for good reason.  The pension benefits would only be assumed on
the condition that the salaried and bargaining unit defined benefit pension plans of Dana
employees have not been terminated.

To the extent not assumed, one hundred percent of the pension benefits of CEO and
Senior Executives would be treated as allowed general unsecured claims in their vested
amount as of the Petition Date, with all postpetition accruals and credits allowed as
administrative claims.

SEVERANCE

Should the need arise, the Debtors propose to pay the CEO and Senior Executives
severance in an amount that complies with section 503(c)(2) of the Bankruptcy Code.  To
quell the fears of objecting parties, the Debtors agreed to submit a statement, upon the
termination of the CEO or Senior Executive, detailing a calculation of the severance
payment for which they are eligible, and allow sufficient notice[6] of such payment.

---

[6] A severance payment notice would be served on the U.S. Trustee, the Equity and Creditors' Committees,
the Unions, the Non-Union Retirees' Committee and the *Ad Hoc* Noteholders' Committee.  If no party in

Non-Disclosure Agreement and Pre-Emergence or Post-Emergence Claim

In consideration for the assumption of their Employment Agreements and receipt of payments under the LTIP, the Senior Executives would execute a new non-compete, non-solicitation, non-disclosure and non-disparagement agreement (collectively, the "NDA Agreements") that would prohibit the Senior Executives from accepting a position with a competitor of Dana, disclosing Dana's confidential information to third parties, soliciting any employees of Dana or disparaging Dana for twelve months.

The CEO's Employment Agreement would be modified to include a provision that in the event the CEO is involuntarily terminated without cause or resigned for good reason prior to the Debtors' emergence from chapter 11, the CEO would be prohibited from accepting a position with a competitor of Dana, disclosing Dana's confidential information to third parties, soliciting any employees of Dana or disparaging Dana for six months. The pre-emergence claim (the Pre-Emergence Claim) of the CEO would be an allowed *general unsecured claim* in the amount of $4 million (with recovery limited to $3 million, less any severance actually paid under section 503(c)(2) of the Bankruptcy Code) on account of the CEO's claim relating to damages from termination of the Employment Agreement. The Pre-Emergence Claim would be freely assignable after termination.

---

interest objects within ten days from the date of the severance payment notice, the severance would be paid. If an objection is filed and cannot be resolved consensually, Dana would pay the undisputed amount of severance, if any, but the disputed amount of severance would not be paid absent a further order of the Court approving such payment.

In the event that the CEO is involuntarily terminated without cause or resigns for good

reason *after* Dana's emergence from chapter 11, the CEO would be prohibited from

accepting a position with a competitor of Dana, disclosing Dana's confidential

information to third parties, soliciting any employees of Dana or disparaging Dana for

twelve months (the "Post-Emergence NDA Agreement"). The post-emergence claim (the

"Post-Emergence Claim") of $3 million would be paid ratably over the term of the Post-

Emergence NDA Agreement on account of the CEO's claim for damages under the

Employment Agreement.

In addition to the request to approve the assumption of the Employment Agreements, the

Executive Compensation Motion requests approval of the LTIP. Under the LTIP, the

CEO and Senior Executives[7] would be eligible for a long-term incentive bonus if the

company reaches a certain EBITDAR,[8] and the amount of the incentive payment would

increase if additional, higher EBITDAR benchmarks were reached. In order for the CEO

to qualify for the minimum amount of the LTIP ($3 million), the company must achieve a

2007 EBITDAR of $250 million. The CEO would earn an additional $750,000 for each

$100 million increase in EBITDAR, with a maximum payout of $4.5 million for 2007. In

2007, the first $3 million, if earned, would be paid in cash, with payment deferred to the

post-emergence period, and any additional amounts would be paid in stock of the

reorganized company. In 2008, a similar structure of minimum EBITDAR with

incremental increases applies, but all payments would be made in the form of stock. The

---

[7] The structure of the payments is similar for the CEO and Senior Executives, with the Senior Executives receiving between $355,556 and $497,778 as a base amount and smaller increments.

[8] Earnings Before Interest, Taxes, Depreciation, Amortization and Restructuring Costs.

EBITDAR calculation is reduced, for purposes of the incremental increases only, by

certain percentages for claims in excess of the unsecured claims threshold ($2.850

billion).[9]  In sum, as Debtors' counsel noted at the hearing, if all EBITDAR goals were

reached, over a three year period, the LTIP provides for $11 million payments in total to

the six executives, $5 million of which is in cash, with the remainder in stock.  *See*

Transcript of Hearing, at p 83.  The LTIP is a substantial reduction from the long-term

incentives that were available prepetition to the CEO and Senior Executives prior to the

bankruptcy filing.


