JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox (HL 3046)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-3053
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
Jeffrey B. Ellman (JE 5638)

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------x
:
In re                                 :   Chapter 11
:
Dana Corporation, *et al.*,           :   Case No. 06-10354 (BRL)
:
                Debtors.   :   (Jointly Administered)
:
----------------------------------------------------------x

### DECLARATION OF R. THOMAS RADCLIFFE, JR.

R. Thomas Radcliffe, Jr. declares and states:

1.    I am over eighteen years of age and competent to testify on the matters set forth in this declaration. I have personal knowledge of the facts set forth in this declaration.

**Background and Experience**

2. I have been practicing law since 1986. I am licensed to practice law in Maryland, Pennsylvania, Virginia, and the District of Columbia. I have been a partner at the law firm of DeHay & Elliston, L.L.P., since June 2002. From 1989 to 2002 I was employed at Church & Houff, P.A. (as a shareholder from 1996 to 2002).

3. Since 1986 my practice has focused on the defense of asbestos related cases and other toxic tort and product liability litigation.

4. My first trial of an asbestos related case was in 1988 (second chair). My most recent trial of an asbestos related case ended in November 2007. In the intervening years I have started numerous trials in various jurisdictions including Maryland, California, Florida, Georgia, Louisiana, Mississippi, New Jersey, Ohio, Pennsylvania, Tennessee, Texas, Virginia, and West Virginia. I currently serve as National Coordinating Counsel for Dana and several other companies in asbestos litigation.

5. I first represented Dana Corporation in 1990 in connection with several hundred cases filed in Hagerstown, Maryland. My representation of Dana included the interview of Dana employees, review of documents, and the preparation of the defense strategy for trial.

6. From 1994 on, I expanded my practice to the national level, serving as co-national counsel for a large manufacturer of asbestos-containing flooring and gasket material (a percentage of which was automotive material), and as lead trial counsel in numerous cases throughout the country for that client.

7. Since 2001, I have served as national coordinating counsel for Dana in asbestos litigation. In that role, I have been intimately and continuously involved (with others) in directing the litigation for Dana. My responsibilities include: acting as trial counsel when

appropriate; directing and implementing the strategy for Dana; and selecting and managing defense counsel across the country who defend Dana on a day-to-day basis. My role has been to ensure that each attorney on Dana's defense team is aware of and effectively implements a unified defense strategy in asbestos litigation proceedings across the country.

8. As national coordinating counsel for Dana, I participate in regular meetings with Dana to review and update litigation strategy. Dana's management philosophy was dynamic and responsive to the litigation needs.

9. As a result of the management efforts by Dana and its defense team from 2001 through 2005, Dana met its strategic goals in the litigation. By the end of 2005, Dana had experienced a significant reduction in indemnity (including a reduction in per case averages overall and by disease category), an increase in the number of dismissals without payment, a reduction in defense costs, and a reduction in trial starts.

10. Although Dana filed a petition for bankruptcy in March 2006, the petition was not related to pending asbestos related cases or asbestos litigation in general. At the time of Dana's filing, Dana's pending asbestos related cases were managed in accordance with its long term strategy and were under control. Dana's defense and indemnity expenses relating to asbestos litigation through early 2006 were not affected by any possibility that Dana might file for bankruptcy protection.

**The Significant Differences Between Dana and Major Asbestos Defendants**

11. Based on my knowledge and experience, Dana's asbestos litigation profile is significantly different than traditional defendants in several important ways summarized below:

    a. Dana's products differ in important ways from those of many other defendants:

3

(i) Dana has been successful in defending its products on the grounds that they could be used without releasing hazardous levels of asbestos fibers.

(ii) The type of asbestos fiber (chrysotile) used in Dana's products is either completely insufficient to cause mesothelioma or is insufficient to cause mesothelioma at the low levels of fiber release (if any) from Dana's products.

(iii) There is considerable favorable scientific data demonstrating the low levels of fiber release, if any, relating to Dana's products.

b. There is a limited pool of persons exposed to Dana's products, in part because Dana's products were designed for vehicular rather than industrial applications. Thus, cases of industrial-only exposure to asbestos are unlikely to involve Dana products.

c. Dana has established its commitment to defend against non-meritorious cases in the tort system.

d. No plaintiffs have successfully mounted a claim that Dana should be subjected to punitive damages for its asbestos containing products.

