**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11
                                              :
Dana Corporation, et al.,                     :    Case No. 06-10354 (BRL)
                                              :
                         Debtors.             :    (Jointly Administered)
                                              :
-------------------------------------------------------------x
```

## ORDER CONFIRMING THIRD AMENDED JOINT PLAN OF REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION

The above-captioned debtors and debtors in possession (collectively,

the "Debtors") having proposed the Third Amended Joint Plan of Reorganization of Debtors and

Debtors in Possession (in the form dated as of October 23, 2007 and included in the contents of

the solicitation packages distributed to the creditors that were entitled to vote thereon,

the "October 23 Plan," a true and correct copy of which (without exhibits) is attached hereto as

Appendix I), as modified by (i) the First Modifications to Third Amended Joint Plan of

Reorganization of Debtors and Debtors in Possession (the "First Modifications") filed with the

Court on December 6, 2007 as Exhibit D to the Confirmation Memorandum (as such term is

defined below) and (ii) the Stipulation and Agreed Order Between the Debtors and the Official

Committee of Non-Union Retirees, entered on December 11, 2007 (Docket No. 7423)

(the "Boilermakers Stipulation" and, collectively with the First Modifications,

the "Modifications," true and correct copies of which are annexed hereto as Appendix II, and

collectively with the October 23 Plan, as modified and including the exhibits thereto,

the "Plan");[1] the Court having conducted a three-day evidentiary hearing to consider

---

[1]      All capitalized terms used but not defined herein have the meanings given to them in the Plan.

confirmation of the Plan on December 10, 11 and 12, 2007 (the "Hearing"); the Court having

considered: (i) the testimony of the 12 witnesses called at the Hearing, as well as the affidavits

and declarations included among the 60 exhibits admitted into evidence at the Hearing;

(ii) the arguments of counsel presented at the Hearing; (iii) the objections Filed with respect to

Confirmation of the Plan; (iv) the resolution and settlement of nine of the 11 timely objections to

Confirmation of the Plan and one late-filed joinder to an objection; and (v) the pleadings Filed by

the Debtors in support of the Plan, including: (A) the Debtors' Consolidated Reply to Objections

to Confirmation of Third Amended Joint Plan of Reorganization of Debtors and Debtors in

Possession and Request for Judicial Notice (Docket No. 7375) (the "Consolidated Reply"),

including (1) the Declaration of William R. Hanlon (Docket No. 7378), (2) the Declaration of

R. Thomas Radcliffe, Jr. (Docket No. 7379), (3) the Declaration of John E. Heintz in Support of

Confirmation of Joint Plan of Reorganization of Dana Corporation and Certain of its Debtor

Affiliates Under Chapter 11 of the Bankruptcy Code (Docket No. 7380) and (4) the Declaration

of Jonathan R. Terrell (Docket No. 7381), attached to the Consolidated Reply as Exhibits E

through H, respectively; (B) the Debtors' (I) Memorandum of Law in Support of Confirmation of

Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession and

(II) Consolidated Reply to Certain Objections to Confirmation of Third Amended Joint Plan of

Reorganization of Debtors and Debtors in Possession (Docket No. 7376) (the "Confirmation

Memorandum"), including the summary of the Debtors' compliance with the standards of

sections 1129(a) and 1129(b) of the Bankruptcy Code (inclusive of the standards of

sections 1122, 1123 and 1124 of the Bankruptcy Code) attached as Exhibit B thereto (and

marked as an unnumbered exhibit by the Court at the Confirmation Hearing) (the "Confirmation

Standards Exhibit"); and (C) the Supplemental Brief in Support of Confirmation of Third

Amended Joint Plan of Reorganization of Debtors and Debtors in Possession (Docket No. 7377); and the Court being familiar with the Plan and other relevant factors affecting these Chapter 11 Cases pending under the Bankruptcy Code; the Court having taken judicial notice of the entire docket of the Debtors' Chapter 11 Cases maintained by the Clerk of the Court and/or its duly appointed agent, and all pleadings and other documents filed, all orders entered, and evidence and arguments made, proffered or adduced at, the hearings held before the Court during the pendency of the Chapter 11 Cases, including, but not limited to, those orders, pleadings and other documents set forth in Exhibit A to the Consolidated Reply; the Court having found that due and proper notice has been given with respect to the Hearing and the deadlines and procedures for Filing objections to the Plan; the appearance of all interested parties having been duly noted in the record of the Hearing; and upon the record of the Hearing, and after due deliberation thereon, and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND CONCLUDED, that:

## JURISDICTION AND VENUE

A.     The Court has jurisdiction over this matter and these chapter 11 cases pursuant to 28 U.S.C. § 1334.

B.     Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has jurisdiction to enter a final order with respect thereto.

C.     The Debtors are proper debtors under section 109 of the Bankruptcy Code, and the Debtors are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

D.     Each of the conditions precedent to the entry of this Order has been satisfied in accordance with Section IV.A of the Plan or properly waived in accordance with Section IV.C of the Plan. *See* Transcript of Confirmation Hearing, December 10, 2007 (the "12/10 Transcript"), at 87:5 – 88:23.

- 3 -

## MODIFICATIONS OF THE PLAN

E.      The Modifications do not materially and adversely affect or change the

treatment of any Claim against or Interest in any Debtor.  Pursuant to section 1127(b) of the

Bankruptcy Code and Bankruptcy Rule 3019, the Modifications do not require additional

disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or

rejections of the Plan under section 1126 of the Bankruptcy Code, nor do they require that

holders of Claims against the Debtors be afforded an opportunity to change previously cast

acceptances or rejections of the Plan as Filed with the Court.  The Filing of the Modifications

and the disclosure of the Modifications on the record at the Confirmation Hearing, constitute due

and sufficient notice thereof under the circumstances of the Chapter 11 Cases.  Accordingly, the

Plan (which consists of the October 23 Plan as modified by the Modifications) is properly before

the Court, and all votes cast with respect to the October 23 Plan prior to the Modifications shall

be binding and shall apply with respect to the Plan.  *See* 12/10 Transcript, at 16:13 – 22:1;

Transcript of Confirmation Hearing, December 11, 2007 (the "12/11 Transcript"), at 105:25 –

106:25; Transcript of Confirmation Hearing, December 12, 2007 (the "12/12 Transcript"), at

10:8 – 10:9.

## STANDARDS FOR CONFIRMATION
## UNDER SECTION 1129 OF THE BANKRUPTCY CODE

F.      The evidentiary record of the Confirmation Hearing and the Confirmation

Standards Exhibit support the findings of fact and conclusions of law set forth in the following

paragraphs.

G.    <u>Section 1129(a)(1)</u>.  The Plan complies with each applicable provision of the Bankruptcy Code.  In particular, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code as follows:[2]

1.      In accordance with section 1122(a) of the Bankruptcy Code, Section II.B of the Plan classifies each Claim against and Interest in the Debtors into a Class containing only substantially similar Claims or Interests (*see* Confirmation Standards Exhibit, at 2-6);

2.      In accordance with section 1123(a)(1) of the Bankruptcy Code, Section II.B of the Plan properly classifies all Claims and Interests that require classification.  With respect to Asbestos Personal Injury Claims classified in Class 3, the Debtors have provided proof of a legitimate reason for the separate classification of such Claims, and such classification is justified (*see id.*, at 5-6; 12/11 Transcript, at 145:14-146:13);

3.      In accordance with section 1123(a)(2) of the Bankruptcy Code, Section II.B of the Plan properly identifies and describes each Class of Claims and Interests that is not impaired under the Plan (*see* Confirmation Standards Exhibit, at 6-7);

4.      In accordance with section 1123(a)(3) of the Bankruptcy Code, Section II.B of the Plan properly identifies and describes the treatment of each Class of Claims or Interests that is impaired under the Plan (*see id.*, at 7);

5.      In accordance with section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim or Interest of a particular Class unless the holder of such a Claim or Interest has agreed to less favorable treatment (*see id.*);

6.      In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for its implementation, including, without limitation, the implementation of the Global Settlement in Article III of the Plan and the provisions regarding Effective Date transactions and transfers and post-Effective Date corporate management, governance and actions in Article V of the Plan (*see id.*, at 7-10);

---

[2]      *See* S. Rep. No. 989, 95th Cong., 2d Sess. 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 412, *reprinted in* 1978 U.S.C.C.A.N. 5962, 6368 (1977); *see In re Johns Manville Corp.*, 68 B.R. 618, 629-30 (Bankr. S.D.N.Y. 1986), *as modified*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988) ("Objections to confirmation raised under § 1129(a)(1) generally involve the failure of a plan to conform to the requirements of § 1122(a) or § 1123.").

CLI-1556545v22

7.      In accordance with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors' charters, bylaws or comparable constituent documents contain provisions prohibiting the issuance of non-voting equity securities and providing for the appropriate distribution of voting power among all classes of equity securities authorized for issuance (*see id.*, at 10-11);

8.      In accordance with section 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan and the Reorganized Debtors' charters, bylaws or comparable constituent documents regarding the manner of selection of officers and directors of the Reorganized Debtors, including, without limitation, the provisions of Section V.C.2 of the Plan, are consistent with the interests of creditors and equity security holders and with public policy (*see id.*, at 11-12; 12/10 Transcript, at 85:11 – 86:15);

9.      In accordance with section 1123(b)(1) of the Bankruptcy Code, Section II.B of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests (*see* Confirmation Standards Chart, at 12);

10.     In accordance with section 1123(b)(2) of the Bankruptcy Code, Section II.E and other provisions of the Plan provide for the assumption, assumption and assignment or rejection of the Executory Contracts or Unexpired Leases of the Debtors that have not been previously assumed, assumed and assigned or rejected pursuant to section 365 of the Bankruptcy Code and orders of the Court (*see id.*, at 12-13);

11.     In accordance with section 1123(b)(3) of the Bankruptcy Code, Section IV.E.2 of the Plan provides that, except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and causes of action that any Debtor or Estate may hold against any entity, including any Recovery Actions, to the extent not expressly released under the Plan or by any Final Order of the Court (*see id.*, at 13);

12.     In accordance with section 1123(b)(5) of the Bankruptcy Code, Section II.B of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of Claims in each Class (*see id.*, at 13-14);

13.     In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including, without limitation, the provisions of Article III, Article IV, Article V, Article VI, Article VII, Article VIII, Article IX and Article X of the Plan (*see id.*, at 14-15); and

CLI-1556545v22

14.    In accordance with section 1123(d) of the Bankruptcy Code, Section II.E.3 of the Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. All Cure Amount Claims will be determined in accordance with the underlying agreements and applicable law.

H.    <u>Section 1129(a)(2)</u>.  The Debtors have complied with all applicable provisions of the Bankruptcy Code with respect to the Plan and the solicitation of acceptances or rejections thereof.  In particular, the Plan complies with the requirements of sections 1125 and 1126 of the Bankruptcy Code as follows:

1.    In compliance with the Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Joint Plan of Reorganization, (III) Scheduling Hearing on Confirmation of Joint Plan of Reorganization and (IV) Approving Related Notice Procedures, entered October 23, 2007 (Docket No. 6673) (the "<u>Disclosure Statement Order</u>"), on or before November 2, 2007, the Debtors, through their Claims and Noticing Agent, BMC Group, Inc. ("<u>BMC Group</u>"), caused copies of the following materials to be transmitted to all holders of Claims in Classes that were entitled to vote to accept or reject the Plan (<u>i.e.</u>, Allowed Claims in Classes 2C, 5B, 5C and 6C):

- notice of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>");

- the Disclosure Statement (together with the exhibits thereto, including the October 23 Plan);

- the Debtors' and the Creditors' Committee's letters recommending acceptance of the Plan; and

- an appropriate form of Ballot (collectively with the materials described in the preceding bullets, the "<u>Solicitation Package</u>").

*See* Certificate of Mailing by BMC Group, Inc. in Connection with Solicitation Package and Notice of (A) Deadline for Casting Votes to Accept or Reject Third Amended Joint Plan of Reorganization, (B) Hearing to Consider Confirmation of Third Amended Joint Plan of Reorganization and (C) Related Matters (Docket No. 6831), dated November 6, 2007 (the "<u>Initial BMC Service Affidavit</u>"), at ¶ 2 and Certificate of Mailing in Connection with Solicitation Book (Docket

No. 7058) (the "Final BMC Service Affidavit"), dated
November 21, 2007, at ¶ 2.

2.      In compliance with the Disclosure Statement Order, on or before
November 2, 2007, the Debtors, through BMC Group, caused copies of
the Solicitation Package (not including Ballots) to be transmitted to:
(a) holders of Administrative Claims; (b) holders of Priority Tax Claims;
(c) non-Debtor parties to Executory Contracts or Unexpired Leases; and
(d) parties listed on the Special Service List and General Service List (as
such terms are defined in the Case Management Order).  *See* Final BMC
Service Affidavit at ¶ 2.

3.      In compliance with the Disclosure Statement Order, on or before
November 2, 2007, the Debtors, through BMC Group, transmitted (a) the
Confirmation Hearing Notice and (b) a Notice of Non-Voting Status (as
such term is defined in the Disclosure Statement Order) to all holders of
Claims and Interests in the Non-Voting Classes (as such term is defined in
the Disclosure Statement Order) that were not entitled to vote on the Plan
(other than Classes 6A, 6B and 8).  *See* Final BMC Service Affidavit
at ¶ 2.

4.      In compliance with the Disclosure Statement Order, on or before
November 2, 2007, the Debtors, through BMC Group, transmitted the
Confirmation Hearing Notice to:  (a) all other creditors and equity security
holders of the Debtors; and (b) all parties in interest that had Filed requests
for notice in accordance with Bankruptcy Rule 2002 in the Chapter 11
Cases on or before the record date established by the Court pursuant to
Bankruptcy Rule 3017(d) in the Disclosure Statement Order.  *See* Final
BMC Service Affidavit at ¶ 2.

5.      In compliance with the Disclosure Statement Order, on
November 5, 2007, the Debtors caused a copy of the Confirmation
Hearing Notice to be published in the national editions of *The Wall Street
Journal* and *USA Today* and the daily edition of *The Toledo Blade*.
*See* Notice of Filing of Sworn Statements of Publication in *The Toledo
Blade*, *USA Today* and *The Wall Street Journal*, dated November 13, 2007
(Docket No. 6899) at page 2.

