UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:                                           :         Chapter 11
                                                 :
Dana Corporation, et al.                         :         Case No. 06-10354 (BRL)
                                                 :         (Jointly Administered)
                         Debtors,                :
-------------------------------------------------------x

APPEARANCES:

WHITE & CASE LLP
Attorneys for Appaloosa Management LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Wachovia Financial Center
200 South Biscayne Blvd.
Miami, Florida 33131
(305) 371-2700
By:    Thomas E. Lauria, Esq.
       Richard S. Kebrdle, Esq.
       J. Christopher Shore, Esq.
       Gerard Uzzi, Esq.

 STROOCK & STROOCK & LAVAN LLP
Attorneys for the Ad Hoc Committee of Dana Noteholders
180 Maiden Lane
New York, New York 10038
(212) 806-5400
By:    Kristopher M. Hansen, Esq.
       Sayan Bhattacharya, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, New York 10004
(212) 510-0500
By:    Diana Adams, Esq.
       Andrew Velez-Rivera, Esq.


Before:  Hon. Burton R. Lifland,
         United States Bankruptcy Judge

1

**DECISION AND ORDER DENYING MOTION FOR ALLOWANCE
AND REIMBURSEMENT OF FEES AND EXPENSES PURSUANT TO
SECTION 503(b) OF THE BANKRUPTCY CODE**

Appaloosa Management L.P. ("Appaloosa") seeks entry of an order pursuant to section 503(b)(3) and 503(b)(4) of title 11 of the United States Code (the "Bankruptcy Code") for (a) allowance of an administrative expense claim in the aggregate amount of $2,507,657.80 (the "Administrative Claim"), consisting of $2,053,640.00 in fees and expenses incurred by White & Case LLP ("W&C") and $454,017.80 in expert fees and expenses incurred by Blackstone Advisory Services, L.P. ("Blackstone" and, together with W&C, the "Professionals") for recovery of the actual fees and expenses incurred in making an alleged substantial contribution to the chapter 11 cases (the "Cases") of Dana Corporation ("Dana") and its affiliated debtors and debtors in possession (collectively with Dana, the "Debtors"). The United States Trustee ("UST") and the Ad Hoc Committee of Certain Equity Holders (the "Ad Hoc Committee")[1] object. This is the second quest by Apaloosa, a nonretained party-in-interest, to wrest a payment from the Debtors' estate for what it subjectively (and questionably) describes itself as having <u>substantially</u> contributed to the successful reorganization of the Debtors. The first was an earlier aborted attempt to lubricate and secure an advanced, unopposed approval of a section 503(b) request in return for withdrawal of an appeal. *See ¶* <u>Appaloosa's Activities Subsequent to Its Appeal</u>, p. 9.

***Background***

The Debtors are leading suppliers of modules, systems and components for original equipment

---

[1] Formerly known as the Ad Hoc Committee of Dana Noteholders.

manufacturers and service customers in the light, commercial and off-highway vehicle markets. The Debtors and their nondebtor affiliates (the "Dana Companies") have more than 100 leased and owned domestic business locations and have operations in approximately 25 states, as well as in Mexico, Canada, 11 countries in Europe and 14 countries elsewhere in the world. For the year ended December 31, 2006, the Dana Companies recorded revenue of approximately $8.5 billion and had assets of approximately $6.7 billion and liabilities totaling $7.6 billion. As of March 3, 2006, the Dana Companies had approximately 44,000 employees.

On March 3, 2006 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, Appaloosa was the largest single holder of common stock of Dana and a holder of some debt securities.

In addition to an official committee of unsecured creditors (the "Creditors' Committee"), the UST appointed an official committee of equity security holders (the "Equity Committee") consisting of three Dana shareholders, including Appaloosa. The Equity Committee retained counsel, but after only six months Appaloosa and another member resigned and the Equity Committee was dissolved on February 9, 2007. In August 2006, the UST also appointed an official committee of non-union retired employees (the "Retiree Committee"), pursuant to section 1114(d) of the Bankruptcy Code.

As of January 1, 2007, the Debtors' unionized workforce was composed of approximately 6,500 employees working at 25 different U.S. facilities. For 2006, the total cost for wages paid
and benefits provided to the Debtors' unionized workforce was approximately $405 million, or in excess of $60,000 per employee. As of December 31, 2006, the Debtors' Accumulated Post-

Employment Benefit Obligation for Non-Pension Retiree Benefits for Union employees and retirees was approximately $1 billion. Over the previous five years, the Debtors' U.S. operations had experienced in excess of $2 billion in losses and could not be restructured without addressing the escalating union labor and retiree legacy costs.