In sum, Dana contends that the compensation provided in the Executive Compensation

Motion is necessary and appropriate, and represents a reasonable exercise of the Debtors'

business judgment, pursuant to sections 363, 365 and 502 of the Bankruptcy Code, and

are permissible under section 503(c) of the Bankruptcy Code.  In denying the Initial

Compensation Motion because it violated section 503(c), I specifically expressed concern

about certain aspects of the plan, including: the guaranteed completion bonus, the targets

set for additional bonuses, and payments classified as non-compete payments.  The

Executive Compensation Motion currently before the Court arguably contains some

similar provisions to the previous motion, but as I noted above, I am considering this plan

anew in light of the many modifications, changes and alterations made.  The plan before

the Court today, unlike the previous iteration, has *no guaranteed payments* to the CEO or

Senior Executives other than base salary and is a substantial retreat from the original

proposals.

---

[9]  The effect of this reduction is to prevent the CEO and Senior Executives from benefiting from rejecting
contracts that ultimately result in a higher level of unsecured claims against the estate.

**DISCUSSION**

Senator Edward Kennedy proposed the amendment to section 503 of the Bankruptcy

Code as a last-minute addition to the bill, expressing his concern over the "glaring abuses

of the bankruptcy system by the executives of giant companies like Enron Corp. and

WorldCom Inc. and Polaroid Corporation, who lined their own pockets, but left

thousands of employees and retirees out in the cold." *See* Statement of Senator Edward

Kennedy on the Bankruptcy Bill (March 1, 2005).  Other members of Congress were

concerned that Senator Kennedy's amendment would prevent responsible companies that

needed to retain key employees to reorganize successfully and suggested that section

503(c) of the Bankruptcy Code should only prevent payments to insiders in the event of

fraud, mismanagement, and conduct contributing to the debtor's insolvency.  *See* CONG.

REC. S2341 (Mar. 9, 2005) (statement of Sen. Orrin G. Hatch); CONG. REC. H2050-51

(Apr. 14, 2005) (statement of Rep. Chris Cannon).  The modified language proposed by

Senator Hatch that would have addressed the above concern was never included in the

final bill.[10]  *See* Pub. L. No. 109-8, §331, 119 Stat. 23, 102-03 (April 20, 2005)

("BAPCA"); *see also In re U.S. Airway*s, 329 B.R. 793, 797 (Bankr. E.D. Va. 2005).


Section 503(c) of the BAPCA restricts transfers or payments by debtors to the extent that

such payments are outside the ordinary course.  The predominate focus of the

---

[10] In a letter to Senator Arlen Specter, Chairman, Committee of the Judiciary, the Association of Insolvency
and Restructuring Advisors also expressed its concern that the bill could cause considerable harm to
companies in bankruptcy and suggested that, "there must be a better approach than handcuffing the
judiciary and stakeholders in bankruptcy cases by essentially precluding all KERPs."  *See* Thomas J.
Salerno and Rebecca S. Revich, KERPS, COMP AND BONUS ISSUES UNDER THE NEW CODE,
INCLUDING PENSION BENEFITS AND UNION CONTRACTS, 060907 ABI-CLE 31 (Sept. 2006).

amendments to section 503(c) is on payments made to "insiders" of the debtor(s).

However, section 503(c) was not intended to foreclose a chapter 11 debtor from

*reasonably* compensating employees, including "insiders," for their contribution to the

debtors' reorganization. *In re Nobex Corp.*, 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan.

19, 2006); *see also In re Werner Holding Co., Inc.*, Case No. 06-10578 (Bankr. D. Del.

2006).

Section 503(c)(1) prohibits the allowance and payment of sums to "insiders" "for the

purpose of inducing such person to remain" with the business "absent a finding by the

court based on the evidence in the record" that (1) the payment is "essential" to the

retention of the individual "because the individual has a bona fide job offer from another

business at the same or greater rate of compensation;" and (2) the services of that

individual are "essential to the survival of the debtor's business." The KERP statute also

fixes the measure of acceptable retention bonuses for insiders by linking them to a

multiple of bonuses available to non-management employees.[11] The Debtors are not

moving under section 503(c)(1).

---

[11] As noted by commentators,

> Under this section, a company will now be required to show not only that each key management employee has another offer, but also that they will take the offer absent a KERP. This is nearly an impossible standard to satisfy and would require that each such employee come to court and testify that they have another offer and will leave absent the KERP. Companies working through a chapter 11 reorganization will lose productivity while their key employees are out interviewing for jobs and many of these employees will simply leave. In addition, the amendment will require that the debtor prove that the services of the key employee are "essential to the survival of the business." But, for many chapter 11 companies with good prospects of reorganization, the crucial issue is not merely survival but value creation for their constituents. Even if the company cannot show it will "fail" due to the loss of the employee, successful reorganization usually depends on maximizing the value of the enterprise, which may depend on retention of key managers.