**The Dana Products At Issue**

12. As part of my duties as national counsel, I have engaged in significant efforts to learn about Dana's products. The overwhelming bulk of the claims alleging exposure to a Dana asbestos-containing product have involved automotive gaskets manufactured by Dana's Victor Products Division ("Victor"), which was later called the Victor Reinz® Division and is currently

4

known as the Sealing Products division. For a period of time, some but not all of the Victor gaskets contained asbestos.

13. Beginning in the late 1970s, Victor began to phase out the production and sale of gaskets that previously had contained asbestos. The ability to remove asbestos from the manufacturing process depended on a variety of factors, so that the dates for phase-out of asbestos from gaskets took several years and varied among specific vehicular applications. By mid-1988, asbestos was no longer used by Victor as an added component in the manufacture of gaskets.

14. With respect to those gaskets that did contain asbestos, Victor exclusively used chrysotile asbestos that was incorporated into the products in a way that encapsulated fiber with elastomeric and other binders and rendered the asbestos non-friable under ordinary conditions of installation, use, and removal. Dana has successfully demonstrated in the litigation that these gaskets could be used without releasing asbestos fibers at hazardous levels. If any fibers were liberated during use, harmful exposure did not occur. In this regard, Dana participated in and is aware of tests or studies that demonstrate that asbestos-containing automotive gaskets could be installed, utilized, and/or removed safely by end users. By contrast, Dana is not aware of any reputable, published, peer-reviewed scientific studies showing a causal association between automotive asbestos-containing gasketing materials and disease.

**Dana's Asbestos Litigation History Pre-2001**

15. During my representation of Dana Corporation and other CCR members from 1989 to 2001, Dana's profile in asbestos litigation was significantly lower than most of the CCR's other members, and Dana was seldom the subject of discovery or targeted as a significant defendant. At the same time, Dana enjoyed the benefits of the CCR's shared defense network

and claims administration. As a result, before 2001, Dana was not required to prepare a comprehensive Dana-specific defense. Under the CCR regime, defense costs tended to be low, relative to indemnity payments, and Dana's allocated share of defense costs was very small.

**The Post-CCR Asbestos Litigation Period (2001-2006) and Dana's Shift in Approach**

16. In 2000-2001, several of CCR's major members filed for bankruptcy protection. As a result, the CCR ended its settlement activities as of February 1, 2001, and ended its joint defense activities as of July 31, 2001. In anticipation of that change, Dana began to develop and implement a plan to assume responsibility for the defense and settlement of its own cases.

17. Dana's assumption of control of its asbestos litigation necessarily entailed a number of start-up and other non-recurring substantial costs. Among other things, Dana assembled and educated a team of its own defense counsel, including in-house counsel, coordinating and national trial counsel, and local counsel in jurisdictions across the country.

18. Dana also undertook an extensive search and review of all potentially relevant information; identified and collected substantial numbers of potentially relevant documents; and assembled those documents and established new litigation document repositories. Moreover, Dana invested substantial resources to identify expert witnesses; to review and update its written discovery responses; and to develop effective product, medical, and causation defenses.

19. The work described above resulted in significant start-up costs. These costs are reflected in Dana's defense costs for the period from 2001-2003.

20. Upon taking control of its own litigation, Dana established certain objectives. It would no longer pay to settle every claim in which it was named, as it had been required to do during the CCR regime. It would make itself a credible, respected trial threat. And it would insist that plaintiffs adduce substantial evidence of a compensable asbestos-related medical

condition and actual meaningful exposure to a Dana asbestos-containing product. These objectives were substantially different than the CCR operating objectives. As a result, there was a need to communicate these objectives to plaintiffs' counsel, Dana's local counsel, and to the courts, and to be prepared to adhere to the objectives even if it required going to verdict.

21. From 2001-04, Dana began to implement its strategy and experienced a period of transition that resulted in significantly increased defense costs. Dana did agree to a number of settlements that were attractive, even though the requirements for evidence of injury and causation were not as stringent as we were able to achieve in later years because the settlement values were low and the dismissals made Dana's overall caseload more manageable. Over time, Dana was able to more consistently apply its litigation objectives.