6.      On November 20, 2007, the Debtors Filed (and made available on BMC
Group's website at http://www.dana.bmcgroup.com) the following
Confirmation Exhibits:  (a) Exhibit II.E.1.a (Executory Contracts and
Unexpired Leases to be Assumed); (b) Exhibit II.E.1.c (Joint Venture
Agreements to be Assumed and Assigned); (c) Exhibit II.E.4 (Previously
Assumed Executory Contracts and Unexpired Leases to be Assigned); and
(d) Exhibit II.E.5 (Executory Contracts and Unexpired Leases to be
Rejected) (collectively, the "Executory Contract Exhibits").  *See* Notice of
Filing Certain Exhibits to Third Amended Joint Plan of  Reorganization

Relating to Executory Contract and Unexpired Leases and Joint Venture Agreements (Docket No. 7030) at page 2.

7.      On December 4, 2007, the Debtors Filed (and made available on BMC Group's website at http://www.dana.bmcgroup.com) supplements to the Executory Contract Exhibits, as necessary. *See* Notice of Filing Supplements to Certain Exhibits to Third Amended Joint Plan of Reorganization Relating to Executory Contract and Unexpired Leases and Joint Venture Agreements (Docket No. 7342).

8.      On December 5, 2007, the Debtors Filed (and made available on BMC Group's website at http://www.dana.bmcgroup.com) the following Confirmation Exhibits:  (a) Exhibit I.A.88 (Principal Terms of the Exit Facility); (b) Exhibit V.C.1.a (Certificate of Incorporation (or Comparable Constituent Documents) of New Dana Holdco, including New Dana Holdco's Certificate of Designations and Form Certificates of Incorporation (or Comparable Constituent Documents) for the Other Reorganized Debtors); (c) Exhibit V.C.1.b (Bylaws (or Comparable Constituent Documents) of New Dana Holdco and Form Bylaws (or Comparable Constituent Documents) for the Other Reorganized Debtors); and (d) Exhibit V.C.2 (Initial Directors and Officers of New Dana Holdco and Each Other Reorganized Debtor). *See* Notice of Filing of Certain Exhibits to Third Amended Joint Plan of Reorganization (Docket No. 7362) at page 2.

9.      The Confirmation Hearing Notice provided due and proper notice of the Hearing and all relevant dates, deadlines, procedures and other information relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the Voting Deadline, the Objection Deadline (as such term is defined in the Confirmation Hearing Notice), the time, date and place of the Hearing and the release provisions in the Plan. *See* Disclosure Statement Order at ¶ 12, Annex 2.

10.     All persons entitled to receive notice of the Disclosure Statement, the Plan and the Hearing have received proper, timely and adequate notice in accordance with the Disclosure Statement Order, applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto. *See* Confirmation Standards Exhibit, at 16.

11.     The Debtors solicited votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order, including, without limitation, the inclusion of letters from the Debtors and the Creditors' Committee recommending acceptance of the Plan in the Solicitation Packages. Accordingly, the Debtors are entitled to the protections afforded by

- 9 -

section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in section IV.E.7 of the Plan. *See id.*, at 15-18.

12.    Claims and Interests in Classes 1A, 1B, 2A, 2B, 3, 4, 5A, 6B and 8 under the Plan are unimpaired, and such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. *See id.*, at 17.  With respect to Asbestos Personal Injury Claims classified in Class 3, even after giving effect to the Restructuring Transactions, holders of Asbestos Personal Injury Claims will retain the same legal, equitable and contractual rights as they possessed prior to the Petition Date, and such rights are unaltered by the Plan and the Restructuring Transactions. *See id.*, at 5.

13.    Claims in Class 6A under the Plan are impaired within the meaning of section 1124 of the Bankruptcy Code.  To the extent that Class 6A Claims are not eliminated by operation of law in the Restructuring Transactions, such Claims are deemed settled and compromised in exchange for the consideration and other benefits provided to the holders of such Claims and are not entitled to any distribution under the Plan.  Notwithstanding this treatment, however, each holder of a Claim in Class 6A is deemed to have accepted the Plan. *See id.*, at 18.

14.    The Plan was voted on by two of the classes of impaired Claims that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order (i.e., Classes 5B and 5C). *See id.*, at 27.

15.    Two of the impaired Classes that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order (i.e., Classes 2C and 6C) are deemed to accept the Plan, consistent with section 1126(c) of the Bankruptcy Code. *See id.*, at 27-28.

16.    BMC Group has made a final determination of the validity of, and tabulation with respect to, all acceptances and rejections of the Plan by holders of Claims entitled to vote on the Plan, including the amount and number of accepting and rejecting Claims in Classes 2C, 5B, 5C and 6C under the Plan. *See* Declaration of Jeffrey B. Ellman Certifying the Tabulation of Votes on, and the Results of Voting with Respect to, the Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession, dated December 6, 2007 (Docket No. 7374) (the "Voting Declaration") at ¶¶ 7-8.

17.    Each of Classes 5B and 5C have accepted the Plan by at least two-thirds in amount and a majority in number of the Claims in such Classes actually voting. *See* Voting Declaration at ¶¶7-8.

- 10 -

18.     The affidavit of BMC Group (attached as an exhibit to the Voting
Declaration) with respect to the voting on the Plan sets forth the tabulation
of votes, as required by the Bankruptcy Code, the Bankruptcy Rules and
the Disclosure Statement Order.  *See* Voting Declaration, Exhibit A.

I.     <u>Section 1129(a)(3)</u>.  The Plan has been proposed in good faith and not by

any means forbidden by law.  The Chapter 11 Cases were filed with an honest belief that the

Debtors were in need of reorganization and the Plan was negotiated and proposed with the

intention of accomplishing a successful reorganization, and for no ulterior purpose.  The Plan

fairly achieves a result consistent with the objectives and purposes of the Bankruptcy Code.  In

so finding, the Court has considered the totality of the circumstances in these Chapter 11 Cases.

The Plan is the result of extensive good faith, arms'-length negotiations between the Debtors and

certain of their principal constituencies (including the Creditors' Committee, the Ad Hoc

Bondholders' Committee, Centerbridge, the Unions and their respective Representatives) and

reflects substantial input from the principal constituencies having an interest in the Chapter 11

Cases and, as evidenced by the overwhelming acceptance of the Plan, achieves the goal of

consensual reorganization embodied by the Bankruptcy Code.  Further, as described in greater

detail below, the Plan's indemnification, exculpation, release and injunction provisions have been

negotiated in good faith, are consensual and voluntary and are consistent with sections 105,

1123(b)(6), 1129 and 1142 of the Bankruptcy Code and applicable law in this Circuit.  *See* 12/10

Transcript, at 83:21 – 83:23; Confirmation Standards Exhibit, at 18-20.

J.     <u>Section 1129(a)(4)</u>.  No payment for services or costs and expenses in or

in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the

Chapter 11 Cases, has been or will be made by a Debtor other than payments that have been

authorized by order of the Court.  Pursuant to Sections III.A.1.h.ii.A and IX.B of the Plan, and

except as otherwise provided under the Plan or herein, all such payments to be made to

- 11 -

Professionals or other entities asserting a Fee Claim for services rendered before the Effective

Date will be subject to review and approval by this Court.  *See* Confirmation Standards Exhibit,

at 20-21.

K.    Section 1129(a)(5).  The Debtors have disclosed (1) the identities of the

officers and directors of New Dana Holdco and each other Reorganized Debtor and (2) the

identity of any insiders that will be employed or retained by the Reorganized Debtors on

Exhibit V.C.2 to the Plan.  The compensation of the Reorganized Debtors' directors will be

consistent with each Reorganized Debtor's applicable constituent documents, as disclosed on

Exhibits V.C.1 and V.C.2 to the Plan.  The Debtors disclosed (1) the affiliations of their

proposed respective directors and officers and (2) the compensation of any insiders to be

employed or retained by the Reorganized Debtors (to the extent not previously disclosed) at or

prior to the Confirmation Hearing.  The prior compensation of the Debtors' management, as well

as that of the Debtors' current directors, has been disclosed by the Debtors in their previous

filings with the SEC (including Dana's most recent Form 10-K, filed March 2007) as well as

within the various pleadings and at the various hearings preceding the Court's entry of the Order,

Pursuant to Sections 105, 363, 365, 502 and 503 of the Bankruptcy Code (A) Authorizing

Assumption of Employment Agreements, as Modified, (B) Approving Long-Term Incentive Plan

and (C) Granting Related Relief (Docket No. 4386), entered on December 18, 2006.  The

proposed directors and officers for the Reorganized Debtors as set forth on Exhibit V.C.2 to the

Plan are qualified, and the appointments to, or continuance in, such offices by the proposed

directors and officers is consistent with the interests of holders of Claims and Interests and with

public policy.  *See* 12/10 Transcript, at 85:6 – 85:10; 105:18 – 105:23; Debtors' Exhibit 3;

Confirmation Standards Exhibit, at 21-23.

L.    <u>Section 1129(a)(6)</u>.  The Plan does not provide for any changes in rates that require regulatory approval of any governmental agency.  *See* Confirmation Standards Exhibit, at 23-24.

M.    <u>Section 1129(a)(7)</u>.  Each holder of an impaired Claim or Interest in each impaired Class of Claims or Interests that has not accepted the Plan will, on account of such Claim or Interest, receive or retain property under the Plan having a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  The Debtors have demonstrated that the Plan is in the best interests of their creditors.  Section 1129(a)(7) of the Bankruptcy Code is inapplicable to Asbestos Personal Injury Claims classified in Class 3 because such Claims are not impaired by the Plan.  Even were the holders of Class 3 Asbestos Personal Injury Claims entitled to the protections of section 1129(a)(7) of the Bankruptcy Code, that section would be satisfied with respect to such holders.  *See* 12/10 Transcript, at 162:22 – 165:25; 183:18 – 185:22; Debtors' Exhibits 9, 10; Confirmation Standards Exhibit, at 24-27.

N.    <u>Section 1129(a)(8)</u>.  The Plan has not been accepted by all impaired classes of Claims and Interests because, pursuant to the Disclosure Statement Order, the holders of Claims in Classes 6D (Section 510(b) Securities Claims Against the Consolidated Debtors) and 7B (Section 510(b) Old Common Stock Claims Against the Consolidated Debtors) and holders of Interests in Class 7A (Old Common Stock of Dana) are deemed to have rejected the Plan, even though they will receive contingent, residual interests in the Disputed Unsecured Claims Reserve Assets under the Plan.  *See* Disclosure Statement Order at ¶ 11.  Nevertheless, as more fully explained below, the Plan is confirmable because it satisfies section 1129(b)(1) of the

Bankruptcy Code with respect to such non-accepting Classes of Claims and Interests.
*See* Confirmation Standards Exhibit, at 27-29.

    O.    <u>Section 1129(a)(9)</u>.  The Plan provides treatment for Administrative

Claims, Priority Tax Claims and Priority Claims that is consistent with the requirements of

section 1129(a)(9) of the Bankruptcy Code.  *See* Confirmation Standards Exhibit, at 29-33.

    P.    <u>Section 1129(a)(10)</u>.  The Plan has been accepted by two classes of

impaired Claims that are entitled to vote on the Plan (<u>i.e.</u>, Classes 5B and 5C), determined

without including any acceptance of the Plan by any insider.  *See* Voting Declaration at ¶ 8;

Confirmation Standards Exhibit, at 33-34.

    Q.    <u>Section 1129(a)(11)</u>.  The Plan is feasible, within the meaning of

section 1129(a)(11) of the Bankruptcy Code.  The Debtors' projections of the capitalization and

financial information of the Reorganized Debtors as of the Effective Date are reasonable and

made in good faith, each Reorganized Debtor is deemed to be solvent as of the Effective Date

after giving effect to the Restructuring Transactions, and Confirmation of the Plan is not likely to

be followed by the liquidation (other than the potential liquidation of inactive Debtor entities that

no longer serve an ongoing business purpose, as described in Exhibit V.B.1 to the Plan) or the

need for the further financial reorganization of the Debtors.  The Debtors have demonstrated a

reasonable assurance of the Plan's prospects for success.[3]

---

[3]     <u>See</u> 12/10 Transcript, at 91:2 – 91:8; 103:3 – 103:20; 167:25 – 169:17; 173:25 – 174:24; 175:1 – 183:17; 209:1 – 209:25; 211:1 – 211:25; 215:7 – 217:13; 220:1 – 221:2; 221:25 – 223:2; 225:25 – 226:21; 232:16 – 235:11; 235:18 – 236:7; 237:15 – 237:23; 238:1 – 241:1; 241:8 – 242:21; 242:25 – 243:2; 244:21 – 245:15; 245:17 – 245:20; 246:4 – 253:13; 261:8 – 261:16; 262:4 – 262:8; 263:12 – 264:3; 12/11 Transcript, at 10:17 – 10:24; 14:1 – 20:21; 21:4 – 23:7; 99:7 – 99:12; 100:5 – 101:2; 102:16 – 103:02; 145:17 – 146:13; 148:14; 149:6 – 150:4; 150:12 – 151:19; 152:17 – 153:7; 155:3 – 156:18; 157:4 – 158:24; 201:12 – 202:4; 204:17 – 205:7; 229:3 – 230:17; Debtors' Exhibits 7, 9, 10, 13, 19, 21 (at ¶¶ 7-8), 22-26, 27 (at ¶¶ 9-11, 14-16, 19-24, 28, 33-38), 28 (at ¶¶ 4-9), 29- 32, 33B-33N, 34 (at ¶ 1, 3-4, 9, 16-17), 35 (at 3-4, 9), 36 (at ¶¶ 5, 10-33), 38; Confirmation Standards Exhibit, at 34-37.

i.      *Dana's Asbestos Litigation*.  Testimony concerning Dana's asbestos litigation and claims database was presented in open court, subject to cross-examination, by R. Thomas Radcliffe, Jr. and William R. Hanlon.  Mr. Radcliffe and Mr. Hanlon are attorneys who are members of Dana's national defense team and who have extensive experience and expertise in asbestos personal injury litigation.  I find from their demeanor, knowledge, and experience that their testimony was credible, truthful and reliable.

ii.      The filing of Dana's chapter 11 petition was not caused by or related to Dana's pending asbestos related cases or asbestos litigation in general.  Debtors' Exhibit 27, at ¶ 10.  As of the Petition Date, Dana's pending asbestos related cases were being managed in accordance with its long term strategy and were under control.  *See* 12/10 Transcript, at 239:19 –241:1; 249:15 – 251:18; Debtors' Exhibit 27, at ¶¶ 9-10.