In October 2006, the Debtors outlined the key components of what they believed was necessary to emerge from chapter 11 as a viable business. Specifically, the Debtors communicated to the labor unions, the Creditors Committee and other key constituencies that the Debtors needed to achieve annual cost savings or revenue enhancement of approximately $405 to $540 million, which the Debtors believed they could achieve from five separate areas (the "Revenue Enhancement Goals"): the restructuring of some of their unprofitable or below market contracts with customers (approximately $175 to $225 million in annual revenue improvements); capitalizing on the Debtors' lower cost manufacturing capabilities by shifting work, where possible, from high-cost operations to low-cost countries (approximately $60 to $85 million in annual cost savings); eliminating various overhead costs ($40 to 50 million in annual cost savings); reducing their labor costs associated with their union and non-union workforce ($60 to $90 million in annual cost savings); and lastly, eliminating non-pension retiree benefits for both union and non-union retirees (as well as any anticipated coverage for both union and non-union active employees) (annual cost savings of approximately $70 to $90 million).

It was recognized by the major constituencies that achievement of all or most of the Revenue Enhancement Goals was essential to a successful reorganization. Notably, Appaloosa, as the major shareholder and erstwhile member of the disbanded Equity Committee, undertook no role in the stormy attempts to reach the five Revenue Enhancement Goals. The other

constituencies, including the Debtors, were the activist oarsmen.

The $130 to $180 million in savings the Debtors sought to realize from the labor and legacy cost component was composed of the following: (a) modifications to certain benefits and programs offered to non-union active employees beginning on January 1, 2007; (b) elimination of Non-Pension Retiree Benefits for non-union active employees and retirees; (c) elimination of Non-Pension Retiree Benefits for union retirees and active employees; and (d) modifications to certain collective bargaining agreements ("CBAs") including wages, as well as certain benefits and programs offered to union active employees. To achieve that goal, on January 31, 2007, the Debtors filed with this Court a motion under sections 1113 and 1114 of the Bankruptcy Code (the "Labor Motion") to reject certain CBAs with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW" and together with the UAW, the "Unions") and to modify certain retiree benefits. The Debtors also filed a motion under section 363 of the Bankruptcy Code for entry of an order authorizing the Debtors to terminate Non-Pension Retiree Benefits for their non-union active employees and retirees (the "Unilateral Termination Motion").
The Unions objected to the proposed rejection of the CBAs and threatened to strike.

The hotly contested trial on the Labor Motion began on March 12, 2007. Prior to the commencement of the trial, the Debtors announced that they had reached consensual agreements with both the International Association of Machinists and Aerospace Workers (with respect to the section 1113 issues in the Labor Motion) and the Retiree Committee (with respect to both the

section 1114 portion of the Labor Motion and the Unilateral Termination Motion). After concluding the trial on April 3, 2007,[2] the Debtors, the Unions and Centerbridge Capital Partners, L.P. ("Centerbridge"), which had been retained as an advisor to the Unions, engaged in extensive collective bargaining in connection with negotiating an overall resolution of the Union labor, retiree and operational issues that had plagued the Debtors' U.S. operations. Such a resolution would enable the Debtors to move forward with a plan of reorganization and satisfy the Unions' desire to protect the interests of their members and retirees to the greatest extent possible given the circumstances.

Those negotiations culminated in a Global Settlement[3] which provided comprehensive terms for the extension of the CBAs, wage structure modifications, benefit modifications, work and scope rule changes and elimination of Non-Pension Retiree Benefits for both Union employees and retirees generating in excess of $100 million in annual expense savings for the Debtors. The Global Settlement also included certain key terms for a plan of reorganization based upon a material equity investment agreement by Centerbridge (the "Original Centerbridge Agreement"). On July 6, 2007, the Debtors filed a motion (the "Settlement Motion") seeking

---

[2] In accordance with the timetable of section 1113, this Court was scheduled to render a decision on the Labor Motion on April 30, 2007. The parties, however, requested that the Court hold off issuing its completed written decision to allow the Debtors and the Unions time to negotiate a potential resolution of these disputes.