Ellen Hennessey, Marcia Goldstein, Scott E. Cohen, Matthew Weinstein, EMPLOYEE BENEFITS AND EXECUTIVE COMPENSATION PROVISIONS IN THE NEW CONSUMER BANKRUPTCY ACT, SL076 ALI-ABA 1917, 1923 -1924 (March 22-24, 2006 ); *see also* Karen Lee Turner, and Ronald S. Gellert, DANA HITS A ROADBLOCK: WHY POST-BAPCPA LAWS MAY IMPOSE STRICTER

Section 503(c)(2) of the Bankruptcy Code allows severance payments to be made to
insiders only if they are part of a generally applicable program and are less than ten times
the amount of the mean severance pay given to non-management employees. 11 U.S.C. §
503(c)(2). The Second Circuit has defined "severance" as a form of "compensation for
the termination of the employment relation, for reasons other than the displaced
employees' misconduct, primarily to alleviate the consequent need for economic
readjustment but also to recompense him for certain losses attributable to the dismissal."
*Straus-Duparquet, Inc. v. Local Union No. 3, IBEW*, 386 F.2d 649, 651 (2d Cir. 1967).

If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the
payments are permissible under section 503(c)(3), which limits payments made to
management and employees, among others, outside of the ordinary course, unless such
payments are shown to be justified under the facts and circumstances of the chapter 11
case. As one treatise points out, the test in section 503(c)(3) appears to be no more
stringent a test than the one courts must apply in approving any administrative expense
under section 503(b)(1)(A). Any expense must be an actual, necessary cost or expense of
preserving the estate. *4 Colliers on Bankruptcy §503.17[3] (15th ed. 1982).* Accordingly,
section 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not
primarily motivated by retention or in the nature of severance. *See In re Nobex Corp.*,

---

KERP STANDARDS, Andrews Bankruptcy Litigation Reporter, 3 No. 14 ANBKRLR 2 (November 6,
2006) ("the requirement under Subsection (c)(1)(A) nears absurdity where it forces an executive to seek
and obtain a bona fide job offer in order for the debtor to be able to simply match that offer. It raises the
question, Who would ever agree to remain with a sinking ship when a solvent company has made a
competing job offer?").

2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006) (court concluded that section

503(c)(3) was nothing more than a reiteration of the standard under 363 under which

courts had previously authorized transfers outside the ordinary course of business based

on the business judgment of the debtor).

Courts consider the following in determining if the structure of a compensation proposal

and the process for developing the proposal meet the "sound business judgment" test:

- Is there a reasonable relationship between the plan proposed and the results to be
  obtained, i.e., will the key employee stay for as long as it takes for the debtor to
  reorganize or market its assets, or, in the case of a performance incentive, *is the
  plan calculated to achieve the desired performance*? (emphasis added)

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities
  and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it
  discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a
  plan; analyzing which key employees need to be incentivized; what is available;
  what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in
  creating and authorizing the incentive compensation?

*In re The Colad Group, Inc.*, 324 B.R. 208 (W.D.N.Y. 2005); *In re Montgomery Ward

Holding Corp.*, 242 B.R. 147, 154 (D. Del. 1999); *In re Brooklyn Hosp. Center*, 341 B.R.

405 (Bankr. E.D.N.Y. 2006); *In re EaglePicher Holdings, Inc.*, 2005 WL 4030132

(Bankr. S.D.Ohio Aug 26, 2005); *In re Georgetown Steel Co., L.L.C.,* 306 B.R. 549

(Bankr. D.S.C. 2004); *In re Aerovox, Inc.*, 269 B.R. 74, 80-81 (Bankr. D. Mass. 2002); *In re AmericaWest Airlines, Inc.*, 171 B.R. 674, 678 (Bankr. D. Ariz. 1994); *Matter of Interco, Inc.*, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991).

As I observed in the September 5 Order,  "…it may be possible to formulate a compensation package that passes muster under the section 363 business judgment rule or section 503(c) limitations…." *See* September 5 Order.  The Debtors contend that the Executive Compensation Motion before the Court today passes muster.

THE EMPLOYMENT AGREEMENTS

The Unions, Non-Union Retiree Committee and the U.S. Trustee (the "Objecting Parties") object to the assumption of the Employment Agreements on several grounds. First, they argue that the pension benefit is severance pay and is retentive in nature. These pension benefits are essentially the entire retirement package from Dana for the CEO and Senior Executives.  The pension benefits do not vest until the executive has been at Dana for five years, and various interim accruing factors determine the actual amount of the benefits, making this a true pension plan.[12]  The Senior Executives have already earned certain of the pension benefits, with more to be earned in the future, and