22. Even during the transition period, the shift in strategy resulted in the dismissal without compensation of a substantially greater percentage of claims against Dana than had been the case when Dana was a member of the CCR, during which time only a very small fraction of cases were dismissed without at least a nominal payment. From 2003 through Dana's bankruptcy filing in early March of 2006, a total of over 40,000 asbestos claims against Dana were dismissed without payment. Dana's litigation strategy also resulted in Dana paying substantially less money to settle cases than it had as a CCR member – both in the aggregate and on a per-claim basis.

### Dana's Success At Trial

23. Initially, Dana's resistance to settling cases that lacked adequate exposure and medical evidence resulted in numerous trial starts and several verdicts. After assuming its own defense in August 2001, Dana went to verdict in 9 different cases that involved the claims of 21 individual plaintiffs (compared to two verdicts during the entire time it was a CCR member). All

but one of those cases resulted in a verdict in Dana's favor, and that one adverse case remains on appeal. Several of Dana's victories came in traditionally tough jurisdictions for defendants, including Beaumont, Texas, and San Francisco, California. In these cases, the juries found that the plaintiff did not have an asbestos-related disease, that the Dana product was not defective, or that the Dana product did not release sufficient asbestos fibers to cause plaintiff's disease. In none of these cases (or in any other cases) were plaintiffs able to present any meaningful evidence that would entitle them to punitive damages against Dana.

24. Once Dana established that it was willing to go to verdict and that it was able to defend its products successfully, Dana's trial activity declined (from 2004-06). Dana's trial starts also declined from 2004-06. Dana last tried a case to verdict in June 2004.

**Changes in the Asbestos Litigation Landscape**

25. As of the late 1990s, the number of new cases filed against asbestos defendants across the country had been rising sharply each year—the great majority of the claims were by unimpaired plaintiffs identified through mass litigation screening programs. A large percentage of these claims were clustered in a small number of pro-plaintiff jurisdictions. In an effort to avoid volatile jurisdictions, numerous defendants had adopted mass settlement approaches under which virtually all claims received payment, regardless of the strength of the claimant's proof of medical condition or exposure to the defendant's asbestos-containing products.

26. By early 2000, the flood of cases combined with sharply higher verdicts and settlements triggered a significant round of asbestos-driven bankruptcies by companies that had been the primary targets of the litigation in the 1990s. These bankruptcies resulted in increased efforts by the plaintiffs' bar to identify additional defendants.

27. Over the past five years, however, substantial changes have taken place in the asbestos litigation area, including in states where the great majority of claims against Dana had been filed.

28. Dana's litigation strategy and related successes generally preceded, but have continued through, a series of widespread tort reforms. These changes, which vary by jurisdiction, often include legislative and/or judicially-imposed limits on the pursuit of claims by unimpaired claimants, virtual elimination of mass consolidations, more aggressive enforcement of *forum non conveniens* and joinder rules and other limits on the ability of plaintiffs to pursue their claims in some formerly plaintiff-friendly jurisdictions, greater scrutiny of mass screening cases and the physicians involved in them, and limits on the extent of each defendant's liability for a plaintiff's claimed damages.

*Unimpaired claims*. Since 2002, the litigation of claims brought by unimpaired claimants has been substantially curtailed by a series of developments. First, a number of courts have entered docketing orders that indefinitely defer cases brought by unimpaired claimants. For example, in December 2002, the state court in New York City, a significant asbestos docket, entered an order deferring claims by unimpaired claimants. Deferral dockets were also created in such historically important jurisdictions as Cuyahoga County, Ohio; Madison and St. Clair Counties, Illinois; Portsmouth, Virginia; Ramsey County, Minnesota; and King County,

Washington. Deferred claims remain inactive unless and until the claimant becomes impaired. It is generally believed that only a relative few deferred claims will later become active.

Second, a number of states have enacted laws that impose threshold medical criteria on asbestos claims. Ohio enacted such a law that became effective in September 2004, and five other states – Texas (2005), Florida (2005), Georgia (2006), Kansas (2006), and South Carolina (2006) – have followed suit since then. These deferral dockets and state medical criteria legislation have made it much less economically appealing for plaintiffs' attorneys to recruit unimpaired plaintiffs.