iii.      Dana believes that it faces a lower level of liability risk in the asbestos litigation than many traditional asbestos defendants (*see* 12/10 Transcript, at 232:24 – 235:11; Debtors' Exhibits 27, at ¶¶ 11, 38; 29), and the Court finds that belief to be reasonable based on a number of factors.  *See* 12/10 Transcript, at 233:20 – 235:11; 241:2 – 242:14; Debtors' Exhibit 27, at ¶¶ 11, 14, 38.

iv.      Dana's successful implementation of its defense and settlement strategy in the period from 2001-2006 has been accompanied and reinforced, at least since 2004, by substantial tort system changes that have limited and continue to limit the overall extent of costs and potential liabilities in the asbestos litigation.  *See* 12/10 Transcript, at 245:17 – 245:20; Debtors' Exhibits 27, at ¶ 28; 31.  Those changes have included (1) limits on the pursuit of claims by unimpaired claimants, under deferral dockets in New York City and elsewhere and new laws in Ohio, Texas, Florida and elsewhere (*see* 12/10 Transcript, at 246:4 –

- 15 -

246:12); (2) increased scrutiny of mass screening and the physicians involved in them, which have also greatly reduced the filing and pursuit of claims for alleged nonmalignant conditions (*see* Debtors' Exhibit 27, at ¶ 28); (3) the essential elimination of mass consolidations, including through statutory or rule changes in Texas, Ohio and Michigan (*see* 12/10 Transcript, at 246:12 – 246:20; Debtors' Exhibit 27, at ¶ 28); (4) greater enforcement of *forum non conveniens* and joinder rules, including in Mississippi, Ohio and Illinois (*see* 12/10 Transcript, at 246:21 – 246:22; Debtors' Exhibit 27, at ¶ 28); and (5) limits on the extent of each defendant's liability for a plaintiff's claimed damages, including in Florida, Mississippi, Texas and Ohio (*see* 12/10 Transcript, at 246:22 – 246:24; Debtors' Exhibit 27, at ¶ 28).  Many of the states in which these reforms have been adopted are the ones in which the greatest numbers of asbestos cases against Dana were pending, including Mississippi, Texas, Florida, Ohio and New York. *See* 12/10 Transcript, at 247:2 – 247:7; Debtors' Exhibits 24, 32.  These changes have, among other things, resulted in dramatic reductions in new asbestos claims filings against other defendants as well.  *See* 12/11 Transcript, at 82:11 – 82:14.

v.    The data in Dana's asbestos claims database reflects that, as a result of Dana's implementation of its strategy and the tort system changes effectuated in various states across the country, Dana's new filings and pending active claims had all been declining by 2005.  *See* 12/10 Transcript, at 248:21 – 251:18; Debtors' Exhibit 30.  Dana's defense costs have been dropping since 2004, with no alterations in the pace of Dana's defense work or change in Dana's billing practices occurring prior to the Petition Date.  Dana's incurrence of defense and indemnity expenses relating to asbestos litigation through December 31, 2005 was not affected by any possibility that Dana might file for bankruptcy protection.  In this regard, the counsel directing Dana's asbestos defense work were not aware

- 16 -

until some time in 2006 of the possibility that Dana might soon file for bankruptcy protection. *See* 12/10 Transcript, at 239:13 – 239:24; 12/11 Transcript, at 22:21 – 23:10; 215:3 – 215:6; Debtors' Exhibit 27, at ¶ 10.

vi.    In anticipation of the proposed Reinstatement of Class 3 Asbestos Personal Injury Claims, Mr. Hanlon worked with personnel at PACE (a part of Navigant Consulting) and with Dana's network of defense counsel across the country to update Dana's asbestos claims database to reflect accurately the current status of the Asbestos Personal Injury Claims that had been filed against Dana. *See* 12/11 Transcript, at 10:17 – 10:24; Debtors' Exhibit 21, at ¶¶ 7-8.  This work was conducted in accordance with reasonable procedures and standards designed to ascertain the true current status of the claims in question. *See* 12/11 Transcript, at 14:1 – 20:21.

vii.    Based on that work, Dana updated its database to reflect the dismissal of 17,655 claims in Mississippi and the rendering inactive of some 80,000 claims pending in Florida, Georgia, Illinois, Maryland, Ohio, Texas, Washington and federal court (as part of MDL-875 pending in the Eastern District of Pennsylvania). *See* 12/11 Transcript, at 19:22 – 20:3; Debtors' Exhibits 21, 22, 24, 38.  In this regard, the claims classified by Dana as inactive are unlikely to be the subject of litigation or payment unless and until the claimant develops an asbestos-related malignancy. *See* 12/11 Transcript, at 17:7 – 19:3.

viii.    The number of new Asbestos Personal Injury Claims filed against Dana rose from 39,716 in 2001 to 63,081 in 2002, but then declined to 40,971 in 2003, to 20,699 in 2004 and to 11,582 in 2005. *See* 12/10 Transcript, at 249:4 – 249:23; Debtors' Exhibits 23, 30.

- 17 -

ix.       The number of claims that Dana resolved without payment (either through dismissal or through the claim being rendered inactive) rose from 7,922 in 2001 and 7,726 in 2002 to 18,699 in 2003, to 47,697 in 2004 and to 66,622 in 2005.  Debtors' Exhibit 30.  Including paid settlements, the number of Asbestos Personal Injury Claims resolved against Dana rose from 23,842 in 2003, to 47,863 in 2004 and to 67,334 in 2005. *See* 12/10 Transcript, at 249:24 – 251:18; Debtors' Exhibits 23.

x.       As a result, the number of active pending claims against Dana, which had risen from 64,399 in 2001 to 127,300 by 2003, declined to 100,136 by the end of 2004, to 44,384 by the end of 2005 and to 35,392 by the end of 2006.  Debtors' Exhibits 23, 25, 30; *See* 12/11 Transcript, at 20:4 – 20:6.

xi.       *Dana Corporation's Asbestos Liabilities*.  Dana reasonably believes that, upon its emergence from bankruptcy protection, the number of claims that it will be required to defend, the percentage of those claims it ultimately pays and the sums that it will be required to spend to defend and resolve cases should generally continue to decline or at worst remain at their relatively low 2005 levels for the foreseeable future.  *See* 12/10 Transcript, at 251:21 – 252:15; Debtors' Exhibit 27, at ¶¶ 33-35.

xii.       With respect to defense costs, Dana reasonably believes that its defense costs for 2008 will not exceed $20,000,000 and should generally continue to decline thereafter, in light of the decrease in the number of claims and in trial activity. *See* 12/10 Transcript, at 252:16 – 253:13; Debtors' Exhibit 27, at ¶¶ 35-36.

xiii.       With respect to settlement costs, Dana reasonably believes that such amounts should continue to remain at the relatively low levels experienced in the

CLI-1556545v22

2001-2005 time period into the foreseeable future, in light of the lower number of filings and

trial activity and Dana's substantial tort system defenses.  *See* Debtors' Exhibit 27, at ¶ 37.

xiv.    Certain objectors argue that Dana's expectations are belied

by *Estate of Louis A. Hicks v. Dana Corp., et al.*, Civil Action, Law Trial Division, December

Term No. 3509 (Ct. C.P., Philadelphia Cty., Pennsylvania), where a judgment in an asbestos

personal injury case was entered against Dana in the amount of $464,605.65 (including interest).

The Court finds that the *Hicks* case does not suggest that Dana's strategy has been unsuccessful

or will not continue to be successful in the future.  First, the *Hicks* case is on appeal, and Dana

believes that it has substantial appellate issues.  *See* 12/10 Transcript, at 242:25 – 243:2.  Second,

the law firm that represents the plaintiff in *Hicks* has had at least 50 other cases against Dana

dismissed, has not tried any other case or obtained any other verdict against Dana and has never

actually obtained any money from Dana through settlement or otherwise.  *See* 12/11 Transcript,

at 229:3 – 230:17.  Finally, the *Hicks* verdict has had no effect on the asbestos litigation against

Dana:  it did not produce an increase in filings, trials or settlement demands, either in

Philadelphia or elsewhere.  *See* 12/10 Transcript, at 244:21 – 245:15.

xv.    Testimony concerning efforts to estimate the dollar amount

of Dana's pending and future asbestos liabilities, including both defense and indemnity costs,

was presented in open court, subject to cross-examination, by Dr. Robin Cantor (called by the

Debtors) and by Dr. Thomas Vasquez (called by certain objectors).

xvi.    Dr. Cantor is a Managing Director in the Insurance and

Claims Services practice of Navigant Consulting, Inc., which was retained by the Debtors.  She

has a Ph.D. in economics from Duke University with a specialization in econometrics.  She has a

faculty appointment in the Graduate Part-Time Program in Environmental Engineering, Science

and Management of the Johns Hopkins University.  She has more than 20 years of research,

teaching and consulting experience, has served on numerous committees and boards and has

published scholarly articles, all in relevant subject matters.  She has extensive experience and

expertise with the estimation of asbestos-related liabilities and has been qualified as an expert on

asbestos claims analysis in other cases as well.  *See* 12/11 Transcript, at 55:8 – 60:14; Debtors'

Exhibit 35.

xvii.    Dr. Vasquez is a partner in Analysis, Research & Planning

Corporation ("ARPC"), which was retained by the Creditors' Committee.  He has a Ph.D. in

economics from Clark University.  He worked for KPMG Peat Marwick from 1987 to 1997 and

then for Yankelovich Partners Inc. from 1997 to 1999.  He also has extensive experience and

expertise with the estimation of asbestos-related liabilities.  *See* 12/11 Transcript, at 170:3 –

172:12; Valdez Exhibit 6, at 9-10.

xviii.    The Court finds that both Dr. Cantor and Dr. Vasquez were

very knowledgeable about the estimation of future asbestos-related liabilities and were reliable in

terms of making calculations based on the assumptions that they made and the methodologies

they employed.  The Court's conclusions in choosing among the numerous estimates that they

presented in their reports and in their testimony are based on the substance of those assumptions

and methodologies.  Indeed, as another court has observed, in estimating asbestos liabilities, "we

are dealing with uncertainties, and are attempting to make predictions which are themselves

based upon predictions and assumptions."  *Owens Corning v. Credit Suisse First Boston*,

322 B.R. 719, 721 (D. Del. 2005).

xix.    Certain objectors argued that Dr. Cantor's findings should

be discounted because Navigant Consulting performs other work for Dana.  The Court finds that

- 20 -

the other work was done by separate personnel in other parts of the Navigant corporate structure and did not affect Dr. Cantor's testimony. *See* 12/11 Transcript, at 75:25 – 76:4.

xx.     Both Dr. Cantor and Dr. Vasquez agreed that there has been a "sea change" in terms of fewer filings and lower defense and indemnity costs for asbestos defendants from 2005 and continuing through the present time. *See* 12/11 Transcript, at 91:12 – 92:16; 177:24 – 178:14.

xxi.     Dr. Cantor forecasts that Dana's combined defense and indemnity costs for asbestos personal injury claims for the 15-year period after emergence from bankruptcy will most likely total between $133.0 and $200 million. *See* Debtors' Exhibits 34, at 1; 35, at 3. She also forecasts that combined costs for the period extending through 2049 will most likely total between $182.4 and $291.5 million (not reduced to present value). *See* Debtors' Exhibit 35, at 3. These are nominal amounts that have not been reduced to present value. Reorganized Dana will be initially capitalized with $195 million in Cash and other assets as of the Effective Date. *See* 12/10 Transcript, 180:16 – 181:17; Debtors' Exhibit 7.

xxii.     Employing a somewhat different methodology, Dr. Vasquez forecasts that the combined costs for the period extending through 2049 will most likely total between $0.7 billion and $1.1 billion, excluding what he termed the "low probability scenarios" that could be more or less than those amounts. Valdez Exhibit 6, at 3. Once again, these are nominal amounts that have not been reduced to present value.

xxiii.     Dr. Cantor testified that, by adopting Dr. Vasquez's methodology, and then applying appropriate assumptions (*e.g.*, the use of "incurred" rather than "paid" defense costs; recognizing a "regime break" leading to increased dismissals; and a 2004/2005 calibration window), Dr. Vasquez' forecast for Reorganized Dana's asbestos liabilities

- 21 -

decreases to $244 million.  Both Dr. Vasquez and Dr. Cantor testified that the 2004/2005

calibration window is the most appropriate assumption for forecasting Reorganized Dana's

asbestos liabilities.  Dr. Cantor further testified that by adopting Dr. Vasquez' approach and her

assumptions set forth in the first sentence of this paragraph, but limiting the calibration window

strictly to 2005 to account for substantial downward trends in the number of filings and defense

and indemnity costs, the forecast for Reorganized Dana's asbestos liabilities decreases further to

$153 million.  *See* 12/11 Transcript, at 99:7 – 103:2; 177:15 – 177:20; Debtors' Exhibit 35, at 4.

   xxiv. *Insurance Coverage for Asbestos Liabilities*.  Testimony

concerning Dana's insurance coverage for asbestos-related liabilities and Dana's estimated

recoveries thereunder was presented by John E. Heintz and by Jonathan R. Terrell.  Mr. Heintz is

an attorney with extensive experience in the negotiation and litigation of insurance coverage for

Asbestos Personal Injury Claims on behalf of Dana and numerous other asbestos defendants.

*See* 12/11 Transcript, at 142:4 – 145:13.  He testified in open court subject to cross-examination,

and I find from his demeanor, knowledge and experience that his testimony was credible and

reliable.  Mr. Terrell has extensive experience in valuing insurance assets and potential

recoveries.  *See* Debtors' Exhibit 28, at ¶ 3.   His direct testimony was presented through his

sworn declaration (without objection), he was cross-examined in open court and his testimony

was credible and reliable.

   xxv. Between 1954 and 1986, Dana purchased over $2.6 billion

in aggregate products liability limits under commercial general liability insurance coverage.

*See* 12/11 Transcript, at 145:17 – 146:13; Debtors' Exhibit 36, at ¶ 5.  After subtracting amounts

that are no longer potentially available due to exhaustion, commutation, insurer insolvency or

exclusion, Dana has about $1.5 billion in products liability limits available to pay Asbestos

Personal Injury Claims.  *See* 12/11 Transcript, at 146:14 – 149:5; Debtors' Exhibit 36, at ¶¶ 5-10.

This significant amount of available coverage distinguishes Dana from companies that filed for

bankruptcy protection after having exhausted or nearly exhausted their available insurance

assets.  *See* 12/11 Transcript, at 149:6 – 149:18; Debtors' Exhibit 36, at ¶ 11.