[3] The Global Settlement was implemented in three agreements: (a) the two settlement agreements between the Debtors and each of the Unions; (b) the Plan Support Agreement dated July 26, 2007, among the Debtors, the Unions, Centerbridge and certain of its affiliates and various holders of unsecured claims that agreed to support the Plan (the "Supporting Creditors"); and (c) an investment agreement dated July 26, 2007, between the Debtors and Centerbridge (the "Original Centerbridge Agreement").

approval of the Global Settlement with the Unions (the "Union Settlements") as well as the Original Centerbridge Agreement. The Debtors concurrently submitted a letter to the Court stating that if the Settlement Motion were approved, then the Debtors would withdraw the Labor Motion. As indicated above, Appaloosa was little more than a bystander to the construct of the Global Settlement forged by others.

Under the Original Centerbridge Agreement, Centerbridge proposed a cash payment of $300 million in exchange for all of the Series A Preferred stock (the "Series A Preferred") that would be issued by the reorganized Dana. The Original Centerbridge Agreement also provided for an additional $450 million contribution by Centerbridge and other investors chosen by Centerbridge and the Debtors in exchange for the Series B Preferred stock (the "Series B Preferred") that would be issued by the reorganized Dana. Of that $450 million, Centerbridge agreed to backstop the purchase of $200 million of the Series B Preferred. In addition, the agreement provided Centerbridge with a break-up fee of $15 million or $22.5 million depending on the alternative transaction the Debtors accepted, if they eventually did so. Finally, as part of the agreement, Centerbridge would receive the right to choose the reorganized Dana's board of directors.

After the framework of the Global Settlement was announced by the Debtors in July 2007, Appaloosa reappeared and expressed its interest in potentially making an investment in the Debtors. To that end, Appaloosa executed a confidentiality agreement dated July 21, 2007 (the "Confidentiality Agreement") which, among other things, restricted Appaloosa's ability to newly acquire a beneficial ownership of claims against the Debtors.

The Creditors' Committee, Wilmington Trust Company as Indenture Trust, GK Capital,

LLC, Timken Company, Brandes Investment Partners and Appaloosa filed objections to the Settlement Motion, voicing concerns regarding, among other things, the relationship between Centerbridge and the Unions, the lack of any meaningful discussion regarding the treatment of equity under the plan and arguing that the terms of the Original Centerbridge Agreement were prejudicial.

On July 18, 2007, Appaloosa submitted its own offer (the "First Appaloosa Bid") wherein, Appaloosa committed to fund and perform Centerbridge's obligations as set forth in the Original Centerbridge Agreement in exchange for the consideration to be provided to Centerbridge thereunder. The First Appaloosa Bid also waived any break-up fee and enhanced the conversion price somewhat.

On July 19, 2007, USW sent a letter to the Debtors urging them to retain Centerbridge as the lead investor despite the First Appaloosa Bid and the Debtors did so. On July 25, 2007, Centerbridge altered the terms of the Original Centerbridge Agreement (the "Second Centerbridge Agreement"). The Second Centerbridge Agreement decreased Centerbridge's cash commitment for the Series A Preferred Stock by $50 million, but increased its backstop obligation to $250 million of the new $500 million of the riskier Series B Preferred. Centerbridge also eliminated the condition in the Original Centerbridge Agreement that all investors of the Series B Preferred be chosen by Centerbridge and the Debtors. Instead, the Second Centerbridge Agreement required that only creditors (the "Supporting Creditors") of the Debtors who, among other things, signed a plan support agreement (the "Plan Support Agreement") and held $25 million or more in aggregate of unsecured claims (the "Qualified Investors") had the right to purchase the Series B Preferred.

On that same day, Appaloosa submitted another competing offer (the "Second Appaloosa Bid") which differed from the Second Centerbridge Agreement by eliminating the Qualified Investor requirement and, instead, offered the right to purchase the Series B Preferred at par to all holders of allowed unsecured claims on a pro rata basis. Under the Second Appaloosa Bid, Appaloosa and certain other entities would backstop all $500 million of Series B Preferred not purchased by the holders of the allowed unsecured claims resulting in a guaranteed equity infusion of $750 million.