---

[12] *See, e.g., Supplee v. Bethlehem Steel Corp.* (In re Bethlehem Steel Corp.), No. 04-CIV-2413, 2006 U.S. Dist. LEXIS 8029, at *7 (S.D.N.Y. Mar. 1, 2006) (holding that a supplemental executive retirement program was not a "severance payment" because the employee's termination, "did not trigger his entitlement to benefits under the program…. Since he had completed five years of management services pre-petition, [the employee] was already entitled to benefits under the program…upon his retirement. His termination merely accelerated the payment of his benefits under the program since he was terminated other than for cause…."); *see also* Executive Benefits: A Survey of Current Trends: 2003 Results, Clark Consulting, (Clark Consulting, North Barrington, IL Jan. 2004) (firms provide pensions to executives mainly through nonqualified supplemental executive retirement plans (SERPs), the key benefits being the supplemental retirement income that they provide and the survivor benefit in case of the executive's premature death).

the assumption of such benefits does not increase the amount of pension benefits to which they are currently entitled. Moreover, such assumption is not contingent upon any Senior Executive continuing to be employed by Dana for any particular period of time after assumption. To the extent these conditions have any retentive impact, it is merely incidental to the terms of the pension plans and are ordinary and customary in such plans.

Richard Priory, the Chairman of the Compensation Committee at Dana, testified[13] that the CEO and Senior Executives gave up retirement plans at their former employers with the expectation that similar benefits would be provided by Dana. *See* Transcript of Hearing, at p 15. The pension benefits would be assumed as part of the Employee Agreement, which originally provided for more lucrative pension benefits for the CEO.[14] Additionally, the assumption of the CEO and Senior Executives' pension plans is expressly tied to the non-termination of Dana's salaried and bargained unit defined benefit pension plans, which ensures parity of treatment of the pensions of the CEO[15] and Senior Executives and Dana's other employees. The pension benefits, therefore, are not retentive in nature and are not severance, rather they are customary pension plans and their assumption is subject to the Debtors' business judgment.

Second, the Objecting Parties contend that the Pre-Emergence Claim and Post-Emergence Claim violate section 503(c). The Pre-Emergence Claim is a general

---

[13] Testimony was offered by proffer during the Hearing, subject to cross-examination.

[14] Mr. Priory testified that the CEO had pension benefits with GM, his former employer of 30 years, that amounted to just less than $10 million when he left GM and went to Dana. *See* Transcript of Hearing, at p 15.

[15] Only if Dana's other employees receive their full pension benefits will the CEO be eligible to receive sixty percent of his pension benefits, with the remaining forty percent being allowed as a general unsecured claim.

unsecured claim.  Section 503(c) of the Bankruptcy Code, which on its face only limits the allowance and payment of *administrative* claims, is not violated.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989)) ("where the statute's language is plain the sole function of the courts, at least where the disposition of the statute's text is not absurd, is to enforce the statute according to its terms").  The U.S. Trustee suggests that Congress meant to prevent debtors from providing *any* sort of compensation to executives of debtors in possession that might in any way be construed as retentive, however the language of section 503(c) is clear and unambiguous that *only administrative claims* are subject to section 503(c) restrictions.

The Post-Emergence Claim would be earned only if the CEO continues to comply with the terms of the agreement after dismissal (and not merely upon dismissal).  Debtors point out that the payment is not for the loss of employment, but rather it is to compensate the employee for losses attributable to foregoing post-termination opportunities that if accepted, could result in direct detriment of Dana.[16]  *See Straus-Duparquet, Inc. v. Local Union No. 3, IBEW*, 386 F.2d 649, 651 (2d Cir. 1967).

---

[16] Mr. Stenger testified that one of the driving forces behind the company securing the non-compete, non-disclosure and non-disparagement provisions was, "that if any of these senior managers left the company that they would be tied up in a non compete so that the knowledge they acquired about Dana could not be used by the competitors."  Transcript of the Hearing, at p 21.  Apparently, this is a common concern among employers.  *See i.e.* Stewart J. Schwab, Randall S. Thomas, *An Empirical Analysis of CEO Employment Contracts: What Do Top Executives Bargain For?* 63 WASH. & LEE L. REV. 231, 254 (Winter 2006) ("One of the major issues in a CEO contract is whether the CEO can continue working in the industry after leaving the particular company.  From the company's perspective, it does not want a CEO to learn its strengths and weaknesses and then go to work for a competitor and exploit that inside knowledge.").

Dana contends that the $3 million post-emergence payment to the CEO is permissible because it would be paid only after the Debtors emerge from chapter 11 and therefore the Debtors will no longer be constrained by section 503(c).  However, to the extent that the $3 million payment is subject to further review and must be passed upon as a provision in a disclosure statement and plan of reorganization, the Court cannot, at this early point in the cases, guarantee that the payment will be ultimately approved.

The Board believes that given the CEO and Senior Executives' extensive knowledge of Dana's operations, customers and strategies, the continuing presence of the CEO and Senior Executives is crucial for the Debtors' operations and challenges of restructuring. The Board came to the conclusion that this CEO and the Senior Executive team that he had assembled was the "right team" to run the company.  *See* Transcript of Hearing, at p 20.