Third, in 2005, a federal court in Texas that was adjudicating claims of injury from silica exposure uncovered powerful evidence of large numbers of fraudulent diagnoses of asbestos-related nonmalignant conditions.

As a result of all of these factors, the volume of new filings on behalf of unimpaired claimants dropped dramatically starting in 2004, and the number of active unimpaired cases had also declined sharply.

*Mass consolidations*. The mass consolidations of thousands of individual claims that were a hallmark of asbestos litigation in the 1990s have also faded from the scene. The last mass consolidations occurred in 2002. Recent statutes adopted in Texas and Georgia in 2005 prohibit consolidation of multiple-plaintiff asbestos cases for trial without the consent of all parties. In 2005, Ohio modified its rules of civil procedure to allow consolidations for trial (without consent) only for those pending actions relating to the same exposed person and members of the exposed person's household. Similarly, the Michigan Supreme Court adopted an administrative order in 2006 that forbids the bundling of asbestos personal disease cases for settlement or trial.

*Forum shopping.* Since 2002, courts have increasingly held that plaintiffs in asbestos cases should be required in most circumstances to sue where they live or where they were exposed. Several states, including Florida and Georgia in 2005, adopted venue statutes that reflect this principle, and the Ohio Supreme Court revised the state's rules of civil procedure in 2005 to limit venue for asbestos cases to the location where all the plaintiffs reside or were exposed to asbestos or where the defendant has its principal place of business.

In Mississippi, the state Supreme Court began in 2004 to interpret joinder rules more strictly by requiring all plaintiffs to show that their claims belonged in the state, and the legislature enacted a tort reform act in 2004 – under which each plaintiff must independently satisfy the venue provisions, thus preventing thousands of out-of-state claimants from tagging onto a single in-state plaintiff's case. As a result of these changes, Mississippi judges since 2004 have severed and dismissed thousands of out-of-state asbestos claims. Thus, whereas Dana had some 11,621 asbestos claims in Mississippi courts pending as of December 31, 2002, it had only 799 active claims in Mississippi courts pending as of October 31, 2007.

Likewise, the court in Madison County, Illinois, which was long a magnet for out-of-state cases, now enforces the principle of *forum non conveniens* more stringently, and the Illinois Supreme Court issued a non-asbestos ruling in 2005 that also takes a relatively strict view of the state's *forum non conveniens* doctrine, especially where out-of-state plaintiffs are concerned.

*Extent of liability.* Since 2002, a number of states have enacted laws that limit a defendant's liability to that defendant's own share of the overall responsibility for a plaintiff's injuries, whereas before each defendant had been jointly and severally liable for the entire damage amount. Two of the most historically important jurisdictions in asbestos litigation,

Florida and Mississippi, have abolished joint and several liability altogether. Others, including Texas and Ohio, have made joint and several liability much more difficult to obtain.

*Bankruptcy trusts.* Over the past few years, several companies who were significant target defendants in the litigation have filed for bankruptcy protection. A number of these companies have completed the bankruptcy process and have either started or are about to start payment to tort claimants through trusts. There are billions of dollars available to claimants through these trusts. The impact of trust payments to claimants has not been determined. There are some claimants who may not enter the tort system and who will elect to proceed only against the trusts. Other claimants may enter the tort system but have some reduction (by state law or by operation of the trust) in the verdict or settlement.

29. Dana was successful in the management of the litigation before many of the tort reform changes. In the aggregate, these tort reform changes have had a significant impact in reducing the magnitude of asbestos litigation. Post emergence, these changes will bolster Dana's ability to defend itself successfully as it did pre-petition.

**Active Pending Cases**

30. The number of active cases pending against Dana increased in the period immediately after the CCR's termination but subsequently declined significantly as a number of cases were dismissed or became inactive under court orders and/or tort reform laws. Based on the most current information available to Dana and discussions with Dana's counsel in various jurisdictions, the number of active pending asbestos claims against Dana as of October 31, 2007 was 35,247. By contrast, the number of asbestos claims against Dana that were pending as of that date, but that were inactive due to tort reform and similar measures, was 96,813.