> xxvi.   In addition, Dana has previously entered into a number of

"coverage-in-place" agreements with certain of its insurers.  These agreements provide a

substantial level of assurance that the available insurance coverage will in fact translate into

future payments of defense and indemnity costs for Asbestos Personal Injury Claims.

*See* 12/11 Transcript, at 149:16 – 150:4; Debtors' Exhibit 36, at ¶ 12.  Specifically, some

$1.24 billion of Dana's approximately $1.5 billion in remaining available products liability limits

is subject to coverage-in-place agreements, including the Wellington Agreement (approximately

$620 million in remaining product liability limits) and four so-called "Bilateral Agreements"

(totaling about $618 million in remaining product liability limits).  *See* 12/11 Transcript,

at 150:12 – 151:14; Debtors' Exhibit 36, at ¶¶ 13-17.  As a result of the so-called "coverage

block" system employed under these agreements, Dana has substantial control over the

disposition of its insurance assets.  *See* 12/11 Transcript, at 155:3 –156:18; Debtors' Exhibit 36,

at ¶¶ 18-21.  Moreover, roughly 75% of Dana's insurance is subject to an A or A- rating.

*See* 12/11 Transcript, at 152:17 – 153:7.

> xxvii.   Despite its available insurance assets, there are instances

when Dana is required to pay, out of its own resources, amounts arising from its asbestos-related

tort liability.  These arise where amounts are allocated to insolvent London-based insurers or to

certain policies that Dana has commuted for lump-sum payments; where the claimant's first

exposure to asbestos postdates the end of Dana's coverage block; or where Dana is obligated to pay retrospective premiums.  *See* Debtors' Exhibit 36, at ¶¶ 22-24.

xxviii.  The percentage that Dana will have to pay out of its own resources will decline sharply over time, as a greater percentage of future payments are allocated to available coverage and coverage subject to gaps are exhausted by Dana payments.  Dana can reduce the impact of the insolvencies and commutations by expanding its so-called "coverage block" beyond June 1, 1976, which will allocate defense costs and liability amounts among more policies, thereby increasing the percentage of solvent and available coverage triggered by substantially all claims (although not increasing the total amount of available coverage).  *See* 12/11 Transcript, at 157:16 – 158:24; Debtors' Exhibit 36, at ¶¶ 24-26.

xxix.   Dana's expansion of its coverage block will, for a period of time, require Dana to pay retrospective premiums on amounts paid under certain policies.  These payments, however, are a short-term issue and will not be overly burdensome.  *See* Debtors' Exhibit 36, at ¶¶ 27-29.  These retrospective premiums are estimated to be approximately $10 million, and are already accounted for in the insurance recoveries calculated by Mr. Terrell.  *See* Debtors' Exhibit 28, at ¶ 7.

xxx.    In addition, Dana has some $259 million of available products liability limits that was issued by insurers with which Dana has not negotiated a "coverage-in-place" agreement.  *See* Debtors' Exhibit 36, at ¶ 30.  To date, Dana's asbestos-related liabilities have not triggered any of this $259 million in unsettled coverage, which therefore remains entirely unexhausted.  *See* Debtors' Exhibit 36, at ¶ 31.  Although these policies are not subject to coverage-in-place agreements, Dana reasonably believes that the insurers that issued this coverage are likely obligated, under applicable law, to pay claims in a

- 24 -

manner consistent with the framework established by those agreements. *See* Debtors' Exhibit 36, at ¶¶ 32-33.

xxxi.   Over the range of reasonable forecasts of Dana's future asbestos liabilities, Dana can expect to recover fifty percent or more of its liabilities from insurance. *See* 12/10 Transcript, at 185:13 – 185:15; 12/11 Transcript, at 157:9 – 159:2; Debtors' Exhibit 28, at ¶¶ 7-9.

xxxii.   It is not necessary for this Court to forecast the exact amount of Reorganized Dana's future costs for asbestos liabilities for the purposes of confirming this Plan and determining that the Plan is feasible. This is so because, in addition to Dana's substantial available insurance resources of approximately $1.5 billion, Reorganized Dana's initial capitalization of $195 million (representing nominal amounts for the next five years and present-valued amounts for years six through 45 at a 6% discount rate) is more than sufficient to cover the range of reasonable forecasts described above. *See* 12/10 Transcript, at 174:13 – 183:17. Based on all the foregoing, the Court finds that the Plan presents a workable scheme of reorganization and operation from which there is a reasonable assurance of success and is, thus, feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.[4]

R.    Section 1129(a)(12).  The Plan provides that Administrative Claims for fees payable pursuant to section 1930 of title 28 of the United States Code will be paid by the Debtors in Cash equal to the amount of such Administrative Claims on or before the Effective Date. After the Effective Date, all fees payable pursuant to section 1930 of title 28 of the United States Code will be paid by the applicable Reorganized Debtor until the earlier of the conversion

---

[4]    See Kane v. Johns Manville Corp. (In re Johns Manville Corp.), 843 F.2d 636, 649 (2d Cir. 1988) ("As the Bankruptcy Court correctly stated, the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.").

CLI-1556545v22

or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or

the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

*See* Confirmation Standards Exhibit, at 37-38.

S.    Section 1129(a)(13).  Prior to the Effective Date, the Debtors will cease

providing and paying all retiree benefits (as defined in section 1114(a) of the Bankruptcy Code)

to:  (1) non-union retirees and their dependents in accordance with the Non-Union Retiree

Settlement Order; and (2) retirees who had been members of the International Association of

Machinists and Aerospace Workers and their dependents in accordance with the Agreed Order

Approving Settlement Agreement Between Dana Corporation and the International Association

of Machinists and Aerospace Workers (Docket No. 5180), dated April 27, 2007.  Moreover, the

Plan implements the Global Settlement and the transactions contemplated thereby, as approved

by the Global Settlement Order.  Retiree benefits (as defined in section 1114(a) of the

Bankruptcy Code) to all UAW and USW-represented retirees will be terminated in accordance

with the Union Settlement Agreements, as approved by the Global Settlement Order, and

Section III.B of the Plan.  Non-pension retiree health and welfare benefits for retirees who were

members, surviving spouses or dependents of members of the International Brotherhood of

Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers, AFL-CIO will be

terminated, pursuant to the Boilermakers Stipulation.  Accordingly, the Plan provides for the

payment of all retiree benefits at the levels established pursuant to sections 1114(e)(1)(B) and

1114(g) of the Bankruptcy Code prior to the Confirmation of the Plan.  *See* Confirmation

Standards Exhibit, at 38-39; Boilermakers Stipulation.

T.    Section 1129(b).  The Plan does not "discriminate unfairly" because each

dissenting Class is treated substantially equally to similarly situated classes, and, except with

- 26 -

respect to holders of Claims and Interests in the dissenting Classes (which Classes are entitled to distributions under the Plan only to the extent that Classes that are senior in priority are paid in full plus Postpetition Interest and Post-Effective Date Interest), no holder of a Claim or Interest will receive more than it is legally entitled to receive on account of its Claim or Interest. Interests in Class 7A and Claims in Class 7B are *pari passu* and subordinated, pursuant to section 510(b) of the Bankruptcy Code, to Claims Class 6D which, in turn, are subordinated to Claims in Class 5B in accordance with 510(b) of the Bankruptcy Code. All Classes of Claims or Interests senior to the Claims in Classes 6D and 7B and Interests in Class 7A either are unimpaired under the Plan or have accepted the Plan. The Plan is "fair and equitable" under section 1129(b) of the Bankruptcy Code because it does not provide a recovery on account of any Claim or Interest that is junior to the impaired, non-accepting Classes of Claims and Interests (i.e., Classes 6D, 7A and 7B). *See* 12/10 Transcript, at 137:2 – 137:7; Debtors' Exhibit 11; Confirmation Standards Exhibit, at 41-44.

U.    Section 1129(c). The Plan is the only plan that has been Filed in the Chapter 11 Cases that has been found to satisfy the requirements of subsections (a) and (b) of section 1129 of the Bankruptcy Code. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

V.    Section 1129(d). No party in interest, including but not limited to any governmental unit, has requested that the Court deny Confirmation of the Plan on grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act, and the principal purpose of the Plan is not such avoidance. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

- 27 -

## RESTRUCTURING TRANSACTIONS

W.      The Restructuring Transactions described in Article V of the Plan are the result of extensive negotiations between the Debtors, their primary stakeholder constituencies and proposed investors and have been proposed in good faith.  The Restructuring Transactions promote, among other things:  (1) the creation of a rational corporate structure; and (2) appropriate financial reporting according to business lines.  Dana's primary purpose in effecting the Restructuring Transactions is the rationalization of the Reorganized Debtors' corporate structure.  Over time, a number of corporate acquisitions and divestitures by various Dana-related entities have resulted in a relatively labyrinthine corporate structure.  The Restructuring Transactions work to streamline this corporate structure to (1) better reflect and serve the Reorganized Debtors' operational functions and (2) enhance the Reorganized Debtors' ability to analyze and address their operational performance along their various business lines. *See* 12/10 Transcript, at 81:22 – 83:23.  The Restructuring Transactions have not been entered into fraudulently, nor with the intent to hinder, delay or defraud any entity to which the Debtors or Reorganized Debtors are, or may become, indebted on or after the Effective Date.   Article V of the Plan and Exhibit V.B.1 to the Plan provide, among other things, for the incorporation and existence of New Dana Holdco as a separate corporate holding company entity and the formation thereunder of various business-unit and product-line limited liability company subsidiaries (collectively, the "Operating Subsidiaries").  *See* 12/10 Transcript, at 79:9 – 80:24; 101:21 – 101:25; 102:14 – 102:19.  New Dana Holdco and the Operating Subsidiaries will acquire and assume those assets and Liabilities of the Debtors as are described in Article V of the Plan, Exhibit V.B.1 thereto or in any contract, instrument or other agreement or document effecting a revesting in, or transfer or assignment of assets and Liabilities to, an Operating Subsidiary or any other Reorganized Debtor.  Pursuant to Article V of the Plan and Exhibit V.B.1 to the Plan, the

- 28 -

transfer of assets to the Operating Subsidiaries and the assumption of certain Liabilities of

Debtor Dana Corporation by the Operating Subsidiaries in exchange for the shares of New Dana

Holdco Common Stock to be distributed to the creditors of Dana Corporation is a transfer for fair

value and fair consideration inasmuch as Dana Corporation will be transferring more liabilities

than assets to New Dana Holdco.  *See* 12/10 Transcript, at 163:15 – 165:10; Debtors' Exhibit 2

(at 3).  After such transfers, New Dana Holdco, the Operating Subsidiaries, Reorganized Dana

Corporation and each of the other Reorganized Debtors will be solvent and left with sufficient

assets, liquidity and capital to satisfy their obligations as they come due for the foreseeable

future.  *See* 12/10 Transcript, at 175:1 – 183:17; 215:7 – 217:13; 220:1 – 221:2; 221:25 – 223:2;

225:25 – 226:21; 232:16 – 235:11; Debtors' Exhibits 7, 8.

## EXECUTORY CONTRACTS

X.    Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the

occurrence of the Effective Date, Section II.E of the Plan provides for the assumption,

assumption and assignment or rejection of certain Executory Contracts and Unexpired Leases.

The Debtors' determinations regarding the assumption, assumption and assignment or rejection

of Executory Contracts and Unexpired Leases are based on and within the sound business

judgment of the Debtors, are necessary to the implementation of the Plan and are in the best

interests of the Debtors, their estates, holders of Claims and other parties in interest in the

Chapter 11 Cases.  *See* 12/10 Transcript, at 198:23 – 205:10.  The Debtors have Filed

Exhibits II.E.1.a, II.E.1.c, II.E.4 and II.E.5 to the Plan (as they may have been amended or

supplemented) and either have provided or will provide notice of the Debtors' determinations

regarding the assumption, assumption and assignment or rejection of Executory Contracts or

Unexpired Leases and any related Cure Amount Claims in accordance with the procedures

(collectively the "Contract Procedures") set forth in paragraph 3 of the Order, Pursuant to

- 29 -

Sections 105, 363 and 1123 of the Bankruptcy Code: (A) Establishing Procedures with Respect to the Proposed Assumption, Assumption and Assignment and Rejection of Executory Contracts and Unexpired Leases and the Treatment of Other Agreements Pursuant to the Debtors' Third Amended Joint Plan of Reorganization and Applicable Law; and (B) Approving the Form and Manner of Notice Thereof (Docket No. 6783), entered on October 31, 2007.

### SETTLEMENTS AND RELEASES

Y.       Pursuant to Bankruptcy Rule 9019(a), and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan (collectively, the "Settlements"), including but not limited to the settlement (the "Ineligible Issue Settlement") between the Debtors, the Creditors' Committee, the Ad Hoc Steering Committee and Centerbridge (1) resolving the dispute between the parties related to certain unsecured creditors that do not qualify to purchase the New Series B Preferred Stock under the terms of the New Investment Agreement and (2) resulting in the creation of the Settlement Pool.

Z.       Based upon the representations and arguments of counsel to the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee and all other testimony either actually given or proffered and other evidence introduced at the Hearing and the full record of these Chapter 11 Cases, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, this Order constitutes the Court's approval of all Settlements, including the Ineligible Issue Settlement (*see* 12/12 Transcript, at 38:25 – 39:3; 120:16 – 137:7; 191:3 – 194:2), and the effectuation of the transactions previously approved by the Court in, among others, the Global Settlement Order, provided for herein or in the Plan because, among other things, such Settlements:

- 30 -

- reflect a reasonable balance between certainty and the risks and expenses of both future litigation and the continuation or conversion of these Chapter 11 Cases;

- fall well within the range of reasonableness for the resolution of complex litigation;

- are fair, equitable and reasonable and in the best interests of the Debtors, Reorganized Debtors, their respective Estates and property, creditors, equity security holders and other parties in interest;

- will maximize the value of the Estates by preserving and protecting the ability of the Reorganized Debtors to continue operating outside of bankruptcy protection and in the ordinary course of business; and

- are essential to the successful implementation of the Plan.

*See* 12/10 Transcript, at  72:15 – 72:20; 120:16 – 137:7; 191:3 – 194:2; 12/12 Transcript, at 38:25 – 39:3.