On August 1, 2007, this Court issued a process order for approval of the Global Settlement, with certain modifications, and establishing formal competitive bidding procedures that allowed the Debtors to consider alternative proposals. Despite the fact that Appaloosa signed onto the Plan Support Agreement[4] as a Supporting Creditor,[5] Appaloosa appealed the Settlement Order (the "Appaloosa Appeal") on August 13, 2007. [6]

---

[4] The Plan Support Agreement obligated Supporting Creditors who had executed the agreement to (i) support the prosecution, confirmation and consummation of the Plan and (ii) not delay, impede, appeal or take any action to interfere with the acceptance or confirmation of the Plan. See Plan Support Agreement §§ 4.1, 4.2. Additionally, by executing the Plan Support Agreement, Appaloosa agreed to engage in good faith negotiations with the other parties thereto regarding the Plan. *See* Plan Support Agreement § 4.3.

[5] Under the Investment Agreement, approved by the Court in connection with the Global Settlement, holders of the Debtors' debt securities wishing to qualify their bonds for participation in the purchase of the new Series B preferred stock were obligated, among other things, to execute and deliver a signature page to the Plan Support Agreement by August 13, 2007. Compliance with the Plan Support Agreement was a prerequisite to the ability of creditors to subscribe for the new Series B preferred stock. On August 13, 2007, Appaloosa executed and delivered a signature page to the Plan Support Agreement as a Supporting Creditor in an apparent attempt to qualify itself to subscribe for the Series B preferred.

[6] By letter dated August 22, 2007 the Debtors informed Appaloosa, as a signatory, that the Appeal was a breach of the Plan Support Agreement. *See Objection of the Ad Hoc Committee of Dana Noteholders to Motion of Debtors and Debtors in Possession, Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, for an Order Approving a Settlement Agreement Among the Debtors, the Official Committee of Unsecured Creditors and Appaloosa Management, L.P.* Ex. A, dated November

The Global Settlement Order set forth a process for the receipt and consideration of proposals for alternative to the Centerbridge investment by "qualified potential investors." Pursuant to such process, Appaloosa submitted an indication of interest to the Debtors on August 17, 2007. The Debtors, in turn, invited Appaloosa to participate in the next phase of the bidding process and to submit a firm and final offer. During the next two months, the Debtors (along with other constituencies, including the Creditors' Committee) continued to negotiate with both Centerbridge and Appaloosa. Ultimately, however, after negotiation with both Centerbridge and Appaloosa, Dana's board of directors determined to reject the Appaloosa offer as inferior to the Centerbridge proposal.

According to the Debtors, Appaloosa indicated to them that this action by Dana's board of directors might lead Appaloosa to object to confirmation of the Plan or potentially take other action contrary to the Debtors' interests.[7] On October 23, 2007, this Court approved the Final Centerbridge Agreement[8] as modified through negotiations between the Debtors, Centerbridge,

---

27, 2007 (ecf doc. 7125).

[7] *See Motion of Debtors and Debtors in Possession, Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, for an Order Approving a Settlement Agreement Among the Debtors, the Official Committee of Unsecured Creditors and Appaloosa Management, L.P.*, dated November 21, 2007 (ecf doc. 7051).

[8] The Final Centerbridge Agreement provided for a total guaranteed equity investment of up to $790 million, under which Centerbridge would still purchase all $250 million of the Series A Preferred, and the Qualified Investors would still have an opportunity to purchase an additional $540 million in aggregate liquidation preference of the Series B Preferred on a pro rata basis. Further, Centerbridge would still backstop the purchase of $250 million in aggregate of the Series B Preferred, but in addition, certain members of the steering committee for the Ad Hoc Steering Committee agreed to backstop the purchase of the remaining $290 million in the Series B Preferred Stock. Thus, under the Final Centerbridge Agreement, the reorganized Debtors received a contractual assurance of a guaranteed $790 million investment through the initial offering and the backstop commitments. Under the Final Centerbridge Agreement, Centerbridge, the Debtors, the Ad Hoc Steering Committee, and the Creditors' Committee also agreed to an additional cash recovery for the holders of allowed unsecured claims that had been ineligible to purchase the Series B Preferred under prior iterations of Centerbridge's proposal (the "Non-

10

the Ad Hoc Committee and the Creditors' Committee. The modifications to the original Centerbridge proposal were responsive to the threats of the Creditors' Committee to object to confirmation of the Debtors' Plan. On the same day, this Court approved the Debtors' Third Amended Disclosure Statement.