At the Hearing, Mr. Priory, testified that the Compensation Committee, with advice from Dana's outside expert on executive compensation, Mercer Human Resources Consulting, and the Compensation Committee's own independent compensation consultant, Frederic W. Cook & Co., Inc., worked to determine the appropriate level of compensation for the CEO and Senior Executives after the Petition Date.  Mr. Priory noted, "[b]y the time Mr. Burns went through the process of having his compensation stripped away Mr. Burns was not only below mean, but way below the median."  *See* Transcript of Hearing, at p 21-22. After the Initial Compensation Motion was denied by this Court, the team went back to the drawing board, and included the Creditors' Committee and Equity Committee in its

deliberations.  Together, they devised the Executive Compensation Motion before the Court today.  *See* Transcript of Hearing, at p 19-20.[17]

This uncontroverted evidence supports the Debtors' contention that they exercised fair and reasonable business judgment in determining to assume the Employment Agreements of the CEO and Senior Executives.

THE AIP (ANNUAL INCENTIVE PLAN)

The 2006 Annual Incentive Plan (the "AIP"), is a refinement of the 2005 short-term incentive program, reflecting current business conditions and a reduction in the number of participants, and is similar to Dana's previous short-term incentive programs.[18]  Dana contends that the continuance of the AIP is a transaction in the ordinary course of business for which no court approval is needed, and contends that no approval was sought.[19]  The parties opposing the Debtors' motion contend that the AIP is not in the ordinary course and that it was restructured just before the Petition Date.  Dana's Board of Directors authorized the bonuses payable under the AIP on February 28, 2006; in the same timeframe the AIP is typically authorized.  The AIP, like its predecessor programs,

---

[17]  Mr. Priory also testified, "[the board members] have confirmed that while this is less than they believe is fair compensation for these individuals given the circumstances, if it's acceptable to the individuals, Mr. Burns for example, they are prepared to go forward and we believe it incents each of these individuals to drive for emergence and incents each of these individuals to achieve what has been the target set by this company to get through this process."  *See* Transcript of Hearing, at p 23.

[18] For over 50 years, prior to 2005, Dana utilized annual short-term incentive plans under which employees would receive incentive payments if they met certain performance goals established at the beginning of the year.  In 2005, as part of Dana's ongoing efforts to focus its leadership on critical performance measurements, the approximately 2,000 Dana employees participating in short-term incentive programs throughout Dana, were consolidated under one Dana-wide incentive program.  No bonuses were paid under the 2005 short-term incentive program because the incentive targets for that year were *not attained*.

[19] In August 2006, during the pendency of the Executive Compensation Motion, Dana made semi-annual AIP payments to all Senior Executives (except the CEO), and also to eligible employees.

provides short-term performance-based incentives to hundreds of key employees of Dana

and its subsidiaries for 2006, including the Senior Executives and CEO.  *See* Form 8-K,

filed March 6, 2006; *see also* Transcript of Hearing, at p 17.


The Bankruptcy Code is designed to allow a debtor-in-possession the flexibility to

engage in ordinary transactions without unneeded oversight by creditors or the court,

while at the same time giving creditors an opportunity to contest those transactions that

are not ordinary.  *See In re Crystal Apparel, Inc*., 207 B.R. 406, 409 (S.D.N.Y. 1997)

(*citing In re Roth American, Inc.,* 975 F.2d 949, 952 (3d Cir. 1992)).  This balance

between allowing businesses to continue their daily operations on the one hand, and

protecting creditors from squandering the estate's assets on the other, is reflected in

section 363(c)(1) of the Bankruptcy Code:

> If the business of the debtor is authorized to be operated under ... this title and
> unless the court orders otherwise, the trustee may enter into transactions ...   in the
> ordinary course of business, without notice or a hearing, and may use property of
> the estate in the ordinary course of business without notice or a hearing.

*Id. citing* 11 U.S.C. § 363(c)(1).  The Bankruptcy Code does not provide guidance as to

whether a particular transaction was conducted "in the ordinary course of business" but

courts have applied a two-step "horizontal and vertical test" that considers the

reasonableness of the transaction from an industry-wide perspective and from the

viewpoint of a creditor:

> The inquiry deemed horizontal is whether, from an industry-wide perspective, the
> transaction is of the sort commonly undertaken by companies in that industry. The
> inquiry deemed vertical analyzes the transactions 'from the vantage point of a
> hypothetical creditor and [the inquiry is] whether the transaction subjects a

creditor to economic risk of a nature different from those he accepted when he decided to extend credit.