12

31. I anticipate that the number of active cases pending against Dana will generally continue to decline in the future. As noted above, the number of new filings against Dana has declined, the number of cases dismissed without payment has risen, and various court docket orders and tort reform statutes have led a large number of cases to be declared inactive. Those trends should continue and the number of pending claims should generally continue to decline over time as Dana settles or is dismissed.

32. During the ongoing chapter 11 proceeding, Dana has been able to negotiate settlements of certain of the asbestos claims pending against it. On November 15, 2007, the Court approved settlement agreements resolving some 7,500 asbestos claims that had been pending against Dana on terms that were within the settlement parameters for injury causation and value that Dana utilized prior to the Petition Date and were consistent with Dana's past settlement practices.

**New Claim Filings**

33. The numbers of new claims filed against Dana declined starting in 2004 from the numbers experienced in 2001 after the CCR terminated its claims handling responsibilities. New filings stopped altogether in March 2006, of course, because of the automatic stay on the filing of new cases against Dana that took effect upon Dana's chapter 11 filing. While it is possible that a short-term rise in new filings will follow Dana's emergence from bankruptcy protection as some of the plaintiffs who sued other defendants in 2006 and 2007 bring Dana into those lawsuits, we expect that such "catch up" filings are likely to be offset by the decline in new filings that has continued through the period of Dana's bankruptcy as to other defendants. Apart from that possible short-term increase, the downward trend in new claim filings against Dana before its bankruptcy filing should continue into the future based on the factors outlined above.

## Dana's Expectations for Future Litigation

34. Based on the historical experiences, trends, and Dana-specific factors discussed above, I expect that, upon Dana's emergence from bankruptcy protection, the number of claims that Dana will be required to defend, the percentage of those claims it ultimately pays, and the sums that it will be required to spend to defend and resolve cases, should generally continue to decline or at worst remain at their most recent low levels for the foreseeable future.

35. Dana's defense costs generally should continue at the same level (from 2005) and then decline after Dana emerges from bankruptcy when compared to defense costs spending from earlier years. As explained above, the need for Dana to prepare and to litigate its own defenses following the CCR's dissolution required Dana to incur numerous substantial one-time costs that are unlikely to be repeated. Further, the level of defense costs is related in part to the level of new claims and of claims and trial activity generally, and thus the ongoing decline in the number of new filings, and in the volume of litigation generally, strongly suggests a further decline in defense costs.

36. Based on the information available to me, I estimate that Dana's defense costs for 2008 will not exceed $20,000,000. My estimate is based on the defense costs Dana incurred during 2005, with an understanding of the level of work involved and the status of the litigation. In 2008, I expect that Dana will continue to manage the litigation in the manner and at the level it experienced in 2005. At the 2005 level, Dana will be prepared to try cases where appropriate, or resolve them for reasonable settlement amounts.

**Settlement Costs**

37. The amounts that Dana agreed to pay to settle asbestos personal injury claims declined substantially upon its emergence from the CCR in 2001-03 and then declined still further in 2004-05. I expect that settlement costs generally should continue to remain at the relatively low levels experienced in the 2001-2005 time period into the foreseeable future due to the factors discussed above.

38. In this regard, Dana has, and will continue to have, substantial advantages compared to other defendants in the asbestos litigation. As described above, the products implicated in the overwhelming majority of claims against Dana – automotive gaskets – were used in far fewer types of settings, and by far fewer categories of workers, than were the products of many other asbestos defendants. These points significantly limit the number of workers potentially exposed to Dana's products, facilitate Dana's defense of claims based on product identification, and result in many claims being dismissed without payment. Moreover, unlike many other asbestos defendants, Dana has substantial defenses that its particular products could be and in fact were used without releasing any hazardous level of asbestos fibers. This point substantially facilitates Dana's defense that, even as to claimants who can furnish sufficient evidence of exposure to Dana's products, those products were not a substantial contributing factor of the claimant's alleged disease. A strong defense, in turn, tends to significantly reduce the sums required to settle arguably meritorious claims. Finally, Dana has a substantial defense that exposure to chrysotile asbestos, the type of fiber incorporated into the Victor gaskets at issue, would be insufficient to cause mesothelioma, particularly at the low levels (if any) arising from the use of automotive gaskets.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 6, 2007.

                                               _____
                                               R. Thomas Radcliffe, Jr.