AA.    Further, each non-Debtor party that will benefit from the releases, exculpations and related injunctions set forth in, among others, Sections IV.E.5, IV.E.6 and IV.E.7 of the Plan (collectively, the "Plan Releases") either shares an identity of interest with the Debtors, was instrumental to the successful prosecution of the Chapter 11 Cases and/or provided substantial consideration to the Debtors, which value will allow for distributions that would not otherwise be available but for the contributions made by such non-Debtor parties.  The Plan Releases are, individually and collectively, integral to, and necessary for the successful implementation of, the Plan, essential to the Debtors' reorganization and supported by reasonable consideration.  Releases of non-Debtor parties pursuant to Section IV.E.6.b of the Plan (1) are binding upon only those creditors (a) that have accepted the Plan and/or (b) to the extent enforceable by applicable law and (2) were appropriately disclosed by the Debtors both in the Disclosure Statement and on each Ballot mailed to creditors.  The Debtors and all creditors that voted to accept the Plan have expressly consented to the Plan Releases and the Creditors'

Committee and the Ad Hoc Bondholders' Committee have not objected to the Plan Releases. Accordingly, in light of all of the circumstances, the Plan Releases are consonant with the prevailing law in this District and are fair to the releasing parties.

**MISCELLANEOUS**

BB.     All findings and conclusions contained in the Global Settlement Order are included herein by this reference, the same as if such findings and conclusions were set forth herein in full.  Except as may be set forth explicitly herein or in an amendment to any of the documents executed in connection with the Global Settlement, this Order does not modify or amend any of the provisions of the Global Settlement or the Global Settlement Order or modify the rights of the parties under the Global Settlement.

CC.     The total amount of Allowed General Unsecured Claims against the Debtors (excluding any General Unsecured Claims held by the Unions (including the Union Claim), any General Unsecured Claims held by the Retiree Committee, Convenience Claims, General Unsecured Claims against EFMG, Prepetition Unsecured Claims and the DCC Claim) will not exceed $3.25 billion and, accordingly, the condition to the Effective Date in Section IV.B.5 of the Plan is satisfied.  *See* 12/10 Transcript, at 189:3 – 190:17; Debtors' Exhibit 15.

DD.     As of the Effective Date and after giving effect to the Restructuring Transactions, the Debtors, the Creditors' Committee, Centerbridge, the Ad Hoc Steering Committee and the Unions agree that the Debtors will not have Cash in excess of (1) the minimum Cash required by the Reorganized Debtors to operate their businesses on the Effective Date and thereafter, *plus* (2) the amount of Cash needed, pursuant to the terms of the Plan, to satisfy all (a) Allowed Secured Claims, Allowed DIP Lender Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims and Allowed Claims in Classes 4, 5A, 6B and 6C and (b) Secured Claims, DIP Lender Claims, Administrative Claims, Priority

- 32 -

Tax Claims, Priority Claims or Claims in Classes 4, 5A, 6B and 6C that (i) are Disputed Claims

and (ii) may become Allowed Claims after the Effective Date, *plus* (3) the amount of Cash

needed to satisfy the Remaining Non-Union Retiree VEBA Contribution, the USW Union

Retiree VEBA Contribution and the UAW Union Retiree VEBA Contribution.  *See* Transcript of

Hearing, December 5, 2007, at 34:11 – 36:4.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED,
AS FOLLOWS:

**A.      Confirmation of Plan**

1.      The Plan and each of its provisions (whether or not specifically approved

herein) are CONFIRMED in each and every respect, pursuant to section 1129 of the Bankruptcy

Code; *provided*, *however*, that if there is any direct conflict between the terms of the Plan and the

terms of this Order, the terms of this Order shall control.

2.      The Effective Date of the Plan shall occur on the date determined by the

Debtors when the conditions set forth in Section IV.B of the Plan have been satisfied or, if

applicable, have been waived in accordance with Section IV.C of the Plan.

3.      Any objections or responses to Confirmation of the Plan and the

reservation of rights contained therein that (a) have not been withdrawn, waived or settled prior

to the entry of this Order or (b) are not cured by the relief granted herein are hereby

OVERRULED in their entirety and on their merits, and all withdrawn objections or responses

are hereby deemed withdrawn with prejudice.

**B.      Approval of Settlements**

4.      Pursuant to Bankruptcy Rule 9019, the Settlements as set forth in the Plan

(including the Ineligible Issue Settlement) are approved in all respects.

- 33 -

5.      The Settlement Pool.  The Settlement Pool shall be established in accordance with the Ineligible Issue Settlement and shall provide for settlement payments to be made to holders of Ineligible Unsecured Claims (as such definition has been modified by the Modifications) in accordance with the terms of Section V.J of the Plan.  Any funds remaining in the Settlement Pool after all payments have been made to holders of Ineligible Unsecured Claims shall be deemed Excess Minimum Cash.

6.      In accordance with section V.J.4 of the Plan, to receive a payment from the Settlement Pool established as part of the Ineligible Issue Settlement, a holder of an Ineligible Unsecured Claim shall be required to provide the Debtors or Reorganized Debtors, as applicable, no later than 15 days after the Effective Date, reasonable evidence that its Claims are Ineligible Unsecured Claims.  The proper completion and execution, and timely submission of a certification (the "Certification") by a holder of an Ineligible Unsecured Claim may be considered such reasonable evidence and the Debtors may rely on such Certification.  Any creditor that fails to provide reasonable evidence that its Claims are Ineligible Unsecured Claims, including the failure to timely submit a properly completed and executed Certification, shall not be eligible to participate in the Settlement Pool in any respect and shall not receive any distributions therefrom.  On the Effective Date, the Debtors shall distribute such Certifications to holders of Class 5B Claims that are Ineligible Unsecured Claims.  Holders of Claims that are first Allowed or estimated after the Effective Date shall not be entitled to participate in the Settlement Pool in connection with such Claims.

C.      **Approval of Releases**

7.      The Plan Releases as set forth in, among others, Section IV.E.6 of the Plan, as such releases may have been modified by the Modifications, are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the

- 34 -

Effective Date of the Plan without further order or action on the part of the Court, any of the parties to such releases or any other party.

8.      Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them, shall forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan, the Global Settlement and the B-2 Backstop Commitment Letter; *provided*, *however*, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

9.      Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim that votes in favor of the Plan (solely with respect to the Claim(s) that such holder voted in favor of the Plan) to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims and termination of Interests provided in the Plan and under this Order and the Bankruptcy Code).  Notwithstanding the foregoing and except with respect to

- 35 -

Derivative Claims and holders of Claims that vote in favor of the Plan (solely with respect to the

Claim(s) that such holder voted in favor of the Plan), nothing in the Plan or this Order shall

release the claims asserted, or to be asserted, solely on account of alleged conduct occurring

prior to the Petition Date, against any non-Debtor defendant in the Securities Litigation.  In

addition, nothing in the Plan shall be deemed to release any applicable Debtor or Reorganized

Debtor from any Liability arising from or related to Asbestos Personal Injury Claims.

10.     From and after the Effective Date, except with respect to obligations

arising under the Plan, the Global Settlement, the Union Fee Order and the B-2 Backstop

Commitment Letter, to the fullest extent permitted by applicable law, the Released Parties shall

release each other from any and all Liabilities that any Released Party is entitled to assert against

any other Released Party in any way relating to any Debtor, the Chapter 11 Cases, the Estates,

the formulation, preparation, negotiation, dissemination, implementation, administration,

confirmation or consummation of any of the Plan (or the property to be distributed under the

Plan), the Confirmation Exhibits, the Disclosure Statement, any contract, employee pension or

other benefit plan, instrument, release or other agreement or document related to any Debtor, the

Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in

connection with either the Plan or any agreement between the Debtors and any Released Party or

any other act taken or omitted to be taken in connection with the Debtors' bankruptcy; *provided*,

*however*, that the foregoing provisions shall not affect the liability of any Released Party that

otherwise would result from any act or omission to the extent that act or omission is determined

in a Final Order to have constituted gross negligence or willful misconduct.

**D.     Order Binding on All Parties**

11.     Subject to the provisions of Section IV.B of the Plan and Bankruptcy

Rule 3020(e), in accordance with section 1141(a) of the Bankruptcy Code and notwithstanding

CLI-1556545v22

any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan

and this Order shall be binding upon, and inure to the benefit of:  (a) the Debtors;

(b) the Reorganized Debtors; (c) any and all holders of Claims or Interests (irrespective of

whether such Claims or Interests are impaired under the Plan or whether the holders of such

Claims or Interests accepted, rejected or are deemed to have accepted or rejected the Plan);

(d) any other person giving, acquiring or receiving property under the Plan; (e) any and all

non-Debtor parties to Executory Contracts or Unexpired Leases with any of the Debtors; and

(f) the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents,

representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the

foregoing.  All settlements (including, without limitation, the Settlements), compromises,

releases (including, without limitation, the Plan Releases), waivers, discharges, exculpations and

injunctions set forth in the Plan shall be, and hereby are, effective and binding on all Persons

who may have had standing to assert any settled, released, discharged, exculpated or enjoined

causes of action, and no other Person or entity shall possess such standing to assert such causes

of action after the Effective Date.

**E.      Consolidation of the Debtors**

12.      As no objections to such consolidation have been Filed or served by any

party pursuant to Section VIII.B of the Plan, the consolidation of the Consolidated Debtors solely

for the purpose of implementing the Plan, including for purposes of voting, Confirmation and

distributions to be made under the Plan is hereby approved.  Solely for purposes of implementing

the Plan, and for no other purposes:  (a) all assets and Liabilities of the Consolidated Debtors will

be deemed merged; (b) all guarantees by one Consolidated Debtor of the obligations of any other

Consolidated Debtor will be deemed eliminated so that any Claim against any Consolidated

Debtor and any guarantee thereof executed by any other Consolidated Debtor and any joint or

- 37 -

several liability of any of the Consolidated Debtors will be deemed to be one obligation of the

Consolidated Debtors; and (c) each and every Claim Filed or to be Filed in the Chapter 11 Case

of any of the Consolidated Debtors will be deemed Filed against the Consolidated Debtors and

will be deemed one Claim against and a single obligation of the Consolidated Debtors.

13.     Such consolidation (other than for the purpose of implementing the Plan)

shall not affect:  (a) the legal and corporate structures of the Consolidated Debtors, subject to the

right of the Consolidated Debtors to effect restructurings as provided in Section V.B; (b) pre- and

post-Effective Date guarantees, liens and security interests that are required to be maintained

(i) in connection with contracts or leases that were entered into during the Chapter 11 Cases or

Executory Contracts and Unexpired Leases that have been or will be assumed or (ii) pursuant to

the Plan; (c) Interests between and among the Consolidated Debtors; (d) distributions from any

insurance policies or proceeds of such policies; or (e) the revesting of assets in the separate

Reorganized Debtors pursuant to Section V.A of the Plan.  In addition, such consolidation shall

not (a) constitute a waiver of the mutuality requirement for setoff under section 553 of the

Bankruptcy Code or (b) otherwise provide the basis for the assertion of any setoff or rights of

subrogation or recoupment of any kind, directly or indirectly, against any obligation due a

Debtor, its Estate or its Assets, or any direct or indirect successor in interest to a Debtor, or any

assets or property of such successor.

## F.     Vesting and Transfer of Assets

14.     On the Effective Date, except as otherwise provided in the Plan (including

with respect to the Restructuring Transactions), all property of the Estate of a Debtor and any

property acquired by a Debtor or Reorganized Debtor under the Plan (including, but not limited

to, owned and leased real property) shall vest (subject to, and taking into account, the

Restructuring Transactions) in, and be transferred to, such Reorganized Debtor in accordance

with the terms of the Plan, free and clear of all liens, charges, Claims, other encumbrances, Interests and other interests in accordance with section 1141 of the Bankruptcy Code, with any prohibitions upon such transfer being null and void.

**G.    Approval of Discharge of Claims and Termination of Interests**

15.    The Plan discharge provision as set forth in Section IV.E.4 of the Plan and the termination of interest provisions of Section V.I of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court or any other party.

16.    Except as specifically set forth in the Plan, as of the Effective Date, pursuant to sections 524 and 1141 of the Bankruptcy Code, the Reorganized Debtors shall be discharged of all Claims and other debts and Liabilities, in accordance with Section IV.E.4 of the Plan, and no creditor shall have recourse against any Reorganized Debtor or any of their assets or property on account of such Claims and other debts and Liabilities.

**H.    Release of Liens**

17.    The release and discharge of all mortgages, deeds of trust, liens or other security interests against the property of any Estate as set forth in Section V.K of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court.  As of the Effective Date, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement this Order and Section V.K of the Plan.

18.    All entities holding Claims against or Interests in the Debtors that are treated under the Plan are hereby directed to execute, deliver, file or record any document, and to

- 39 -

take any action necessary to implement, consummate and otherwise effect the Plan in accordance

with its terms, and all such entities shall be bound by the terms and provisions of all documents

executed and delivered by them in connection with the Plan.  Upon the entry of this Order, all

entities holding Claims against or Interests in the Debtors that are treated under the Plan, and

other parties in interest, along with their respective present or former employees, agents, officers,

directors or principals, shall be enjoined from taking any actions to interfere with the

implementation and consummation of the Plan.

**I.      Injunction**

19.     As of the Effective Date, except as provided in the Plan or this Order, all

entities and Persons that have been, are or may be holders of Claims against or Interests in a

Debtor are enjoined from taking any of the following actions against or affecting a Debtor, its

Estate, its Assets, any direct or indirect successor in interest to a Debtor or any assets or property

of such successor with respect to such Claims or Interests (other than actions brought to enforce

any rights or obligations under the Plan):  (a) commencing, conducting or continuing in any

manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing,

levying, attaching, collecting or otherwise recovering by any manner or means, directly or

indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing

in any manner, directly or indirectly, any lien (other than as contemplated by the Plan);

(d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly,

against any obligation due to any Debtor, its Estate, its Assets, any direct or indirect successor in

interest to a Debtor or any assets or property of such successor; and (e) proceeding in any

manner in any place whatsoever that does not conform to or comply with the provisions of the

Plan or the settlements set forth therein (including, without limitation, the Settlements).

CLI-1556545v22

20.      All Persons that have held, currently hold or may hold any Liabilities

released or exculpated pursuant to Sections IV.E.6 and IV.E.7 of the Plan, respectively, are

permanently enjoined from taking any of the following actions against any Released Party or its

property on account of such released Liabilities:  (a) commencing, conducting or continuing in

any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing,

levying, attaching, collecting or otherwise recovering by any manner or means, directly or

indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing

in any manner, directly or indirectly, any lien; (d) except as provided in the Plan, asserting any

setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any

obligation due a Released Party; and (e) commencing or continuing any action, in any manner, in

any place that does not comply with or is inconsistent with the provisions of the Plan.