**Appaloosa's activities subsequent to its appeal**

During the negotiations, the Debtors and Appaloosa had entered into a number of stipulated orders that delayed the briefing of the Appaloosa Appeal in anticipation of a consensual resolution. The parties however, failed to timely reach a consensus to further delay briefing and Appaloosa filed its opening brief on November 8, 2007. [9]

By mid-November, the Appaloosa Appeal remained one of the major potential obstacles to confirmation of the Plan. In order to overcome such obstacle, on November 20, 2007, the Debtors, the Creditors' Committee and Appaloosa entered into a settlement agreement (the "Appaloosa Settlement Agreement") which required Appaloosa to reaffirm its obligation to support the Plan, withdraw the Appaloosa Appeal and refrain from taking other actions that would serve to interfere with the Final Centerbridge Agreement or delay or impede confirmation of the Plan. The Settlement Agreement also served to permit Appaloosa to acquire unsecured claims prior to the November 28, 2007 record date established by the Plan and the Investment Agreement for determining parties entitled to purchase new Series B preferred stock.

---

Qualified Investors"). Specifically, the Final Centerbridge Agreement established a settlement pool of $40 million in cash, from which the Non-Qualified Investors (whose claims were estimated at roughly $180 million) could receive up to an additional $0.085 per $1.00 of allowed ineligible unsecured claims.

[9] According to the Ad Hoc Committee, Appaloosa only submitted its opening brief in the Appaloosa Appeal after its final alternative investment proposal was rejected and after its initial demands for reimbursement of its expenses were rejected by the Debtors, Centerbridge and the Ad Hoc Committee.

<u>In return</u>, the Appaloosa Settlement Agreement provided that the Creditors' Committee would support,[10] and the Debtors would take no position with respect to, a motion by Appaloosa under section 503(b) of the Bankruptcy Code seeking reimbursement of fees and expenses not to exceed $2 million incurred in connection with the Debtors' chapter 11 cases. Additionally, the Debtors and the Creditors' Committee would waive certain claims for breach of contract against Appaloosa under the Plan Support Agreement.

The Ad Hoc Steering Committee objected to the Appaloosa Settlement Motion claiming that Appaloosa had breached the Plan Support Agreement and the Debtors and Creditors' Committee could not unilaterally waive that breach without the consent of all parties to the agreement. After a chamber's conference with the Court on the date set for the hearing, however, the Debtors withdrew their motion to approve the Appaloosa Settlement. Despite its failure to gain approval of the Appaloosa Settlement, Appaloosa withdrew the Appaloosa Appeal on December 10, 2007, two days before the commencement of the Confirmation Hearing on December 12. On December 26, 2007, this Court signed the order confirming the Plan and the Plan became effective on January 31, 2008.

*Discussion*

Section 503(b) of the Bankruptcy Code authorizes the bankruptcy court to award compensation to creditors for their legal and other expenses incurred in making a substantial

---

[10] It was not clear what standing the Creditors' Committee had to enter into the Settlement as it was not a party to the Appaloosa Appeal or to the Plan Support Agreement and had no apparent dispute with Appaloosa. In an obvious attempt to appease an aggressive litigant, the anxious Creditors' Committee supported the proposed settlement in consideration that its advance acquiescence to a future section 503(b) application would be accompanied by a current quid pro quo withdrawal of the Appaloosa Appeal. At a chambers conference, the questionable aspects of the Appaloosa Settlement Agreement was explored by this Court.

contribution to the case.[11] 11 U.S.C. § 503(b). The burden of proof is on the applicant to demonstrate by a preponderance of the evidence that it has made a substantial contribution in the case. *In re Randall's Island Golf Ctrs., Inc.,* 300 B.R. 590, 598 (Bankr. S.D.N.Y. 2003); *In re Granite Partners*, 213 BR 440, 445 (Bankr. S.D.N.Y. 1997); *In re Best Products Co., Inc.*, 173 B.R. 862, 865 (Bankr.S.D.N.Y.1994). "The substantial contribution test is intended to promote meaningful creditor participation in the reorganization process, but not to encourage mushrooming administrative expenses." *See Granite Partners*, 213 B.R. at 445; *Best Products,* 173 B.R. at 865. Inherent in the term "substantial" is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests. *Lebron v. Mechem Financial Inc*., 27 F.3d 937, 944 (3d Cir. 1994). "Creditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily in their own interests." *In re U.S. Lines, Inc*., 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989) *aff'd* 1991WL 67464 (S.D.N.Y. 1991) ; *accord In re Hooker*

---

[11] The section provides, in pertinent part, as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including-

....