*In re Crystal Apparel, Inc*., 207 B.R. at 409 (citations omitted). *See also In re Dant & Russell, Inc.,* 853 F.2d 700, 704-05 (9th Cir.1988); *In re Drexel Burnham Lambert Group, Inc.,* 157 B.R. 532, 537 (S.D.N.Y.1993); *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616-19 (Bankr. S.D.N.Y. 1986) (This Court examined the horizontal and vertical tests for ordinary course transactions in depth and stating that, "[o]nly extraordinary transactions which are 'different from those that might be expected to take place,' need be brought to the attention of creditors and other interested parties to allow them to voice any objections to the debtor's proposals").

The Objecting Parties argue that the AIP is not ordinary course and should not be approved, citing the order in *In re Delphi Corp.*, Case No. 05-44481 (RDD) (July 21, 2006) (the "Delphi Order"), in support of that contention.  In *Delphi* however, the annual incentive plan was only one part of a Key Employee Compensation Plan for which Delphi sought approval and was developed by the debtors specifically for postpetition implementation.  The AIP component of the Delphi plan was, "developed in order to encourage participants to increase the [d]ebtors' enterprise value, and thus increase value and returns for all stakeholders during the debtors' chapter 11 cases" and was different than the incentive plan in place prepetition. *See In re Delphi Corp.*, Case No. 05-44481, ECF # 13, Motion for an Order under 11 U.S.C. §§ 105(a) and 363(b)(1) Authorizing the Debtors to Implement a Key Employee Compensation Program, dated October 8, 2005.

In contrast, a short-term incentive plan has been a common component of compensation

plans at Dana for the past fifty years and does not differ significantly from Dana's

prepetition practice.  Accordingly, it is within the ordinary course of Debtors' business.

*See i.e., In re American Plumbing & Mechanical, Inc.* 323 B.R. 442 (Bankr. W.D. Tex.

2005) (incentive bonus program deemed ordinary course although bonus payments not

entitled to administrative priority).  However, the payments to be made under the AIP to

the Executives must be considered in the context of determining whether the overall

compensation proposal is a proper exercise of Debtors' business judgment.[20]


THE LTIP

The LTIP requires that the company reach certain EBITDAR benchmarks before the

CEO and Senior Executives will be eligible for any payment under the long-term

incentive plan.  This aspect of the bonus is a significant change from the terms of the

doomed Initial Compensation Motion, where Debtors' sought approval of a completion

bonus, awarded upon emergence from chapter 11 and a separate bonus based on total

enterprise value of the company upon emergence, with a bonus being awarded even if the

total enterprise value of the company declined by the time the company emerged.  The

---

[20] Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a).  A court may approve motions to assume, assume and assign or reject executory contracts upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993).  Section 363(b) provides, in relevant part, that a debtor-in-possession "after notice and a hearing, may use…other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Under applicable case law, in this and other circuits, courts should authorize business transactions outside the ordinary course of business if the Debtors have exercised sound business judgment. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  *See also*, discussion on section 503(c)(3), *supra*.

Debtors assert that the proposed EBITDAR minimum benchmarks will require management to "stretch" in order to achieve superior operating results for the Debtors, particularly in the difficult and rapidly deteriorating auto industry. The Objecting Parties argue that EBITDAR required over the first six months of 2006 indicates that the 2007 EBITDAR for the CEO and Senior Executives to be paid their minimum LTIP is "virtually guaranteed." Based upon the uncontroverted evidence at the hearing, however, achievement of the EBITDAR benchmarks is uncertain, at best.

Ted Stenger, a managing director at Alix Partners and the Debtors' Chief Restructuring Officer, testified that although, as of September 30, 2006, the Debtors had reached an EBITDAR of $235 million, the remainder of the year would finish at about that level. Mr. Stenger explained that the first half of the year resulted in $175 million EBITDAR with the second half only expected to add only $750,000 due to a significant decline in sales. Much of the Debtors' negative performance is due to the state of the automotive industry in general, [21] the increasing cost of materials,[22] and Dana's dependency on Ford, General Motors and Daimler-Chrysler (the "Detroit 3") which have recently instituted

---

[21] The dire state of the auto industry has been reported by Debtors' counsel at hearings throughout these cases and in the press.  *See i.e.* Thomas Content, *Suppliers Must Think Globally, Leaders Say Many in Auto Parts Industry are Struggling*, MILWAUKEE JOURNAL SENTINEL, Aug. 9, 2006, at D1 ("'The past 18 months in the automotive supply world has been particularly painful and challenging.  Much of our industry went into a 'hunker-down' mode, and in many cases, companies placed well-thought-out strategies on hold while they fought for survival,' said Tom Amato, an executive vice president of Metaldyne Corp., a supplier based in Plymouth, Mich."); *Dana Has New Cuts in Mind to Save $540 Million,* ST. LOUIS POST DISPATCH, November 10, 2006, at B2 ("Dana is among the auto parts manufacturers hit hard by U.S. auto industry's financial woes. Other manufacturers in Chapter 11 bankruptcy are Delphi Corp., Tower Automotive Inc., Collins & Aikman Corp. and Dura Automotive Systems Inc.").