21.      Except with respect to Derivative Claims and holders of Claims that vote

in favor of the Plan (solely with respect to the Claim(s) that such holder voted in favor of the

Plan), nothing in this Order or in the Plan shall enjoin the prosecution of the claims asserted, or

to be asserted, solely on account of alleged conduct occurring prior to the Petition Date, against

any non-Debtor defendant in the Securities Litigation.  In addition, nothing in this Order or in the

Plan shall prevent the holders of Asbestos Personal Injury Claims from exercising their rights

against any applicable Debtor or Reorganized Debtor or its Estate or Assets with respect to their

Asbestos Personal Injury Claims.

22.      With respect to Asbestos Personal Injury Claims, the automatic stay

imposed by section 362 of the Bankruptcy Code is hereby terminated as of the Effective Date

rather than as provided in Section IV.E.5.c of the Plan, and, pursuant to section 108(c) of the

CLI-1556545v22

Bankruptcy Code, the applicable statute of limitations with respect to any such Claim that did not

expire prior to the Petition Date will cease to be tolled as of the Effective Date.

**J.      Survival of Corporate Indemnities**

23.     Prior to the Effective Date, Dana shall make arrangements to continue

liability and fiduciary (including ERISA) insurance for the benefit of its directors, officers and

employees for the period from and after the Effective Date, and, prior to the Effective Date, shall

fully pay the annual premium for such insurance.  With respect to its pre-Effective Date officers

and directors' liability insurance, Dana shall obtain and pay for a run-off policy continuing

existing policy limits on substantially the same terms and conditions as existing officers and

directors' liability policies, for a term of six years, and providing coverage to all parties covered

by policies in effect during the pendency of the cases.

24.     The obligations of each Debtor or Reorganized Debtor to indemnify any

person who was serving as one of its directors, officers or employees on or after February

28, 2006 by reason of such person's prior or future service in such a capacity or as a director,

officer or employee of another corporation, partnership or other legal entity, to the extent

provided in the applicable certificates of incorporation, bylaws or similar constituent documents,

by statutory law or by written agreement, policies or procedures of or with such Debtor or

Reorganized Debtor, shall be deemed and treated as executory contracts that are assumed by the

applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy

Code as of the Effective Date.  Accordingly, such indemnification obligations will survive and

be unaffected by entry of this Order, irrespective of whether such indemnification is owed for an

act or event occurring before or after the Petition Date.

25.     The obligations of each Debtor or Reorganized Debtor to indemnify any

person who was serving as one of its directors, officers or employees prior to February 28, 2006

- 42 -

by reason of such person's prior service in such a capacity or as a director, officer or employee of

another corporation, partnership or other legal entity, to the extent provided in the applicable

certificates of incorporation, bylaws or similar constituent documents, by statutory law or by

written agreement, policies or procedures of or with such Debtor, shall terminate and be

discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective

Date; *provided, however*, that to the extent that such indemnification obligations no longer give

rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy

Code, such indemnification obligations will be deemed and treated as Executory Contracts that

are rejected by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365

of the Bankruptcy Code as of the Effective Date, and any Claims arising from such

indemnification obligations (including any rejection damage claims) will be subject to the bar

date provisions of Section II.E.6 of the Plan, <u>provided that</u> the Debtors shall not have to reserve

for such Claims in the Disputed Claims Reserve, as such claims (if any) are already adequately

reserved for in the Contingency Reserve.

**K.    Exemption From Securities Laws**

26.    Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering,

issuance and distribution of the New Dana Holdco Common Stock pursuant to the Plan are, and

shall be, exempt from section 5 of the Securities Act and any state or local law requiring

registration for the offer or sale of a security or registration or licensing of an issuer or

underwriter of, or broker or dealer in, a security.  Resales and subsequent transactions in the New

Dana Holdco Common Stock shall generally be exempt from registration under the Securities

Act pursuant to section 4(1) of the Securities Act unless the holder thereof is deemed to be (a) an

"underwriter" with respect to the New Dana Holdco Common Stock within the meaning of

section 1145(b) of the Bankruptcy Code, (b) an "affiliate" of New Dana Holdco within the

- 43 -

meaning of the Securities Act or (c) a "dealer" within the meaning of section 2(12) of the Securities Act.

27.     Stockbrokers effecting transactions in the New Dana Holdco Common Stock prior to the expiration of 40 days after the first date on which such securities are bona fide offered to the public by New Dana Holdco or by or through an underwriter shall be required to deliver to the purchaser of such New Dana Holdco Common Stock a copy of the Disclosure Statement at or before the time of delivery of such New Dana Holdco Common Stock to such purchaser, in accordance with section 1145(a)(4) of the Bankruptcy Code.

28.     Each Qualified Investor that subscribes for shares of the New Preferred Stock shall be bound by the restrictions contained in the certificate of designation of New Dana Holdco attached as Exhibit V.C.1.a to the Plan.  In addition, the New Preferred Stock will not have been registered under the Securities Act and will not be issued and distributed pursuant to the exemption from the registration requirements under the Securities Act provided by section 1145 of the Bankruptcy Code and, as such, will be subject to certain restrictions on resale contained in the Securities Act.

**L.     Exemption From Taxation**

29.     Pursuant to section 1146(a) of the Bankruptcy Code, the following transactions will not be subject to any sales or use Tax, stamp Tax, transfer Tax, intangible Tax, mortgage recording Tax or similar Tax, charge, expense or conveyance fee:  (a) the issuance, transfer or exchange of any securities (including the New Dana Holdco Common Stock and New Preferred Stock), instruments or documents; (b) the making of the New Equity Investment; (c) the creation of any mortgage, deed of trust, lien or other security interest; (d) the making or assignment of any lease or sublease; (e) the execution and delivery of the Exit Facility; (f) any Restructuring Transaction, including, but not limited to, any transfers of owned or leased real

- 44 -

property between the Debtors or from a Debtor to a Reorganized Debtor created as part of the

Restructuring Transactions; (g) the establishment of the Settlement Pool; or (h) the making,

delivery or recording of any instrument, lease, deed, pledge, deed of trust, bill of sale or other

instrument of transfer, financing statement or assignment (including any merger agreements and

agreements of consolidation, restructuring, disposition, liquidation or dissolution) or the

revesting, transfer or sale of any real or personal property of a Debtor under, in furtherance of or

in connection with the Plan or this Order.

30.     All filing and recording officers are hereby directed to accept for filing or

recording all instruments of transfer to be filed and recorded in accordance with the Plan or the

Confirmation Exhibits without payment of any such Taxes.  Notice of entry of this Order in the

form approved by the Court (a) shall have the effect of an order of the Court, (b) shall constitute

sufficient notice of the entry of this Order to such filing and recording officers and (c) shall be a

recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law.

This Court retains jurisdiction to enforce the foregoing direction by contempt proceedings or

otherwise.

31.     Any transfers of owned or leased real property undertaken pursuant to the

Plan or the Restructuring Transactions are specifically for the purpose of reorganizing and

restructuring the Debtors under the Bankruptcy Code and shall not trigger (a) any increase in

applicable real property taxes or (b) a reappraisal of any real property so transferred.

**M.     Executory Contracts and Unexpired Leases**

32.     The Executory Contract and Unexpired Lease provisions of Section II.E of

the Plan are specifically approved in all respects, are incorporated herein in their entirety and are

so ordered.  The Debtors are authorized to assume, assign and/or reject Executory Contracts or

Unexpired Leases in accordance with Section II.E of the Plan and the Contract Procedures.

- 45 -

33.     This Order shall constitute an order of the Court approving the

assumptions, assumptions and assignments or rejections described in Section II.E. of the Plan,

pursuant to section 365 of the Bankruptcy Code, as of the later of:  (a) the Effective Date; (b) the

resolution of any motion to reject an Executory Contract or Unexpired Lease filed on or prior to

the Effective Date; or (c) the resolution of any objection to the proposed assumption, assumption

and assignment or rejection of an Executory Contract or Unexpired Lease or the amount of any

proposed Cure Amount Claim.  If an objection to a proposed assumption, assumption and

assignment or Cure Amount Claim is not resolved in favor of the Debtors or the Reorganized

Debtors, the applicable Executory Contract or Unexpired Lease may be designated by the

Debtors or the Reorganized Debtors for rejection within five Business Days of the entry of the

order of the Court resolving the matter against the Debtors.  Such rejection shall be deemed

effective as of the Effective Date.

34.     Except as otherwise provided in the Plan, the Contract Procedures or as

requested in any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant

to section 365 of the Bankruptcy Code, the Debtors shall be deemed to reject each Executory

Contract and Unexpired Lease that (a) was not previously assumed, assumed and assigned or

rejected by an order of the Court, (b) was not assumed pursuant to Section II.E of the Plan

(including any related agreements assumed pursuant to Section II.E.1.b of the Plan) or (c) did not

terminate or expire pursuant to its own terms.

35.     Contracts, leases and other agreements entered into after the Petition Date

by a Debtor, including, without limitation, the Union Settlement Agreements and any Executory

Contracts or Unexpired Leases assumed by a Debtor, shall be performed by such Debtor or

Reorganized Debtor in the ordinary course of its business, as applicable.  Such contracts and

CLI-1556545v22

leases (including any assumed Executory Contracts or Unexpired Leases) shall survive and remain unaffected by entry of this Order; *provided*, *however*, that, except as provided under Section III.A of the Plan, any Executory Contracts or Unexpired Leases assumed by a Debtor and not previously assigned will be assigned to the Reorganized Debtor identified on Exhibit II.E.4 to the Plan. The Debtors and Reorganized Debtors may, at any time until the date that is 30 days after the Effective Date, amend Exhibit II.E.4 to the Plan to identify or change the identity of the Reorganized Debtor party that will be the assignee of an Executory Contract or Unexpired Lease.

36.    As provided in the Contract Procedures, the Reorganized Debtors may provide counterparties to various prepetition agreements that are not executory in nature (collectively, the "Nonexecutory Agreements") and postpetition agreements that generally are not subject to the provisions of section 365 of the Bankruptcy Code (collectively, the "Postpetition Agreements") with notice of the applicable surviving or resulting corporate entity in which such Nonexecutory Agreements and Postpetition Agreements shall vest following the completion of the Restructuring Transactions. The Debtors may exercise their rights under state law and applicable nonbankruptcy law — including section 2-210 of the Uniform Commercial Code — to provide parties to Nonexecutory Agreements and Postpetition Agreements with notice of any assignments as practicable following the Effective Date.

37.    Notwithstanding any language to the contrary in any such Executory Contract or Unexpired Lease, and in accordance with section 365(f) of the Bankruptcy Code, any assignment of an Executory Contract or Unexpired Lease under which a Debtor is the lessee of real property may be effected without (a) the consent of the lessor party thereto and (b) the payment of any fees or similar charges (including attorneys' fees) to the lessor. In addition,

- 47 -

section 365(c)(1) is inapplicable to the Executory Contracts being assumed or assumed and

assigned by the Debtors pursuant to Section II.E of the Plan.

**N.     Plan Distributions**

38.     On and after the Effective Date, distributions on account of Allowed

Claims and the resolution and treatment of Disputed Claims shall be effectuated pursuant to

Section II.B and Article VI of the Plan.  Notwithstanding anything to the contrary in the Plan, the

Distribution Record Date shall be the later of (a) the Confirmation Date and

(b) December 28, 2007.

**O.     Recovery Actions**

39.     Except as otherwise provided in the Plan or in any contract, instrument,

release or other agreement entered into or delivered in connection with the Plan, in accordance

with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may

enforce any claims, demands, rights, defenses and causes of action that the Debtors or the Estates

may hold against any entity, including any Recovery Actions, to the extent not expressly released

under the Plan or by any Final Order of the Bankruptcy Court.

40.     If the Reorganized Debtors determine to pursue any Specified Recovery

Action and, as a result, receive Cash proceeds through a settlement or other compromise of, or a

judgment in connection with, such Specified Recovery Action, then promptly following the

receipt of such Cash proceeds, the Reorganized Debtors will deposit the Net Preference

Recovery Proceeds, if any, with respect to such Specified Recovery Action in the Disputed

Unsecured Claims Reserve for the benefit of creditors and, to the extent applicable, the benefit of

Interest holders as provided in the Plan.

41.     All decisions and determinations by the Reorganized Debtors in

connection with the Specified Recovery Actions, including without limitation decisions and

- 48 -

determinations regarding whether to pursue or at any time to abandon any Specified Recovery

Action and decisions and determinations regarding the terms for any settlement or other

compromise of any Specified Recovery Action that is pursued, will be made in the sole and

absolute discretion of the Reorganized Debtors and none of the Reorganized Debtors, Affiliates

of the Reorganized Debtors or Representatives of the Reorganized Debtors or their Affiliates will

have liability for any act or omission in connection with the Specified Recovery Actions,

including without limitation the pursuit, abandonment or resolution or other compromise thereof.

**P.      Claims Bar Dates and Other Claims Matters**

42.      General Administrative Claim Bar Date Provisions.  Except as otherwise

provided in Section II.A.1.i.ii of the Plan or in a Bar Date Order or other order of the Court,

unless previously Filed, requests for payment of Administrative Claims must be Filed and served

on the Notice Parties, pursuant to the procedures specified in this Order and the notice of entry of

this Order, no later than 30 days after the Effective Date.  Holders of Administrative Claims that

are required to File and serve a request for payment of such Administrative Claims and that do

not File and serve such a request by the applicable Bar Date will be forever barred from asserting

such Administrative Claims against the Debtors, the Reorganized Debtors or their respective

property, and such Administrative Claims will be deemed discharged as of the Effective Date.

Objections to such requests must be Filed and served on the Notice Parties and the requesting

party by the later of (a) 150 days after the Effective Date, (b) 60 days after the Filing of the

applicable request for payment of Administrative Claims or (c) such other period of limitation as

may be specifically fixed by a Final Order for objecting to such Administrative Claims.