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by-

....

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title.

...

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

*Investments, Inc.*, 188 B.R. 117, 120 (S.D.N.Y. 1995), *aff'd.*, 104 F.3d 349 (2nd Cir. 1996). Efforts undertaken by creditors solely to further their own self interest are not compensable under section 503(b). *In re Lister*, 846 F.2d 55, 57 (10th Cir.1988). Finally, services calculated primarily to benefit the client do not justify an award even if they also confer an indirect benefit on the estate. *United States Lines*, 103 B.R. at 430. Thus, the general rule remains that attorneys must look to their own clients for payment. *In re McLean Industries, Inc*., 88 B.R. 36, 38 (Bankr. S.D.N.Y. 1988). "The integrity of section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate." *Best Products*, 173 B.R. at 866. Thus, compensation under section 503 is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate. *Id.*

Although the term "substantial contribution" is not defined in the Code, courts have found that an applicant satisfies the substantial contribution test when it has provided "actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders." *U.S. Lines*, 103 B.R. at 429. Factors which the courts have considered in determining whether an applicant has made a substantial contribution in a chapter 11 case include: whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct, significant and demonstrably positive benefit upon the estate; and whether the services were duplicative of services performed by others. *Best Products*, 173 B.R. at 865. "A court may also consider whether the applicant's noncompensable activities increased the administrative costs to the estate." *Granite Partners*, 213 B.R. at 445; *see also In re Alert Holdings Inc.*, 157 B.R. 753, 759 (Bankr. S.D.N.Y. 1993).

Appaloosa contends that it produced a demonstrable benefit to the Debtors, their creditors and estates by objecting to the Original Centerbridge Agreement and continuing to make counter proposals that offered the Debtors allegedly superior investment transactions. Appaloosa claims that but for Appaloosa's objections and efforts in putting forth multiple unsolicited alternative investment proposals, Centerbridge would not have had any economic incentive to provide the substantial additional monetary benefits contained in the Final Centerbridge Agreement which provided for an investment in the Debtors that is substantially superior to Centerbridge's initial offer. Thus, Appaloosa argues, it and its professionals provided a substantial contribution to these chapter 11 cases because its actions resulted in a material monetary benefit to the Debtors' estates. Specifically, Appaloosa contends that by objecting to the Original Centerbridge Agreement and submitting multiple counteroffers, Appaloosa increased the guaranteed investment in the reorganized Debtors by $290 million.

The Ad Hoc Committee counters credibly, however, that the substantial changes to the economic terms of the Centerbridge investment that benefitted creditors were principally achieved through negotiations between Centerbridge and the Ad Hoc Committee and not, as Appaloosa suggests, in response to Appaloosa's proposals. In particular, (i) the change in terms from $300 million of financing to be provided by Centerbridge and $450 million of financing to be provided by parties chosen by Centerbridge, to $250 million of financing to be provided by Centerbridge and ultimately $540 million of financing to be provided by creditors; and (ii) the inclusion of the Qualified Investor criteria for creditor participation, rather than a selection process to be controlled by Centerbridge, were brought to bear through the insistence of the Ad

Hoc Committee on these points. Moreover, Appaloosa's proposals contained material conditions that <u>never</u> made them viable, failed to address the fees that would be payable to Centerbridge, and most importantly, <u>never</u> carried the support of the Unions which was necessary to the Union Settlements that were integral to the Global Settlement and thus were rejected by the Debtors and the other major constituencies in the cases. In approving the Global Settlement the Court concurred with the negative assessments of the Appaloosa proposals.

The UST also objects on the grounds that Appaloosa is, in essence, nothing more than a losing bidder who stands in sharp contrast to Centerbridge which was intimately involved in the plan process and completed a final investment agreement with the Debtors. The UST contends that Appaloosa, which pursued membership in the Equity Committee only to resign six months later and then unsuccessfully pursue an investment opportunity in the Debtors, has not overcome the presumption that it acted only in its self-interest.

I agree.