[22] Mr. Stenger testified that the cost of aluminum, nickel, stainless steel, copper and brass are increasing. *See* Transcript of Hearing, at p 32.

unprecedented cutbacks.[23]  Specifically with respect to Dana's automotive systems group, which manufactures parts for pick-up trucks and SUVs, Dana has suffered severe losses and anticipates a $750 million decline in sales of light trucks in 2007.  In addition, Mr. Stenger noted that due to pre-buying of medium and heavy-duty trucks in 2006 in advance of changes in regulatory emissions standards that will take effect in the United States in the beginning of 2007, the Debtors anticipate decreases of approximately 47% in North American heavy-duty truck build and 19% in medium-duty truck build, compared to 2006.  This reduction will have a significant adverse impact on the Debtors, reducing their sales in these markets by an estimated $500 million in 2007.  Mr. Stenger stated that although the Debtors are planning major cost cutting initiatives, the benefits depend upon the speed at which the Debtors can institute those measures, and some involve negotiations with third parties and are therefore unpredictable.  *See* Transcript of Hearing, at 30-31.

---

[23] As noted by the press, "The big hit will come in the fourth quarter, when Ford will periodically idle workers at 10 U.S. and Canadian plants as it slashes pickup truck and sport utility vehicle production by 28%.  Soaring fuel prices have hit hard at Ford and its Big Three rivals General Motors Corp. and Chrysler Group, all heavily dependent on trucks, as buyers have begun shifting to smaller, lighter and more fuel-efficient cars and car-based crossover vehicles.  'The short-term ramifications will be ugly…. The sharp decline in production volumes will make it more difficult to see any signs of a turnaround at Ford,' said Craig Hutson, an auto industry bond analyst at Gimme Credit."  John O'Dell, *Ford to Make Fewer Vehicles*, LOS ANGELES TIMES, Aug. 19, 2006, at Business.  "The slowdown [in production by Ford] represented the deepest production cuts since the industry's crisis of the 1980's.  It also underscored the difficulty that Detroit, whose business relies on sales of sport utility vehicles and pickup trucks, is having as gas prices remain around $3 a gallon.  Detroit's market share has dropped to its lowest level in history. . ."  Micheline Maynard, *Ford is Slashing Production 20% for 4th Quarter*, NEW YORK TIMES, Aug. 19, 2006, at A1.  "In another indication of the industry's struggles, DaimlerChrysler said Friday that its Chrysler Group would lose twice as much money in the third quarter as previously estimated and said the unit would cut production in the third and fourth quarters to reduce dealer inventories."  Martin Zimmerman, *Ford, in Tailspin, Speeds Cutbacks*, LOS ANGELES TIMES, Sept. 16, 2006, at Main News.  "'My biggest thing I worry about on a day-to-day basis is who's going to go bankrupt next,' said James Applegate, president of a supply chain solutions with the logistics firm National Logistics Management."  Thomas Content, *Suppliers Must Think Globally, Leaders Say Many in Auto Parts Industry are Struggling*, MILWAUKEE JOURNAL SENTINEL, Aug. 9, 2006, at D1.

Due to these factors, among others, Mr. Stenger expects 2007-2008 EBITDAR levels will not reach the 2006 number. *See* Transcript of Hearing, at 27-30. When pressed on cross-examination, Mr. Stenger opined that the pro forma EBITDAR for 2007 is $210 million. *See* Transcript of Hearing, at p 42. As such, the benchmarks for the LTIP are difficult targets to reach and are clearly not "lay-ups."[24] In sum, the LTIP is not a KERP, but is a program designed to incentivize the CEO and Senior Executives, and may be assumed by the Debtors if it is a fair and reasonable exercise of business judgment.

Returning to the holistic approach discussed earlier, in order to determine the reasonableness and cost effectiveness of the compensation levels, one must consider the total compensation that could potentially be earned by the CEO[25] and Senior Executives during the chapter 11 proceedings. The information before this Court indicates that the only compensation to be earned by the CEO and Senior Executives in 2006 is their salary[26] and the potential for AIP payments of up to $2 million for the CEO and between $336,000 to $528,000 for the Senior Executives. The 2007 compensation packages, however, include salary, an AIP and a LTIP. In 2007, when the CEO and Senior

---

[24] In the hearing on the Initial Compensation Motion, the Creditors' Committee suggested that the levels set for the incentive program were a "lay up" (a cinch to achieve, a softball). At the Hearing on November 21, 2006, the Creditors' Committee, in support of the Executive Compensation Motion pointed out that the terms of the LTIP were no longer a lay up and in fact truly incentivizing.