43.      Professional Compensation.  Except as otherwise provided in

Sections II.A.1.e, II.A.1.f, II.A.1.h and II.A.1.i.ii.A of the Plan, Professionals or other entities

asserting a Fee Claim for services rendered before the Effective Date must File and serve on the

CLI-1556545v22

Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Fee

Order, this Order or other order of the Court an application for final allowance of such Fee Claim

no later than 60 days after the Effective Date; *provided*, *however*, that any professional who may

receive compensation or reimbursement of expenses pursuant to the Ordinary Course

Professionals Order may continue to receive such compensation and reimbursement of expenses

for services rendered before the Effective Date pursuant to the Ordinary Course Professionals

Order without further Court review or approval (except as provided in the Ordinary Course

Professionals Order).  Objections to any Fee Claim must be Filed and served on the Notice

Parties and the requesting party by the later of (a) 90 days after the Effective Date, (b) 30 days

after the Filing of the applicable request for payment of the Fee Claim or (c) such other period of

limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims.  To the

extent necessary, this Order shall amend and supersede any previously entered order of this

Court regarding the payment of Fee Claims; *provided*, *however*, that Fee Claims Filed by Union

Professionals will continue to be governed by, and paid in accordance with, the Union Fee Order.

Other than as set forth herein or in the Plan, the procedures set forth in the Fee Order regarding

interim compensation of Professionals shall remain in effect through the Effective Date.

Notwithstanding anything to the contrary in the Plan or this Order, each Reorganized Debtor is

authorized to pay the charges that it incurs on or after the Effective Date for retained Estate

Professionals' fees, disbursements, expenses or related support services (including fees relating

to the preparation of Professional fee applications) without application to the Court.

44.    Bar Date for Rejection Claims.  Except as otherwise provided in a Final

Order of the Court approving the rejection of an Executory Contract or Unexpired Lease, Claims

arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan

CLI-1556545v22

must be Filed with the Court on or before the later of:  (a) 30 days after the Effective Date or

(b) for Executory Contracts or Unexpired Leases identified on Exhibit II.E.5 to the Plan, 30 days

after (i) the service of a notice of such rejection is served pursuant to the Contract Procedures, if

the contract counterparty does not timely File an objection to the rejection in accordance with the

Contract Procedures, or (ii) if such an objection to rejection is timely Filed with the Court in

accordance with the Contract Procedures, the date that an order is entered approving the rejection

of the applicable contract or lease or the date that the objection to rejection is withdrawn.  Any

Claims not Filed within such applicable time periods are forever barred from receiving a

distribution from the Debtors, the Reorganized Debtors or the Estates.

       45.     28 U.S.C. § 1930 Fees.  Pursuant to Section II.A.1.b of the Plan, on or

before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930

shall be paid in Cash equal to the amount of such Administrative Claims by the applicable

Reorganized Debtor in accordance therewith until the earlier of the (a) conversion or dismissal of

the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code or (b) closing of the

applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

**Q.**     **Plan Implementation**

       46.     In accordance with section 1142 of the Bankruptcy Code, section 13.1-

604.1 of the Virginia Stock Corporation Act, section 303 of the Delaware General Corporation

Law, section 1701.75 of the Ohio Revised Code, section 808 of the New York Business

Corporation Law and any comparable provisions of the business corporation law of any other

state (collectively, the "Reorganization Effectuation Statutes"), without further action by the

Court or the stockholders, members, managers or directors of any Debtor or Reorganized Debtor,

the Debtors, the Reorganized Debtors, as well as the Chairman of the Board, Chief Executive

Officer, President, Vice President, Chief Financial Officer, Treasurer, Assistant Treasurer or

- 51 -

Secretary (collectively, the "<u>Responsible Officers</u>") of the appropriate Debtor or Reorganized

Debtor, are authorized to:  (a) take any and all actions necessary or appropriate to implement,

effectuate and consummate the Plan, this Order or the transactions contemplated thereby or

hereby, including, without limitation, those transactions identified in Article V of the Plan and

the payment of any employment taxes owing in respect of distributions under the Plan; and

(b) execute and deliver, adopt or amend, as the case may be, any contracts, instruments, releases,

agreements and documents necessary to implement, effectuate and consummate the Plan,

including without limitation, those contracts, instruments, releases, agreements and documents

identified in Article V of the Plan.

47.    To the extent that, under applicable non-bankruptcy law, any of the

foregoing actions would otherwise require the consent or approval of the stockholders or

directors of any of the Debtors or Reorganized Debtors, this Order shall, pursuant to

section 1142 of the Bankruptcy Code and the Reorganization Effectuation Statutes, constitute

such consent or approval, and such actions are deemed to have been taken by unanimous action

of the directors and stockholders of the appropriate Debtor or Reorganized Debtor.

48.    Each federal, state, commonwealth, local, foreign or other governmental

agency is hereby directed and authorized to accept any and all documents, mortgages and

instruments necessary or appropriate to effectuate, implement or consummate the transactions

contemplated by the Plan and this Order.

49.    All transactions effected by the Debtors during the pendency of the

Chapter 11 Cases from the Petition Date through the Confirmation Date are approved and

ratified.

CLI-1556545v22

50.     The consummation of the Plan, the implementation of the Restructuring

Transactions or the assumption or assumption and assignment of any Executory Contract or

Unexpired Lease to another Reorganized Debtor shall not constitute a change in ownership or

change in control under any employee benefit plan or program, financial instrument, loan or

financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in

existence on the Effective Date to which a Debtor is a party.

**R.     Implementation of the Global Settlement**

51.     <u>Assumption and Assignment of Collective Bargaining Agreements</u>.  On

the Effective Date, Reorganized Dana will assume and assign to the applicable Reorganized

Debtor, in consultation with and subject to the consent of the applicable Unions, the collective

bargaining agreements identified on Exhibit III.A to the Plan, which include the Union

Settlement Agreements, and such other agreements as are described in Section III.A of the Plan.

Upon assumption, all proofs of Claim filed by the Unions or any individual relating to such

collective bargaining agreements will be deemed withdrawn to the extent that such proofs of

Claim relate to such collective bargaining agreements.  Ordinary course obligations arising under

the assumed agreements shall be unaltered by the Plan and shall be satisfied in the ordinary

course of the Reorganized Debtors' business.  The Debtors shall take any and all actions

necessary to implement the terms of the Global Settlement.

52.     <u>Cessation of Union Retiree and Long Term Disability Benefits</u>.  On the

Union Retiree Benefit Termination Date, the Reorganized Debtors, in accordance with the Union

Settlement Agreements, shall cease providing and paying (a) all retiree benefits (as defined in

section 1114(a) of the Bankruptcy Code) to all UAW and USW-represented retirees and (b) all

long-term disability income and medical benefits to individuals who are Union Disableds (as

defined in the Union Settlement Agreements).

- 53 -

53.    _Contributions to UAW Union Retiree VEBA and USW Union Retiree_
_VEBA_.  After the Effective Date, in accordance with the terms of the Union Settlement
Agreements, the Reorganized Debtors will make (a) the UAW Union Retiree VEBA
Contribution and (b) the USW Union Retiree VEBA Contribution, as such contributions may be
adjusted pursuant to Appendix K of the Union Settlement Agreements.

54.    _Assumption and Assignment of Pension Benefits_.  On the Effective Date,
Reorganized Dana shall assume and assign the Pension Plans to Dana Limited, which shall
become the sponsor and continue to administer the Pension Plans, satisfy the minimum funding
standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082 and administer the Pension Plans in
accordance with their terms and the provisions of ERISA and the Internal Revenue Code.
Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the
Debtors or the Debtors' successors from any liability imposed under any law or regulatory
provision with respect to the Pension Plans.  Neither the PBGC, the Pension Plans nor any
participant or beneficiary of the Pension Plans shall be enjoined or precluded from enforcing
such liability with respect to the Pension Plans.

55.    _Emergence Bonus for Union Employees_.  In accordance with the terms of
the Union Settlement Agreements, New Dana Holdco shall reserve New Dana Holdco Common
Stock having a maximum aggregate Per Share Value of $22.53 million to be distributed to
certain current and former union employees as a post-emergence bonus in accordance with
Appendix J to the Union Settlement Agreements.

56.    _The New Equity Investment_.  On the Effective Date, New Dana Holdco,
shall (a) issue the New Preferred Stock and (b) receive the New Equity Investment in accordance
with the terms and conditions of the New Investment Agreement, the New Series B Subscription

Agreements and the B-2 Backstop Commitment Letter.  The New Investment Agreement, as amended by the executed First Amendment to the Investment Agreement, dated December 7, 2007 (Docket No. 7407), is approved in all respects and the issuance of New Preferred Stock pursuant thereto is approved in all respects with no further stockholder or directors action required.

57.    New Employment Agreements.  Prior to the Effective Date, the individuals who will serve as directors of New Dana Holdco, shall appoint a three-person committee of such directors to commence negotiating, in consultation with Centerbridge, post-Effective Date employment agreements with New Dana Holdco's anticipated senior management team.  Such employment agreements shall (a) be at market terms, (b) be reasonably acceptable in form and substance to Centerbridge, in consultation with the Ad Hoc Steering Committee as set forth in the Plan Term Sheet, and (c) be approved by New Dana Holdco's board of directors on or after the Effective Date.

**S.      Claims Monitor**

58.    The appointment of a Claims Monitor as described at Section V.G of the Plan (as modified by the Modifications) is hereby approved and the Debtors are authorized to enter into an engagement letter (the "Engagement Letter") with the Claims Monitor consistent with Section V.G of the Plan (as modified by the Modifications), which may also provide for customary indemnities.  The identity of the Claims Monitor, as filed with the Court on December 6, 2007, is hereby approved and shall be effective as of the Effective Date.

59.    The powers, rights and responsibilities of the Claims Monitor shall be as specified in the Plan.  In connection with its responsibilities, the Claims Monitor may employ, without further order of the Court, professionals to assist in carrying out its duties under the Plan.

- 55 -

60.     Except as otherwise ordered by the Court, the reasonable and necessary fees and expenses of the Claims Monitor (including the reasonable and necessary fees and expenses of any professionals assisting the Claims Monitor in carrying out its duties under the Plan) shall be paid by the Reorganized Debtors in accordance with the Plan and the Engagement Letter without further order from the Bankruptcy Court.

## T.     Cancellation of Securities

61.     On the Effective Date, the Indentures, the Bonds and the Old Common Stock of Dana (including, without limitation, the Series A Participating Preferred Stock Purchase Rights issued pursuant to the Rights Agreement, dated as of April 25, 1996, as amended, between Dana and The Bank of New York, as Rights Agent) shall be deemed canceled and of no further force and effect, without any further action by the Debtors, the Reorganized Debtors or the Court.  The holders of and parties to such canceled securities and other documentation shall have no rights arising from or relating to such securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan, *provided*, *however*, that the applicable provisions of the Indentures shall continue in effect solely for the purposes of (a) allowing the Indenture Trustee or other Disbursing Agent to make distributions on account of Bondholder Claims under the Plan as provided in Section VI.F of the Plan and for the Indenture Trustee to perform such other functions with respect thereto under the Indentures and to have the benefit of all the protections and other provisions of the applicable Indentures with respect to the Bondholders in doing so and (b) permitting the Indenture Trustee to maintain or assert any rights or Charging Liens it may have on distributions to Bondholders for the Indenture Trustee Fee Claim pursuant to the terms of the Plan and the applicable Indenture.  The Reorganized Debtors shall have not have any obligations to the Indenture Trustee for any fees, costs or expenses except as expressly provided in the Plan.

62.    Nothing in the Plan shall be deemed to impair, waive or extinguish the Charging Lien with respect to fees and expenses of the Indenture Trustee incurred after the Effective Date.  Reasonable fees and expenses incurred by the Indenture Trustee after the Effective Date (a) in its capacity as a Disbursing Agent, (b) for matters relating to distributions to Bondholders, (c) for matters relating to any dispute concerning the Indenture Trustee Fee Claims, (d) for matters relating to any dispute concerning the Claims of the Indenture Trustee and (e) matters relating to enforcement of the Plan will be paid in accordance with Section VI.D of the Plan and any dispute between the Reorganized Debtors and the Indenture Trustee regarding the reasonableness of such fees and expenses will be submitted to this Court for resolution.

63.    Nothing in the Plan shall be deemed to impair, waive or extinguish any rights of the Indenture Trustee with respect to a Charging Lien, *provided*, *however*, that any such Charging Lien will be released to the extent provided in the Plan upon payment of the Indenture Trustee's reasonable fees and expenses in accordance with the terms of the applicable Indentures and the Plan.

**U.    Approval of Equity Incentive Plan**

64.    Entry of this Order constitutes the approval of the equity incentive plan described at Section V.E.5 of the Plan (the "Equity Incentive Plan"), substantially in the form as Filed with the Court on December 7, 2007 (Docket No. 7401).  The Debtors and Reorganized Debtors, as applicable, are authorized to (a) take any and all actions necessary or appropriate to implement, effectuate and consummate the Equity Incentive Plan and (b) execute and deliver, adopt or amend, as the case may be, any contracts, instruments, agreements and documents necessary to implement, effectuate and consummate the Equity Incentive Plan.

CLI-1556545v22

## V.    Approval of Non-Union Emergence Bonus

65.    New Dana Holdco shall  reserve New Dana Holdco Common Stock having a maximum aggregate Per Share Value of $22.0 million to be distributed to certain non-union hourly and salaried non-management employees, excluding in all events employees that will be eligible for management bonus programs after the Effective Date, on terms and conditions established by the Debtors or the Reorganized Debtors consistent with the description of such terms and conditions previously provided to the Unions and the Creditors' Committee.

## W.    Binding Effect of Prior Orders

66.    Pursuant to section 1141 of the Bankruptcy Code, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 11 Cases, all documents and agreements executed by the Debtors as authorized and directed thereunder and all motions or requests for relief by the Debtors pending before the Court as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Reorganized Debtors and their respective successors and assigns.

## X.    Final Order

67.    This Order is a final order, and the period in which an appeal must be Filed shall commence immediately upon the entry hereof.

## Y.    Reversal

68.    If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of such order.  Notwithstanding any such reversal, modification or vacatur of this Order, any such

- 58 -

act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan and all related documents or any amendments or modifications thereto.

## Z.    Notice of Confirmation of the Plan

69.    Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2), the Debtors or the Reorganized Debtors are directed to serve a notice of the entry of this Order and the establishment of bar dates for certain Claims hereunder, substantially in the form of Appendix III attached hereto and incorporated herein by reference (the "Confirmation Notice"), on all parties that received the Confirmation Hearing Notice and parties to Executory Contracts or Unexpired Leases in accordance with the Contract Procedures, no later than 20 Business Days after the Confirmation Date; *provided*, *however*, that the Debtors or the Reorganized Debtors shall be obligated to serve the Confirmation Notice only on the record holders of Claims or Interests as of the Confirmation Date.  The Debtors are directed to publish the Confirmation Notice once in the national editions of *The Wall Street Journal* and *USA Today* and the daily edition of the *Toledo Blade* no later than 20 Business Days after the Confirmation Date.  As soon as practicable after the entry of this Order, the Debtors shall make copies of this Order and the Confirmation Notice available on BMC Group's website at www.dana.bmcgroup.com.