Appaloosa was, in its own words, "a determined, prospective investor." As noted by the Ad Hoc Committee, to the extent that Appaloosa's objections played a role in the implementation of the alternative investment procedures under the Global Settlement Order, no party was better served by the implementation of those procedures than Appaloosa itself because no party other than Appaloosa showed a serious interest in making an alternative proposal. *See In re Kidron, Inc.*, 278 B.R. 626, 630-31 (Bankr. M.D. Fla. 2002) (holding that "expenses incurred by a creditor with respect to merely participating as a bidder in the purchase of a debtor's assets in a chapter 11 case are not 'incurred by a creditor in making a substantial contribution' to a chapter 11 case."); *In re Granite Partners*, 213 B.R. at 450-55 (denying

16

applications of law firms representing investors and group of equity holders for allowance of fees and expenses under section 503(b)); *In re Public Service Co. of New Hampshire*, 160 B.R. 404, 452 (Bankr. D.N.H. 1993) (when a creditor is pursuing its own economic self-interest, as by definition it does as a bidder at a bankruptcy auction, then that creditor cannot establish the requisite "direct benefit" required to establish a substantial contribution). Moreover, other parties including the Creditors' Committee, sought and obtained an order providing for a competitive investment process. Parenthetically, it was the Court in a chambers conference that "greenlighted" the process only after being satisfied that the opportunity for competitive investment offers was preserved. Throughout its application, Appaloosa assumes credit for a large share of the efforts and productive activities of others, especially those of the Ad Hoc Committee and the now disbanded Creditors' Committee.

Appaloosa also claims that its offer in the Second Appaloosa Bid to allow all unsecured creditors to participate in the purchase of Series B Preferred resulted in the additional benefit of a $40 million "true-up" payment being distributed to Non-Qualified Investors. The Ad Hoc Committee however contends that the treatment of those creditors was a subject of debate from early on in the negotiations concerning the Centerbridge Agreement among the Debtors, Centerbridge the Ad Hoc Committee and the Creditors' Committee. The Amended Support Agreement filed on July 26, 2007, contemplated these discussions which had little to do with Appaloosa's proposals.[12] The Ad Hoc Committee explains that it was the strenuous objection

---

[12] The Plan Term Sheet that is an exhibit to the Amended Plan Support Agreement provides in relevant part, under the heading "Treatment of Unsecured Creditors" that "Unsecured Creditors that are not Qualified Investors... will receive an amount of cash or New Common Stock that is (i) determined to be reasonably acceptable to the Debtors, Centerbridge and the Supporting Creditors and (ii) approved by the Bankruptcy Court."

raised by the Creditors' Committee and the desire of the major constituencies in these cases to arrive at a consensual resolution that the $40 million settlement pool was established. To the extent Appaloosa's actions played some role in achieving that result, it is insufficient to rise to the level of a substantial contribution.

In actuality, any proposed investor in these cases had to have the support of the Unions and the Debtors' labor force in order to achieve a successful reorganization. Appaloosa knew that it did not have that support but it continued to proffer unrealistic proposals. Moreover, apparently acting in furtherance of its own economic interest, Appaloosa signed the Plan Support Agreement in order to preserve its option to participate in the Centerbridge investment should it be unsuccessful in realizing its alternative investment proposals. As recounted hereinabove, despite its obligations to support the Debtors' Plan, Appaloosa nonetheless appealed the Global Settlement Order. Appaloosa then attempted to use its appeal of the Global Settlement Order to extract a settlement with the Debtors and the pro appeasement Creditors' Committee to support its fees. This Court, concerned with the merits of a linkage of section 503(b) relief with a quid pro quo appeal withdrawal, questioned the propriety of the Appaloosa Settlement. Appaloosa eventually withdrew its appeal without further pursuing a settlement. Rather than contributing to the Debtors' reorganization, Appaloosa has cost the parties in interest in these chapter 11 cases considerable time and expense on nonviable proposals and what could be considered a dilatory appeal despite its having signed onto the Plan Support Agreement with its preclusive appellate provisions.

**Conclusion**

Appaloosa has failed to meet its burden in establishing that it has made a substantial contribution to these cases. The contribution that Appaloosa claims to have made to these cases was primarily the result of negotiations among the parties to the Global Settlement and the Creditors' Committee. Moreover, as a prospective bidder, Appaloosa's actions were hardly extraordinary and were taken essentially for its own economic self interest with any incidental benefit to the Debtors' estates from its actions failing, as a matter of law, to rise to the level of a substantial contribution within the meaning of section 503(b) of the Bankruptcy Code. Accordingly, for the foregoing reasons, the motion is denied.

IT IS SO ORDERED.

Dated: New York, New York
    June 19, 2008

/s/ Burton R. Lifland
United States Bankruptcy Judge