[25] Mr. Priory indicated in his testimony at the Hearing that the CEO's incentive package was devised to replace the package provided under this initial, pre-bankruptcy, employment agreement, which included a significant amount of now devalued Dana stock in lieu of cash – a risk the CEO assumed without a backstop guarantee and without a legitimate expectation of being made whole, dollar for dollar, post-petition.

[26] The CEO's 2006 salary is $1,552,500 and the Senior Executives' 2006 salaries range from $500,000 to $600,000.

Executives are eligible for significant long-term incentive bonuses,[27] they may also be eligible for AIPs of up to 200% of the their salary.[28]

Looking at the packages through the previously identified prism of whether the cost or expense is reasonable and in the best interests of the estate, the present record is not sufficiently transparent to support an affirmative finding. The Debtors have made a record supporting the reasonableness and cost effectiveness of providing a base salary and LTIP for 2007. However, if *augmented* by an AIP bonus, the potential compensation earned for services during the course of the pre-confirmation period (2007, *et. seq.*) is not transparent from this record and may well be outside the realm of reasonableness, disproportionate and overly generous.[29] Although this Court has considered the "no guarantee" aspect of the package and the different timing of the long-term versus the short-term payments, the inclusion of both incentive programs in 2007 and 2008, in their current form, may not accomplish the "sharing the pain" objective.[30]

---

[27] In the case of the CEO, the 2007 LTIP bonus, if earned is between approximately 200% of his salary and 300% of his salary.

[28] In SEC papers filed by the Debtors, they indicate that the CEO would potentially be eligible for AIP bonuses of up to 200% of his salary. The range for the Senior Executives, however, is unclear. It may be between 80% and 120% of their salaries, however the document also states generally that 200% of salary is available for superior performance. No metrics are available for the 2007 AIP.

[29] Specifically, the CEO's incentive bonuses for 2007 could potentially be several multiples of his salary.

[30] Notably, the CEO, with curious timing, issued a letter to employees and former employees of Dana in the days after this Executive Compensation Motion was filed. The letter indicated that the Debtors, in order to accomplish a successful restructuring, would have to close plants, terminate employees, modify collective bargaining agreements and potentially terminate retiree benefits. The CEO noted that the initiatives outlined in the letter "involve sacrifices by all Dana stakeholders." The Debtors repeatedly referred to the diminished executive compensation package as a way to share the sacrifice with others involved in the cases.

This Court is inclined to approve the LTIP provided that an appropriate yearly ceiling is placed on each of the CEO and Senior Executives' total compensation earned during the reorganization period.

## WAIVER OF THE STAY

Debtors have requested that the Court waive the ten-day stay otherwise operable pursuant to Bankruptcy Rule 6004(h), on the grounds that they have articulated sound business reasons for the new proposal, and because of "significant uncertainty" relating to the CEO and Senior Executives' compensation since the Initial Compensation Motion was proposed.

Bankruptcy Rule 6004(h) is intended to provide sufficient time for an objecting party to seek a stay pending appeal before an order can be implemented, and protect the objector's appellate rights. *In re Quanalyze Oil & Gas Corp.*, 250 B.R. 83, 88 (Bankr. W.D. Tex. 2000) (*citing* Advisory Committee Note (1999), FED. R. BANKR. P. 6004 (Norton Bankr. Rules Pamphl. 1999-2000 Edition -- page 325)). No specific exigencies sufficient to support the Debtors' request have been demonstrated.

## <u>CONCLUSION</u>

By presenting an executive compensation package that properly incentivizes the CEO and Senior Executives to produce and increase the value of the estate, the Debtors have established that section 503(c)(1) does not apply to the Executive Compensation Motion. Additionally, the Debtors have satisfactorily established that none of the payments

proposed violate section 503(c)(2), as the Executive Compensation Motion specifically

limits "severance" payments to those permissible under section 503(c)(2) and any other

payments are non-severance in nature.


With the exceptions noted herein, pursuant to sections 503(c)(3), 363(b) and 365, the

Debtors have presented this Court with unconverted evidence that the assumption of the

Employment Agreements and the adoption of the LTIP is fair and reasonable and well

within the Debtors' business judgment.  Accordingly, the Executive Compensation

Motion is granted, conditioned on the submission of an order including an appropriate

ceiling or cap on the total level of yearly compensation to be earned by the CEO and

Senior Executives during the course of the bankruptcy proceedings.


SETTLE AN ORDER[31] CONSISTENT WITH THIS OPINION THAT PROVIDES FOR

A CEILING AS SET FORTH HEREIN ABOVE.


Dated:  New York, New York                    _/s/ Hon. Burton R. Lifland_____
        November 30, 2006                      United States Bankruptcy Judge

---

[31] In the course of settling an order, the Court expects that the parties will attempt to reach a consensus as to
an appropriate ceiling amount.