## AA.    Miscellaneous Provisions

70.    The Debtors are hereby authorized to amend or modify the Plan at any time prior to the substantial consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and Section X.A of the Plan, without further order of the Court.  In addition, without the need for a further order or authorization of this Court, but subject to the express provisions of this Order, the Debtors shall be authorized and empowered to make non-

- 59 -

material modifications to the documents Filed with the Court, including Confirmation Exhibits

or documents forming part of the evidentiary record at the Hearing, in their reasonable business

judgment as may be necessary; *provided*, *however*, the Debtors shall provide the Creditors'

Committee and the Unions with 5 days' notice of such non-material modifications.

71.     On the Effective Date, the Official Committees, to the extent not

previously dissolved, shall dissolve, and the members of the Official Committees and their

respective Professionals shall cease to have any role arising from or related to the Chapter 11

Cases; *provided*, *however*, that the Creditors' Committee (a) shall continue to exist for the

purpose of objecting to and litigating Fee Claims and applications for fees and expenses under

section 503(b) of the Bankruptcy Code and (b) to the extent (i) an appeal to this Order is pending

as of the Effective Date and (ii) the Creditors' Committee is a party to and is actively

participating in such appeal, the Creditors' Committee shall continue to exist for the purpose of

participating in such appeal; and *provided further*, that the Retiree Committee shall continue to

exist solely for the purpose of fully and finally resolving the claim for the termination of

non-pension retiree benefits of the International Brotherhood of Boilermakers, Iron Ship

Builders, Blacksmiths, Forgers and Helpers AFL-CIO (the "Boilermakers") who were formerly

employed at the Debtors' heavy axle facility in Marion, Ohio (the "Boilermaker Claim") and for

such reasonable time thereafter for purposes of either effecting payment to each of the retirees

and/or their surviving spouses and eligible dependents formerly employed at the Debtors' heavy

axle facility in Marion, Ohio and affiliated with the Boilermakers (the "Boilermaker Retirees") or

informing each Boilermaker Retiree of any Allowed Claim.

72.     Upon the later of (a) the resolution of the Creditors' Committee's

outstanding objections to any Fee Claims and applications for fees and expenses under

CLI-1556545v22

section 503(b) of the Bankruptcy Code and (b) the resolution of any appeal of this Order in which the Creditors' Committee is actively participating, the Creditors' Committee shall dissolve, and its Professionals shall cease to have any role arising from or relating to the Chapter 11 Cases. Upon the full and final resolution of the Boilermaker Claim and effecting payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any Allowed Claim, the Retiree Committee shall dissolve, and its Professionals (both legal and actuarial) shall cease to have any role arising from or relating to these Chapter 11 Cases. The Reorganized Debtors shall pay the reasonable expenses of the members of the Creditors' Committee and the reasonable fees and expenses of the Creditors' Committee's Professionals incurred in connection with (a) objecting to and litigating Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (b) to the extent applicable, actively participating in an appeal of this Order, without further Court approval. The Reorganized Debtors shall pay the reasonable expenses of the Retiree Committee and the reasonable fees and expenses of the Retiree Committee's Professionals (legal and/or actuarial) incurred in connection with the full and final resolution of the Boilermaker Claim and effecting payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any Allowed Claim without the need for further Bankruptcy Court approval.

73.     The Professionals retained by the Official Committees (legal and, if deemed necessary by the Retiree Committee, financial and actuarial) and the respective members thereof shall not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with (a) any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served

- 61 -

after the Effective Date pursuant to Section II.A.1.i.ii.A of the Plan; (b) with respect to the

Retiree Committee's efforts in fully and finally resolving the Boilermaker Claim and effecting

payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any Allowed

Claim; and (c) with respect to the Creditors' Committee (i) objecting to and litigating Fee Claims

and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (ii) to

the extent applicable, the Creditors' Committee's active participation in any appeal of the

Confirmation Order.

74.    Nothing contained in paragraphs 71 through 73 shall, or shall be deemed

to, limit, abridge or otherwise affect the exculpations and limitations on liability to which the

foregoing parties may be entitled under Article IV of the Plan.

75.    As to the United States, its agencies, departments or agents (collectively

the "United States") and the Indiana Department of Environmental Management (the "IDEM"),

nothing in the Plan or this Confirmation Order, including Sections IV.E.4, 5, 6 and 7 of the Plan,

shall discharge, release, or otherwise preclude:  (a) any liability of the Debtors or Reorganized

Debtors first arising on or after the Confirmation Date; (b) any liability that is not a Claim;

(c) any valid right of setoff or recoupment against a Debtor or Reorganized Debtor; (d) any

police or regulatory action against a Debtor or Reorganized Debtor to the extent excepted from

the automatic stay provisions of section 362 of the Bankruptcy Code; (e) any environmental

liability that a Debtor or Reorganized Debtor may have as an owner or operator of real property

owned or operated by a Debtor or Reorganized Debtor on or after the Confirmation Date; and

(f) any liability to the United States or the IDEM on the part of any Persons other than the

Debtors and Reorganized Debtors.  Notwithstanding the foregoing and for the avoidance of

doubt, other than as set forth in this paragraph, all Claims of the United States and the IDEM

CLI-1556545v22

against any Debtor or Reorganized Debtor are discharged as of the Effective Date to the extent

such Claims are discharged under the Plan.  In addition,  proof of claim number 11790 filed by

the IDEM against Dana is not a Tort Claim.

76.    Nothing in the Plan or this Confirmation Order shall be construed to limit,

expand, modify or otherwise affect relief granted in the Opinion and Order of the United States

District Court for the Southern District of New York, dated November 20, 2007, in Case

No. 07 Civ. 8160 (SAS) (the "Withdrawal Order"), which approved the motion of the United

States Environmental Protection Agency and certain other federal agencies (collectively,

the "EPA") pursuant to 28 U.S.C. § 157(d) to withdraw the reference in connection with the

Debtors' pending objection to the EPA's proofs of claims identified as Claim Numbers 13321,

13796 and 14958 and related estimation proceeding, as long as such Order remains in effect.

See Withdrawal Order at 27 (indicating that the District Court is "withdrawing the reference to

the bankruptcy court of all proceedings relating to the Government's claims, including but not

limited to the Claim Objection and the Estimation Motion").  In addition, notwithstanding any

other provision of this Order or the Plan, the Debtors shall not reduce the specific reserve amount

established for any particular Claim (or group of Claims) identified on Exhibit A to the Claims

Reserve Order without either (a) obtaining the written agreement of the holder of the Claim(s),

(b) an order of the Bankruptcy Court addressing the allowance or estimation of the Claim(s) or

(c) compliance with the additional reserve procedures in paragraph 4(a) of the Claims Reserve

Order.

77.    The Reorganized Debtors shall file a consolidated report of their activities

and financial affairs with the Court on a quarterly basis, within 30 days after the conclusion of

each such period, with the first such report being due 30 days after the conclusion of the first

- 63 -

calendar quarter following the Effective Date. Any such reports shall be prepared substantially consistent with (both in terms of content and format) the applicable Court and U.S. Trustee guidelines for such matters.

78.    Notwithstanding anything to the contrary contained in this Order, the Plan or section 1141 of the Bankruptcy Code, the obligations of Dana Corporation, Torque Traction Manufacturing Technologies, LLC. and Dana Heavy Axle Mexico, S.A. de C.V. under that certain Settlement Agreement between Dana and Sypris Solutions, Inc., Sypris Technologies, Inc., Sypris Technologies Marion, LLC and Sypris Technologies Mexico, S. de R.L. de C.V. and the New Agreement (defined in the Settlement Agreement), approved by this Court on August 7, 2007, shall survive entry of the Confirmation Order unimpaired.

79.    With respect to federal tax liabilities incurred by Debtors after the Petition Date and before the Confirmation Date, the Internal Revenue Service expressly reserves the right to seek to recover as Administrative Claims under the Plan penalties and interest with respect to such tax liabilities accruing on or after the Petition Date until the date that such tax liabilities are paid in full as Allowed Administrative Claims under the Plan and the Debtors and Reorganized Debtors reserve the right to object to such Claims. In addition, Allowed Priority Tax Claims of the Internal Revenue Service will accrue Post-Effective Date Interest until paid, and the Internal Revenue Service and the Debtors will work expeditiously to resolve and finalize all such Priority Tax Claims.

80.    The Claims of Pine Tree Independent School District (Proof of Claim No. 14746), Longview Independent School District (Proof of Claim No. 14746), County of Harrison (Proof of Claim No. 14748), Hallsville Independent School District (Proof of Claim No. 14748), Dallas County (Proof of Claim No. 14841) and Gregg County (Proof of Claim No.

- 64 -

14693) (collectively, the "Taxing Authorities") are Secured Tax Claims that will be paid on the

Effective Date, or as soon thereafter as such Claims are Allowed.  Payment of such Allowed

Secured Tax Claims shall include prepetition interest at the applicable statutory rate, Postpetition

Interest and Post-Effective Date Interest, but will not include any penalties, which are hereby

waived.  To the extent any postpetition Taxes owing to the Taxing Authorities are not timely

paid before delinquency, they shall accrue both penalties and interest as provided in section

503(b)of the Bankruptcy Code.  Property taxes for 2007 and any subsequent years owing to the

Taxing Authorities shall be paid in the ordinary course without the requirement of the filing of an

Administrative Claim, or any request for payment of such.  Further, any ad valorem property tax

liens of the Taxing Authorities for prepetition Taxes as well as for the postpetition tax years are

hereby expressly preserved and shall remain attached to the corresponding property with the

same validity, force, effect and priority as provided under applicable non-bankruptcy law until

payment as provided for herein.

81.    Nothing in the Plan or this Order shall be construed to alter, amend, limit,

expand or modify the Lead Plaintiffs' right, if any, to seek recovery against the Debtors in

respect of Proof of Claim No. 10820, to the extent such Claim is eventually Allowed or

otherwise resolved by a court of competent jurisdiction, solely to the extent of available

proceeds, if any, under applicable Insurance Contracts, if any.

82.    Nothing in the Plan or this Order shall be construed to alter, amend, limit,

expand or modify the rights of Ogre Holdings, Inc. f/k/a Acraline Products, Inc. ("Ogre"), if any,

to pursue a claim  for available proceeds, if any, under applicable Insurance Contracts, if any (an

"Insurance Action"), on account of the costs for required environmental remediation for the site

located at 641 Cleveland Street in Tipton County, Tipton, Indiana (the "Tipton Site"), as set forth

in Proof of Claim No. 11615 filed in these cases by Ogre (as it may be amended, the "Ogre Claim"); provided, however, that (a) Ogre shall not pursue any such Insurance Action to the extent that the Reorganized Debtors may incur any direct or indirect liabilities to Ogre as a result of such Insurance Action, and Ogre shall be permitted to name any of the Reorganized Debtors solely as a nominal party in any Insurance Action; and (b) Ogre shall not initiate any such Insurance Action until both the Ogre Claim and Proof of Claim No. 11790 (as it may be amended) asserted by the Indiana Department of Environmental Management with respect to the Tipton Site are Allowed or otherwise resolved by agreement or a final nonappealable order of the Bankruptcy Court. For the avoidance of doubt, (a) nothing in the preceding sentence shall limit or modify the discharge of the Ogre Claim pursuant to sections 1141 and 524 of the Bankruptcy Code upon the entry of this Order; and (b) the rights of the Reorganized Debtors or any other parties under applicable non-bankruptcy law to challenge any Insurance Action brought by Ogre on any and all available grounds are fully preserved.

83.     The terms and conditions of the Exit Facility and any documents related thereto are approved and ratified as being entered in good faith and being critical to the success and feasibility of the Plan. The Reorganized Debtors are hereby authorized to execute and deliver the loan agreement for the Exit Facility, all mortgages, security documents and all other related documents (the "Exit Facility Documents") and perform their obligations thereunder. The Exit Facility Documents shall constitute the legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. On the Effective Date, all of the liens and security interests to be granted in accordance with the Exit Facility Documents shall be deemed approved and shall be legal, valid, binding and enforceable liens on the collateral in accordance with the terms of the Exit Facility Documents.

- 66 -

84.    Except as otherwise provided in the Plan and this Order, notice of all subsequent pleadings in the Chapter 11 Cases shall be limited to counsel to the Debtors, counsel for the Claims Monitor, counsel for Centerbridge, the United States Trustee and any party known to be directly affected by the relief sought.

85.    Failure specifically to include or reference particular sections or provisions of the Plan or any related agreement in this Order shall not diminish or impair the effectiveness of such sections or provisions, it being the intent of the Court that the Plan be confirmed and such related agreements be approved in their entirety.

86.    Any document related to the Plan that refers to a plan of reorganization of the Debtors other than the Plan confirmed by this Order shall be, and it hereby is, deemed to be modified such that the reference to a plan of reorganization of the Debtors in such document shall mean the Plan confirmed by this Order, as appropriate.

87.    Without intending to modify any prior Order of this Court (or any agreement, instrument or document addressed by any prior Order), in the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (unless otherwise expressly provided for in such agreement, instrument, or document).  In the event of any inconsistency between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

88.    In accordance with Section IV.D of the Plan, if the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects, including with respect to (i) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy

- 67 -

CLI-1556545v22

Code, (ii) the assumptions, assignments or rejections of Executory Contracts or Unexpired

Leases pursuant to section II.E of the Plan and (iii) the releases described in section IV.E of the

Plan; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims

by or against, or any Interest in, any Debtor or (ii) prejudice in any manner the rights of the

Debtors or any other party in interest.

        89.     The business and assets of the Debtors shall remain subject to the

jurisdiction of this Court until the Effective Date.  Notwithstanding the entry of this Order, from

and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 11 Cases as

is legally permissible, including jurisdiction over those matters and issues described in Article IX

of the Plan.

Dated: New York, New York
       December 26, 2007

                /s/ Burton R. Lifland
                UNITED STATES BANKRUPTCY JUDGE

CLI-1556545v22